# United States Court of Appeals
# for the District of Columbia Circuit

### No. 23-7160

AENERGY, S.A.,

*Plaintiff-Appellant,*

*v.*

REPUBLIC OF ANGOLA; MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA; MINISTRY OF FINANCEOF THE REPUBLIC OF ANGOLA; EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP; EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:22-cv-02514-TNM, Honorable Trevor Neil McFadden, U.S. District Judge*

## JOINT APPENDIX

<div style="display:flex">

KIRAN NASIR GORE
LAW OFFICES OF KIRAN N. GORE, PLLC
1050 30th Street, NW
Washington, DC 20007
(917) 589-8714
kng@gorelaw.com

- and -

MICHAEL D. EHRENSTEIN
EHRENSTEIN | SAGER
2800 Ponce De Leon Boulevard,
   Suite 1400
Coral Gables, Florida 33134
(305) 503-5930
mike@ehrensteinsager.com

*Counsel for Defendants-Appellees*

VINCENT LEVY
KEVIN D. BENISH
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
(646) 837-5151
vlevy@hsgllp.com
kbenish@hsgllp.com

*Counsel for Plaintiff-Appellant*

</div>

March 4, 2024

CP COUNSEL PRESS   (800) 4-APPEAL • (327832)

# TABLE OF CONTENTS

          **Page**

Docket Entries ........................................................................... A1

Defendant's Notice of Related Cases, dated December 20, 2022 .......... A10

First Amended Complaint, dated February 15, 2023 ........................... A12

Declaration of Henrique Abecasis in Support of the Angolan
  Defendants' Motion to Dismiss Complaint, dated
  March 8, 2023 ...................................................................... A40

Supplemental Declaration of Henrique Abecasis in Support of the
  Angolan Defendants' Motion to Dismiss Plaintiff's First Amended
  Complaint, dated March 8, 2023 ............................................. A43

Declaration of Michael Ehrenstein, Esq., in Support of the Angolan
  Defendants' Motion to Dismiss Plaintiff's First Amended
  Complaint, dated March 8, 2023 ............................................. A53

Declaration of Alberto Sérgio Raimundo in Support of Plaintiff's
  Opposition to Defendants' Motion to Dismiss, dated
  March 29, 2023 ...................................................................... A55

Declaration of Lino Diamvutu, PhD in Support of the Angolan
  Defendants' Motion to Dismiss Plaintiff's First Amended
  Complaint, dated April 19, 2023 ............................................. A79

Declaration of Henrique Abecasis in Support of the Angolan
  Defendants' Reply Memorandum of Points and Authorities in
  Further Support of the Angolan Defendants' Motion to Dismiss
  Plaintiff's First Amended Complaint, dated April 19, 2023 ............... A103

Supplemental Declaration of Michael Ehrenstein, Esq. in Further
  Support of the Angolan Defendants' Motion to Dismiss Plaintiff's
  First Amended Complaint, dated April 19, 2023 ................................. A105

Exhibit A to Memorandum in Opposition -
  Selected Overview of the Angolan Defendants' Arguments in the
  Motion to Dismiss which draw upon Dkt. Nos. 43, 45-1,
  45-2, and 45-3 ...................................................................... A107

Memorandum Opinion, dated June 20, 2023 ......................................... A112

Order, dated June 20, 2023 ..................................................... A142

Declaration of Henrique Abecasis in Support of the Angolan
   Defendants' Opposition to Plaintiff's FRCP 59(E) Motion for
   Reconsideration of Dkts. 49 and 50, dated August 1, 2023 ................. A143

Notice of Disposition of Related Cases, dated October 2, 2023 ............ A146

Order, dated October 27, 2023 ................................................ A149

Notice of Appeal, dated November 27, 2023 ......................................... A155

**U.S. District Court**
**District of Columbia (Washington, DC)**
**CIVIL DOCKET FOR CASE #: 1:22–cv–02514–TNM**

AENERGY, S.A. v. REPUBLIC OF ANGOLA et al
Assigned to: Judge Trevor N. McFadden
Demand: $1,000,000,000
Case in other court:  USCA, 23–07160
Cause: 28:1330 Breach of Contract

Date Filed: 08/22/2022
Date Terminated: 06/20/2023
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

**Plaintiff**

**AENERGY, S.A.**                represented by    **Kevin D. Benish**
HOLWELL SHUSTER & GOLDBERG
LLP
425 Lexington Avenue
14th Floor
New York City, NY 10017
646–837–8349
Email: kbenish@hsgllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vincent Levy**
HOLWELL SHUSTER & GOLDBERG
LLP
425 Lexington Avenue
14th Floor
New York, NY 10017
646–837–5120
Email: vlevy@hsgllp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**REPUBLIC OF ANGOLA**          represented by    **Kiran Nasir Gore**
LAW OFFICES OF KIRAN N. GORE,
PLLC
1050 30th Street NW
Washington, DC 20007
917–589–8714
Email: kng@gorelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael David Ehrenstein**
EHRENSTEIN SAGER
2800 Ponce De Leon Boulevard
Suite 1400
Coral Gables, FL 33134
305–503–5930
Email: mike@ehrensteinsager.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MINISTRY OF ENERGY AND**       represented by    **Kiran Nasir Gore**
**WATER OF THE REPUBLIC OF**                       (See above for address)
**ANGOLA**                                         *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Michael David Ehrenstein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA** | represented by | **Kiran Nasir Gore** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Michael David Ehrenstein** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP** | represented by | **Kiran Nasir Gore** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Michael David Ehrenstein** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE** | represented by | **Kiran Nasir Gore** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Michael David Ehrenstein** (See above for address) *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 08/22/2022 | 1 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 402 receipt number ADCDC−9459716) filed by AENERGY, S.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons)(Levy, Vincent) Modified on 8/24/2022 to edit docket text (znmg). (Entered: 08/22/2022) |
| 08/22/2022 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AENERGY, S.A. (Levy, Vincent) (Entered: 08/22/2022) |
| 08/22/2022 | 3 | MOTION to Stay *pending US Supreme Court petition for a writ of certiorari* by AENERGY, S.A.. (Levy, Vincent) (Entered: 08/22/2022) |
| 08/24/2022 | | NOTICE OF ERROR re 1 Complaint; emailed to vlevy@hsgllp.com, cc'd 3 associated attorneys –– The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & full residence address of each party using the event Errata., 2. Incorrect coversheet. Please use the cover sheet at https://www.dcd.uscourts.gov/new−case−forms & file |

| | | |
|---|---|---|
| | | using the event Civil Cover Sheet., 3. Missing/incorrect summonses. Please submit using the event Request for Summons to issue., 4. For defendants with foreign mailing addresses, summons 28 USC 1608 must be used., 5. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (znmg, ) (Entered: 08/24/2022) |
| 08/24/2022 | 4 | CIVIL COVER SHEET by AENERGY, S.A. filed by AENERGY, S.A..(Levy, Vincent) (Entered: 08/24/2022) |
| 08/24/2022 | 5 | REQUEST FOR SUMMONS TO ISSUE filed by AENERGY, S.A..(Levy, Vincent) (Entered: 08/24/2022) |
| 08/24/2022 | 6 | ERRATA by AENERGY, S.A. re 1 Complaint,. (Attachments: # 1 Corrected Complaint)(Levy, Vincent) (Entered: 08/24/2022) |
| 08/26/2022 | | Case Assigned to Judge Trevor N. McFadden. (znmg) (Entered: 08/26/2022) |
| 08/26/2022 | 7 | SUMMONS (5) Issued Electronically as to All Defendants. (Attachment: # 1 Notice and Consent)(znmg) (Entered: 08/26/2022) |
| 08/26/2022 | 8 | STANDING ORDER Establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 8/26/22. (lctnm2) (Entered: 08/26/2022) |
| 08/30/2022 | | MINUTE ORDER denying without prejudice Plaintiff's 3 Motion to Stay. Pursuant to the Court's 8 Standing Order, Plaintiff shall begin service of process on the Defendants. SO ORDERED. Signed by Judge Trevor N. McFadden on 8/30/22. (lctnm2) (Entered: 08/30/2022) |
| 09/15/2022 | 9 | AFFIDAVIT REQUESTING FOREIGN MAILING *re Defendants Republic of Angola; Ministry of Energy and Water of The Republic of Angola; Ministry of Finance of The Republic of Angola; Empresa Publica De Producao De Electricidade, EP; and Empresa Nacional De Distribuicao De Electricidade* by AENERGY, S.A.. (Levy, Vincent) (Entered: 09/15/2022) |
| 10/13/2022 | 10 | REQUEST from AENERGY, S.A.. for the Clerk to effect service of one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by DHL, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (zed) (Entered: 10/13/2022) |
| 10/14/2022 | 11 | CERTIFICATE OF CLERK of mailing one copy of the summons and complaint, together with a translation of each into the official language of the foreign state on 10/14/2022, by DHL, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. 1608(a)(3). (Attachment: # 1 Waybill) (zed) (Entered: 10/18/2022) |
| 10/27/2022 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE served on 10/24/2022, answer due 12/23/2022; EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP served on 10/24/2022, answer due 12/23/2022; MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA served on 10/24/2022, answer due 12/23/2022; MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA served on 10/24/2022, answer due 12/23/2022; REPUBLIC OF ANGOLA served on 10/27/2022, answer due 12/26/2022. (Attachments: # 1 Exhibit Proof of Service)(Levy, Vincent) (Entered: 10/27/2022) |
| 11/07/2022 | 13 | NOTICE of Appearance by Kevin D. Benish on behalf of AENERGY, S.A. (Benish, Kevin) (Entered: 11/07/2022) |
| 12/20/2022 | 14 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, 6 Errata, 12 Summons Returned Executed as to foreign state or agency,, by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Text of Proposed Order)(Gore, Kiran) (Entered: 12/20/2022) |

| 12/20/2022 | 15 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA (Gore, Kiran) (Entered: 12/20/2022) |
|---|---|---|
| 12/20/2022 | 16 | NOTICE OF RELATED CASE by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. Case related to Case No. 20−cv−3569 (JPC) (S.D.N.Y). (Gore, Kiran) (Entered: 12/20/2022) |
| 12/20/2022 | 17 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Michael Ehrenstein, Filing fee $ 100, receipt number ADCDC−9746017. Fee Status: Fee Paid. by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit Declaration of Michael Ehrenstein, esq. In support of motion for admission pro hac vice, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Gore, Kiran) (Entered: 12/20/2022) |
| 12/20/2022 | | MINUTE ORDER granting 17 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/20/2022. (lctnm2) (Entered: 12/20/2022) |
| 12/20/2022 | | MINUTE ORDER granting Defendants' 14 Unopposed Motion for Extension of Time to File Answer. The Defendants shall have through and including January 25, 2023, to respond to the complaint. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/20/2022. (lctnm2) (Entered: 12/20/2022) |
| 12/20/2022 | | Set/Reset Deadlines: Answer due by 1/25/2023. (hmc) (Entered: 12/20/2022) |
| 12/27/2022 | 18 | NOTICE of Appearance by Michael David Ehrenstein on behalf of All Defendants (Ehrenstein, Michael) (Main Document 18 replaced on 12/28/2022) (zed). (Entered: 12/27/2022) |
| 01/25/2023 | 19 | MOTION to Dismiss , MOTION to Dismiss for Lack of Jurisdiction by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Memorandum in Support Motion to Dismiss, # 2 Text of Proposed Order)(Gore, Kiran) (Entered: 01/25/2023) |
| 01/25/2023 | 20 | DECLARATION *of Henrique Abecasis in Support of the Angolan Defendants' Motion to Dismiss Plaintiff's Complaint, dated January 24, 2023, with Exs 1–17* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 19 MOTION to Dismiss MOTION to Dismiss for Lack of Jurisdiction filed by EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit 1 Power Plant Contract 1, # 2 Exhibit 2 Power Plant Contract 2, # 3 Exhibit 3 Power Plant Contract 3, # 4 Exhibit 4 Power Plant Contract 4, # 5 Exhibit 5 Power Plant Contract 5, # 6 Exhibit 6 Power Plant Contract 6, # 7 Exhibit 7 Power Plant Contract 7, # 8 Exhibit 8 Power Plant Contract 8, # 9 Exhibit 9 Power Plant Contract 9, # 10 Exhibit 10 Power Plant Contract 10, # 11 Exhibit 11 Power Plant Contract 11, # 12 Exhibit 12 Power Plant Contract 12, # 13 Exhibit 13 Power Plant Contract 13, # 14 Exhibit 14 Translation of Arbitration Forum Selection Clauses, # 15 Exhibit 15 Summary of Invoices, # 16 Exhibit 16 Loose Translation of MINEA Ltr to Aenergy, # 17 Exhibit |

| | | |
|---|---|---|
| | | 17 Translation of Complaint in Angola Case)(Gore, Kiran) (Entered: 01/25/2023) |
| 02/08/2023 | 21 | NOTICE *Re: Plaintiff's Forthcoming First Amended Complaint (due Feb. 15, 2023)* by AENERGY, S.A. (Levy, Vincent) (Entered: 02/08/2023) |
| 02/15/2023 | 22 | AMENDED COMPLAINT against All Defendants filed by AENERGY, S.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit Redline of Amended Complaint per Standing Order)(Levy, Vincent) (Entered: 02/15/2023) |
| 02/16/2023 | | MINUTE ORDER: In light of Plaintiffs 22 Amended Complaint, Defendants' 19 Motion to Dismiss is denied without prejudice as moot. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/16/2023. (lctnm2) (Entered: 02/16/2023) |
| 02/23/2023 | 23 | MOTION for Extension of Time to File Answer re 22 Amended Complaint, by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Text of Proposed Order Proposed Order)(Gore, Kiran) (Entered: 02/23/2023) |
| 02/24/2023 | | MINUTE ORDER granting 23 Motion for Extension of Time to File Answer. Defendants' responsive pleading shall now be due on or before March 8, 2023. SO ORDERED. Signed by Judge Trevor N. McFadden on 2/24/2023. (lctnm2) (Entered: 02/24/2023) |
| 02/24/2023 | | Set/Reset Deadlines: Answer due by 3/8/2023. (hmc) (Entered: 02/24/2023) |
| 03/08/2023 | 24 | MOTION to Dismiss *Amended Complaint* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Memorandum in Support Motion to Dismiss, # 2 Text of Proposed Order)(Gore, Kiran) (Entered: 03/08/2023) |
| 03/08/2023 | 25 | DECLARATION *of Henrique Abecasis in Support of the Angolan Defendants' Motion to Dismiss Plaintiff's Complaint, with Exs 1−17, dated Jan 24, 2023* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 24 MOTION to Dismiss *Amended Complaint* filed by EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit Ex 1 Power Plant Contract 1, # 2 Exhibit Ex 2 Power Plant Contract 2, # 3 Exhibit Ex 3 Power Plant Contract 3, # 4 Exhibit Ex 4 Power Plant Contract 4, # 5 Exhibit Ex 5 Power Plant Contract 5, # 6 Exhibit Ex 6 Power Plant Contract 6, # 7 Exhibit Ex 7 Power Plant Contract 7, # 8 Exhibit Ex 8 Power Plant Contract 8, # 9 Exhibit Ex 9 Power Plant Contract 9, # 10 Exhibit Ex 10 Power Plant Contract 10, # 11 Exhibit Ex 11 Power Plant Contract 11, # 12 Exhibit Ex 12 Power Plant Contract 12, # 13 Exhibit Ex 13 Power Plant Contract 13, # 14 Exhibit Ex 14 Translation of Arbitration Forum Selection Clauses, # 15 Exhibit Ex 15 Summary of Invoices, # 16 Exhibit Ex 16 Loose Translation of MINEA Ltr to Aenergy, # 17 Exhibit Ex 17 Translation of Complaint in Angola Case)(Gore, Kiran) (Entered: 03/08/2023) |
| 03/08/2023 | 26 | DECLARATION *of Henrique Abecasis in Support of the Angolan Defendants' Motion to Dismiss Plaintiff's Complaint, with Exs 1−2, dated Mar 8, 2023* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 24 MOTION to Dismiss *Amended Complaint* filed by EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, |

| | | |
|---|---|---|
| | | REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit 1 – Presidential Decree, # 2 Exhibit 2 – Law No 11/13)(Gore, Kiran) (Entered: 03/08/2023) |
| 03/08/2023 | 27 | DECLARATION *of Michael Ehrenstein in Support of the Angolan Defendants' Motion to Dismiss Plaintiff's Complaint, with Ex 1, dated Mar 8, 2023* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 24 MOTION to Dismiss *Amended Complaint* filed by EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit 1 – February 24, 2023 letter)(Gore, Kiran) (Entered: 03/08/2023) |
| 03/09/2023 | 28 | First MOTION for Extension of Time to File Response/Reply as to 24 MOTION to Dismiss *Amended Complaint* by AENERGY, S.A.. (Levy, Vincent) (Entered: 03/09/2023) |
| 03/10/2023 | | MINUTE ORDER granting 28 First Motion for Extension of Time to File/Response Reply. Plaintiff's opposition to Defendants' 24 Motion to Dismiss Amended Complaint shall now be due on or before March 29, 2023. Defendants' Reply shall now be due on or before April 5, 2023. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/10/2023. (lctnm2) (Entered: 03/10/2023) |
| 03/10/2023 | | Set/Reset Deadlines: Plaintiff's opposition due by 3/29/2023. Defendant's reply due by 4/5/2023. (hmc) (Entered: 03/10/2023) |
| 03/29/2023 | 29 | Memorandum in opposition to re 24 Motion to Dismiss, filed by AENERGY, S.A.. (Levy, Vincent) (Entered: 03/29/2023) |
| 03/29/2023 | 30 | DECLARATION *ALBERTO SRGIO RAIMUNDO* by AENERGY, S.A. re 29 Memorandum in Opposition filed by AENERGY, S.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Levy, Vincent) (Entered: 03/29/2023) |
| 03/29/2023 | 31 | DECLARATION *OF VINCENT LEVY* by AENERGY, S.A. re 29 Memorandum in Opposition filed by AENERGY, S.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25)(Levy, Vincent) (Attachment 19 flattened and replaced on 3/30/2023.) (ztnr) (Entered: 03/29/2023) |
| 03/29/2023 | 32 | DECLARATION *PEDRO BENTO* by AENERGY, S.A. re 29 Memorandum in Opposition filed by AENERGY, S.A.. (Levy, Vincent) (Entered: 03/29/2023) |
| 03/29/2023 | 33 | DECLARATION *JOSE LEITAO AMARO* by AENERGY, S.A. re 29 Memorandum in Opposition filed by AENERGY, S.A.. (Levy, Vincent) (Entered: 03/29/2023) |
| 03/29/2023 | 34 | DECLARATION *JORGE MORGADO* by AENERGY, S.A. re 29 Memorandum in Opposition filed by AENERGY, S.A.. (Levy, Vincent) (Entered: 03/29/2023) |
| 03/30/2023 | 35 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by AENERGY, S.A. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration Machado Declaration, # 2 Exhibit Exhibit A, # 3 Certificate of Service Certificate of Service)(Levy, Vincent) (Entered: 03/30/2023) |
| 03/30/2023 | 36 | REDACTED DOCUMENT– Redacted Declaration to 29 Memorandum in Opposition *by RICARDO MACHADO* by AENERGY, S.A.. (Attachments: # 1 Exhibit A (filed under seal), # 2 Exhibit B)(Levy, Vincent) (Entered: 03/30/2023) |
| 03/31/2023 | 37 | MOTION for Extension of Time to File Response/Reply as to 24 MOTION to Dismiss *Amended Complaint* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, |

| | | |
|---|---|---|
| | | EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit A – counsel correspondence, # 2 Text of Proposed Order)(Gore, Kiran) (Entered: 03/31/2023) |
| 03/31/2023 | 38 | RESPONSE re 37 MOTION for Extension of Time to File Response/Reply as to 24 MOTION to Dismiss *Amended Complaint* filed by AENERGY, S.A.. (Levy, Vincent) (Entered: 03/31/2023) |
| 03/31/2023 | | MINUTE ORDER granting in part and denying in part 37 Motion for Extension of Time to File Response/Reply. Defendants' Reply shall now be due on or before April 19, 2023. Further extensions will be disfavored. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/31/2023. (lctnm2) (Entered: 03/31/2023) |
| 03/31/2023 | | Set/Reset Deadlines: Reply due by 4/19/2023. (hmc) (Entered: 03/31/2023) |
| 03/31/2023 | 39 | MOTION for Hearing *Request for Oral Argument once Motion is fully submitted* by AENERGY, S.A. re 24 Motion to Dismiss, 29 Memorandum in Opposition (Levy, Vincent) Modified event title on 4/4/2023 (znmw). (Entered: 03/31/2023) |
| 03/31/2023 | 40 | NOTICE of Proposed Order by AENERGY, S.A. re 24 MOTION to Dismiss *Amended Complaint*, 29 Memorandum in Opposition (Levy, Vincent) (Entered: 03/31/2023) |
| 04/07/2023 | | MINUTE ORDER: Plaintiff's 35 Motion for Leave to File Document Under Seal is denied without prejudice. Plaintiff's motion violates Local Civil Rule 7(m), which requires the moving party to discuss any anticipated nondispositive motion with opposing counsel and to "include in its motion a statement that the required discussion occurred, and a statement as to whether the motion is opposed." SO ORDERED. Signed by Judge Trevor N. McFadden on 4/7/2023. (lctnm2) (Entered: 04/07/2023) |
| 04/19/2023 | 41 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by AENERGY, S.A. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration Machado Declaration, # 2 Exhibit Exhibit A, # 3 Certificate of Service Certificate of Service)(Levy, Vincent) (Entered: 04/19/2023) |
| 04/19/2023 | | MINUTE ORDER granting 41 Sealed Motion for Leave to File Document Under Seal. ECF No. 41 and its attachments may remain under seal. Plaintiff is directed to publicly file a redacted version of ECF No. 41−1 by May 3, 2023. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/19/2023. (lctnm2) Modified on 4/20/2023 to edit ECF number (hmc). (Entered: 04/19/2023) |
| 04/19/2023 | 42 | REPLY to opposition to motion re 24 MOTION to Dismiss *Amended Complaint* filed by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Gore, Kiran) (Entered: 04/19/2023) |
| 04/19/2023 | 43 | DECLARATION *of Lino Diamvutu PhD dated April 19, 2023* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 42 Reply to opposition to Motion, filed by EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit A – CV of Lino Diamvutu PhD)(Gore, Kiran) (Entered: 04/19/2023) |
| 04/19/2023 | 44 | DECLARATION *of Henrique Abecasis dated April 19, 2023* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 42 Reply to opposition to Motion, filed by EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, |

| | | |
|---|---|---|
| | | MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, REPUBLIC OF ANGOLA. (Gore, Kiran) (Entered: 04/19/2023) |
| 04/19/2023 | 45 | DECLARATION *of Michael Ehrenstein dated April 19, 2023* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 42 Reply to opposition to Motion, filed by EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit A – Declaration of Lino Diamvutu, dated December 2, 2020, # 2 Exhibit B – Declaration of Lino Diamvutu, dated April 30, 2021, # 3 Exhibit C – Declaration of Sofia Vale dated September 18, 2020)(Gore, Kiran) (Entered: 04/19/2023) |
| 05/10/2023 | 46 | MOTION to Strike 43 Declaration,, 45 Declaration,,, 42 Reply to opposition to Motion, by AENERGY, S.A.. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Text of Proposed Order)(Levy, Vincent) (Entered: 05/10/2023) |
| 05/24/2023 | 47 | Memorandum in opposition to re 46 Motion to Strike *DKTS. 43, 45–1, 45–2, 45–3, AND RELATED PARTS OF DEFENDANTS REPLY (DKT. 42)* filed by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Exhibit A – Selected Overview of the Angolan Defendants Arguments in the Motion to Dismiss which draw upon Dkt. Nos. 43, 45–1, 45–2, and 45–3, # 2 Text of Proposed Order)(Gore, Kiran) (Entered: 05/24/2023) |
| 05/31/2023 | 48 | REPLY to opposition to motion re 46 MOTION to Strike 43 Declaration,, 45 Declaration,,, 42 Reply to opposition to Motion, filed by AENERGY, S.A.. (Levy, Vincent) (Entered: 05/31/2023) |
| 06/20/2023 | 49 | MEMORANDUM OPINION re 24 Motion to Dismiss, 39 Motion for Hearing, and 46 Motion to Strike. See attached Opinion for details. Signed by Judge Trevor N. McFadden on 6/20/20. (lctnm2) (Entered: 06/20/2023) |
| 06/20/2023 | 50 | ORDER. For the reasons stated in the 49 Memorandum Opinion, Defendants' 24 Motion to Dismiss is GRANTED in part and denied in part, Plaintiff's 39 Motion for Hearing is DENIED, and Plaintiff's 46 Motion to Strike is DENIED as moot. See attached Order for details. The Clerk of Court shall close this case. Signed by Judge Trevor N. McFadden on 6/20/2023. (lctnm2) (Entered: 06/20/2023) |
| 07/18/2023 | 51 | MOTION for Reconsideration re 49 Memorandum & Opinion, 50 Order, *pursuant to Fed. R. Civ. P. 59(e)* by AENERGY, S.A.. (Levy, Vincent) (Entered: 07/18/2023) |
| 07/18/2023 | 52 | DECLARATION *of Kevin D. Benish* by AENERGY, S.A. re 51 MOTION for Reconsideration re 49 Memorandum & Opinion, 50 Order, *pursuant to Fed. R. Civ. P. 59(e)*. (Attachments: # 1 Exhibit A)(Levy, Vincent) (Entered: 07/18/2023) |
| 08/01/2023 | 53 | Memorandum in opposition to re 51 Motion for Reconsideration *Dkt. Nos 49 and 50* filed by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA. (Attachments: # 1 Text of Proposed Order)(Gore, Kiran) (Entered: 08/01/2023) |
| 08/01/2023 | 54 | DECLARATION *Henrique Abecasis* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 53 Memorandum in Opposition,. (Attachments: # 1 Exhibit A – translated excerpts of Contestacao, # 2 Exhibit B – translated excerpts of Replica)(Gore, Kiran) (Entered: 08/01/2023) |

| 08/08/2023 | 55 | REPLY to opposition to motion re 51 MOTION for Reconsideration re 49 Memorandum & Opinion, 50 Order, *pursuant to Fed. R. Civ. P. 59(e)* filed by AENERGY, S.A.. (Levy, Vincent) (Entered: 08/08/2023) |
|---|---|---|
| 08/08/2023 | 56 | NOTICE of Proposed Order by AENERGY, S.A. re 51 MOTION for Reconsideration re 49 Memorandum & Opinion, 50 Order, *pursuant to Fed. R. Civ. P. 59(e)* (Levy, Vincent) (Entered: 08/08/2023) |
| 10/02/2023 | 57 | NOTICE *OF DISPOSITION OF RELATED CASES* by EMPRESA NACIONAL DE DISTRIBUICAO DE ELECTRICIDADE, EMPRESA PUBLICA DE PRODUCAO DE ELECTRICIDADE, EP, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, REPUBLIC OF ANGOLA re 16 Notice of Related Case, (Attachments: # 1 Exhibit 1 – docket materials from Case No. 3:22– cv–1055 concerning General Electric International, # 2 Exhibit 2 – docket materials from Case No. 3:22–cv–1054 concerning GE Capital EFS Financing, Inc.)(Gore, Kiran) (Entered: 10/02/2023) |
| 10/27/2023 | 58 | ORDER denying Plaintiff's 51 Motion for Reconsideration. See attached Order for details. Signed by Judge Trevor N. McFadden on 10/27/2023. (lctnm2) (Entered: 10/27/2023) |
| 11/27/2023 | 59 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 49 Memorandum & Opinion, 58 Order, Memorandum & Opinion, 50 Order, by AENERGY, S.A.. Filing fee $ 505, receipt number ADCDC–10519214. Fee Status: Fee Paid. Parties have been notified. (Levy, Vincent) (Entered: 11/27/2023) |
| 11/29/2023 | 60 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 59 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 11/29/2023) |
| 11/30/2023 | | USCA Case Number 23–7160 for 59 Notice of Appeal to DC Circuit Court, filed by AENERGY, S.A.. (znmw) (Entered: 12/04/2023) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.** | |
| *Plaintiff,* | |
| | CIVIL ACTION NO. <u>22-cv-2514-TNM</u> |
| v. | |
| **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** | **DEFENDANTS' NOTICE OF RELATED CASES** |
| *Defendants.* | |

Defendants, The Republic of Angola,  Ministry of Energy and Water of the Republic of Angola, Ministry of Finance of the Republic of Angola, Empresa Publica de Producao de Electricidade, EP, and Empresa Nacional de Destribuicao de Electricidade (together "The Angolan Defendants"), by and through undersigned counsel and pursuant to LCvR 40.5 file this Notice of Related Cases, and state:

1. Pursuant to LCvR 40.5(a)(4), a civil case "shall be deemed related where a case is dismissed, with prejudice or without, and a second case is filed involving the same parties and relating to the same subject matter."

2. *Aenergy et al v. Republic of Angola et al*, Case No. 20-cv-3569 (JPC) (S.D.N.Y) involves the same parties and relates to the same subject matter.[1]  Indeed, in its Motion to Stay in the present case, Plaintiff Aenergy concedes the related case "involved some

---

[1] That case also involved claims by Plaintiff Aenergy against General Electric Company and its affiliates, General Electric International, Inc., and GE Capital EFS Financing, Inc.

1

A10

of the same facts, circumstances, and claims as those alleged in this action." *See* D.E.

3 at ¶1 In that case, on May 19, 2021, the district court dismissed Plaintiff's complaint

based on *forum non conveniens*.  Aenergy appealed, and the Second Circuit Court of

Appeals affirmed the district court's dismissal on April 13, 2022. *See Aenergy et al. v.*

*Republic of Angola et al,* 31 F.4th 119 (2d Cir. 2022).  On November 14, 2022, Aenergy

filed a petition for writ of certiorari seeking review of the Second Circuit Court of

Appeals' decision.

Dated: December 20, 2022

Respectfully submitted,

**EHRENSTEIN|SAGER**
*Counsel for the Angolan Defendants*
2800 Ponce De Leon Blvd.,
Suite 1400
Coral Gables, Florida, 33134
Phone: (305) 503-5930

By: */s/ Michael D. Ehrenstein*
Michael D. Ehrenstein
Florida Bar No.: 857378
mike@ehrensteinsager.com

**LAW OFFICES OF KIRAN N GORE, PLLC**
*Counsel for the Angolan Defendants*
1050 30th Street NW
Washington, DC 20007
Phone: (917) 589-8714

By: */s/ Kiran Nasir Gore*
Kiran Nasir Gore
DC Bar No. 1031846
kng@gorelaw.com

2

A11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AENERGY, S.A.,
c/o Pact-Orey da Cunha
Rua Tomás Ribeiro, 111
Lisboa, Portugal

       *Plaintiff,*

      v.

REPUBLIC OF ANGOLA
Minister of Foreign Affairs
Ministry of Foreign Affairs          x
Edificio do Mirex, RUA Major Kanhangulo  :
n. Baxia/Luanda, Angola;         :
MINISTRY OF ENERGY AND WATER OF THE  :
REPUBLIC OF ANGOLA        :
Minister of Foreign Affairs       :
Ministry of Foreign Affairs      :    **CIVIL ACTION NO. 22-cv-2514**
Edificio do Mirex, RUA Major Kanhangulo  :
n. Baxia/Luanda, Angola;        :    **FIRST AMENDED**
MINISTRY OF FINANCE OF THE REPUBLIC  :    **COMPLAINT**
OF ANGOLA           :
Minister of Foreign Affairs       :
Ministry of Foreign Affairs      :
Edificio do Mirex, RUA Major Kanhangulo  :
n. Baxia/Luanda, Angola;        :
EMPRESA PÚBLICA DE PRODUÇÃO DE    :
ELECTRICIDADE, EP         :
Gaveto entre a Entrada do Camama e Via Expresso  x
Proximo ao centra de producao de TPA
Luanda, Angola; AND
EMPRESA NACIONAL DE DISTRIBUIÇÃO DE
ELECTRICIDADE
Headquarters Buildings, N'gola Kiluange
Rua Conego Manuela Das Nevas No. 234
Luanda, Angola,

       *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Aenergy, S.A. ("AE"), as and for its First Amended Complaint against defendants the Republic of Angola (the "Republic"), the Ministry of Energy and Water of the Republic of Angola ("MINEA"), the Ministry of Finance of the Republic of Angola ("MINFIN"), Empresa Pública de Produção de Electricidade, EP ("PRODEL"), and Empresa Nacional de Distribuição de Electricidade ("ENDE") (collectively referred to as the "Defendants" or "Angola" since each operates as an alter ego and/or agent of one another), with knowledge as to itself and as to the facts within it possession, and otherwise on information and belief, hereby alleges as follows:

## NATURE OF ACTION

1.      This is a simple breach of contract action for unpaid work and supplies in which the Republic of Angola and certain Angolan state-owned entities injured the plaintiff through their unlawful and unjustified repudiation of commercial contracts with Plaintiff involving the construction, extension, refurbishment, operation, and maintenance of power plants.

2.      Through its commercial services, Plaintiff AE provided substantial performance to its contractual counterparts (specifically, the Republic, MINEA, ENDE, and PRODEL), which directly benefitted from this commercial arrangement.  However, these Defendants received far more goods and services from AE than AE was paid for.  In this action, Plaintiff seeks compensatory damages for the unpaid work and unpaid services that Angola obtained before its repudiation of the at-issue commercial contracts.

3.      As discussed below, this action is brought pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602, *et seq.*, and the Court has jurisdiction over Defendants pursuant to the FSIA's commercial activity exception.  *See id.* § 1605(a)(2).

4.      Previously, Plaintiff and one of its affiliates pursued an action for damages against both Angola and U.S.-based General Electric Co. (and its related entities) arising out of

A13

the termination of these contacts.  That suit was brought before the U.S. District Court for the Southern District of New York ("SDNY").  *See Aenergy, S.A. et al. v. Republic of Angola et al.*, Case No. 20-cv-3569 (JPC) (S.D.N.Y.).  Angola and the GE defendants moved to dismiss that action based on the doctrine of *forum non conveniens*, and the SDNY granted that motion in May 2021.

5.      The U.S. Court of Appeals for the Second Circuit affirmed that *forum non conveniens* dismissal.  In the Second Circuit's decision, the court of appeals held that Plaintiff's case against Angola, which primarily asserted claims for taking of property in violation of international law, wrongful termination of contract, and unjust enrichment, were more appropriately heard in an Angolan court, because Angola had an interest in its own courts resolving a dispute against it, because Plaintiff had previously sought administrative relief there, and because evidence relevant to those particular claims were more easily accessed in Angola— namely, Angola's officials.

6.      Notably, material events have occurred since the SDNY and Second Circuit decisions were announced.  For instance, when making its motion to dismiss, Angola represented to the SDNY that the Republic had taken "temporary possession" of certain property owned by Plaintiff (specifically, turbines and associated equipment) in order "to secure and preserve" it while Plaintiff and Defendants were litigating a related dispute in Angolan court.  Case No. 20-cv-3569 (JPC) (S.D.N.Y.), Dkt. 61 at 12.  However, just after the SDNY action was dismissed and despite being completely contrary to its representations to the SDNY (and later the Second Circuit), Angola took *permanent* possession of AE's property by connecting AE's turbines to Angola's power grid in June 2021.  *See infra* ¶ 62.  Then, following the Second Circuit's decision, the President of Angola on June 9, 2022, proclaimed on national television

A14

that the SDNY action had been dismissed on the merits, despite this being completely false. AE's understanding is that, at around this time, Angola seized additional AE turbines that had been in the custody of a third-party warehouse. These recent actions provide further proof that AE cannot obtain justice in Angola.

7.      Neither the SDNY nor the Second Circuit ever addressed the question of whether the claims asserted here can be brought in Angola despite the fact that the procedural vehicle for bringing such claims in Angola was only open for a period of 180 business days. Now that this period has lapsed, there is no other available forum for the breach-of-contract claim asserted here. As a result, AE respectfully brings this breach of contract claim for unpaid work and services.

## THE PARTIES

8.      Plaintiff AE (formerly known as Aenergia, S.A.) is a Portuguese-shareholder-owned corporation constituted under the laws of the Republic of Angola in 2012. At all times relevant to this complaint, AE was run by senior executives and directors out of executive headquarters in Lisbon, Portugal (where its books and records were and are maintained), while AE's principal commercial activities were undertaken in Angola (although AE also carried business negotiations and activities elsewhere, including but not limited to the United States).

9.      Defendant the Republic of Angola (the "Republic") is a "foreign state" within the meaning of 28 U.S.C. § 1603(a). The current President of the Republic is the leader of Angola's ruling political party, the MPLA ("People's Movement for the Liberation of Angola"). For almost fifty years, without any interruption, the MPLA has ruled the Republic, and today it exerts substantial influence over various sectors of Angolan society, including but not limited to the judiciary. For example, eight of the eleven judges sitting on Angola's Constitutional Court are nominated by the MPLA, either through the Office of the Angolan President or the MPLA-

controlled National Assembly.  Furthermore, the leadership of Angola's Supreme Court is appointed by the President of the Republic, and Angolan judges are commonly known to be members of the MPLA (which is led by Angola's President).

10.     Defendant Ministry of Energy and Water of the Republic of Angola ("MINEA"), a ministry of the Republic of Angola, is a political subdivision and/or integral part of the Republic and is thus a "foreign state" under 28 U.S.C. § 1603(a).  Although a foreign state under the FSIA, MINEA is responsible for providing power and water and conducts various commercial activities in relation to that function. MINEA is headed by the Minister of Energy and Water, which is a cabinet-level position in the national government's executive branch. As such, MINEA is ultimately directed, influenced, and controlled by Angola's President.

11.     Defendant Ministry of Finance of the Republic of Angola ("MINFIN"), a ministry of the Republic of Angola, is a political subdivision and/or integral part of the Republic and is thus a "foreign state" under 28 U.S.C. § 1603(a).  As noted herein, it entered into a U.S. Dollar-denominated financing agreement ("credit facility") with U.S.-based GE Capital in order to pay for the contracts underlying Plaintiff's claims in this case, among other things. MINFIN is headed by the Minister of Finance, which is a cabinet-level position in the national government's executive branch. As such, MINFIN is ultimately directed, influenced, and controlled by Angola's President.

12.     Defendant Empresa Pública de Produção de Electricidade, EP ("PRODEL"), a subsidiary entity of MINEA (which is a ministry of the Republic of Angola), is the alter ego and/or agent of the Republic of Angola because, among other things, it regularly takes steps that it believes the Republic desires and because the Republic issues policies and/or directives that cause PRODEL to act on behalf of the Republic.  All the contracts at issue in this case were

entered, and could only be entered, by presidential decree, and they were similarly terminated without full payment at the direction of the President of Angola and the Minister of Energy and Water.  PRODEL's chief executive from the time of the events giving rise to this suit has indeed testified in a prior proceeding that PRODEL could not enter into or amend the relevant contracts with AE without the authorization of the President of Angola.  Moreover, payment under the contracts could be made only on the approval of AE invoices by the Minister of Energy and Water and the approval of payment by the Minister of Finance.  In the alternative, PRODEL is a "foreign state" under 28 U.S.C. § 1603(a)—which defines a "foreign state" to include an "agency or instrumentality of a foreign state"—under 28 U.S.C. § 1603(b) because (1) as a public company, it is a separate legal person; (2) it is an organ or political subdivision of the foreign state; and (3) it is not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c).  Accordingly, PRODEL is subject to the FSIA as either the alter ego/agent of the Republic, or as an agency or instrumentality of the Republic.

13.     Defendant Empresa Nacional de Distribuição de Electricidade ("ENDE"), a subsidiary entity of MINEA (which is a ministry of the Republic of Angola), is the alter ego and/or agent of the Republic of Angola because, among other things, it regularly takes steps that it believes the Republic desires and because the Republic issues policies and/or directives that cause ENDE to act on behalf of the Republic.  All the contracts at issue in this case were entered, and could only be entered, by presidential decree, and they were similarly terminated without full payment at the direction of the President of Angola and the Minister of Energy and Water. Moreover, payment under the contracts could be made only on the approval of AE invoices by the Minister of Energy and Water and the approval of payment by the Minister of Finance.  In the alternative, ENDE is a "foreign state" under 28 U.S.C. § 1603(a)—which defines a "foreign

state" to include an "agency or instrumentality of a foreign state"—under 28 U.S.C. § 1603(b) because (1) as a public company, it is a separate legal person; (2) it is an organ or political subdivision of the foreign state; and (3) it is not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c). Accordingly, ENDE is subject to the FSIA as either the alter ego/agent of the Republic, or as an agency or instrumentality of the Republic.

14.     Non-party General Electric Company ("GE Co.") is a New York corporation with its principal place of business in Boston, Massachusetts. At all times relevant to this Complaint, GE Co. operated through a number of business entities and divisions; the financial results of all of these entities and divisions were incorporated into and reflected in GE Co.'s consolidated financial statements in the United States and are reported publicly on disclosures issued pursuant to SEC rules and regulations.

15.     Non-party GE Capital EFS Financing, Inc. ("GE Capital") is a Delaware corporation with its principal place of business in Norwalk, Connecticut.

16.     Non-party GE Packaged Power, Inc. ("GEPP") is a Delaware corporation with its principal place of business in Houston, Texas. Non-party GEPP is a wholly-owned subsidiary of New York-based GE Co. Along with other GE affiliates, GEPP manufactures and supplies power-generation turbines, equipment and services, including as most pertinent here TM2500 turbines ("TM2500s").

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over the claims asserted against Defendants under 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" within the meaning of 28 U.S.C. § 1603(a).

7

A18

18.     This Court also has subject-matter jurisdiction over this action under 28 U.S.C.

§ 1605(a)(2) because the claim asserted is "based upon a commercial activity carried on in the

United States by the foreign state" and/or because it is based upon "an act performed in the

United States in connection with a commercial activity of [the Defendants] elsewhere" and/or

because it is based upon "an act outside the territory of the United States in connection with a

commercial activity of [the Defendants] elsewhere" that "cause[d] a direct effect in the United

States," such that the Defendants are not immune from suit for those claims.

19.     This Court has jurisdiction over the Republic of Angola under 28 U.S.C.

§ 1330(a) and 28 U.S.C. § 1603(b).

20.     This Court has jurisdiction over MINEA under 28 U.S.C. § 1330(a) and 28 U.S.C.

§ 1603(b).

21.     This Court has jurisdiction over MINFIN under 28 U.S.C. § 1330(a) and

28 U.S.C. § 1603(b).

22.     This Court has jurisdiction over PRODEL under 28 U.S.C. § 1330(a) and

28 U.S.C. § 1603(b), and because PRODEL is the alter ego and/or agent of MINEA and the

Republic of Angola.

23.     This Court has jurisdiction over ENDE under 28 U.S.C. § 1330(a) and 28 U.S.C.

§ 1603(b), and because ENDE is the alter ego and/or agent of MINEA and the Republic of

Angola.

24.     Venue is proper pursuant to 28 U.S.C. § 1391(f)(4) because this suit is brought

against a foreign state and its political subdivisions, and Congress intended to make this District

a venue for all suits brought against foreign sovereign states not immune from suit.

A19

## **FACTUAL BACKGROUND**

### I.        **AE IS ESTABLISHED AND FLOURISHES**

25.      Ricardo Machado is a Portuguese investor and entrepreneur.  He observed that energy and transportation companies operating in certain African countries often were not just unreliable but also supplying their services at very high prices.  Exacerbating the problem, he observed, local companies in Angola typically acted as agents or distributors for international conglomerates, but did not develop long-term, sustainable solutions based on local know-how.

26.      At around this time, Angola publicly announced that it would award power projects by selecting an international manufacturer of relevant equipment (such as General Electric or Siemens) and award projects to a fully functioning entity that would use those products and handle all related installation and construction in partnership with the international manufacturer.

27.       Sensing an opportunity, Mr. Machado believed he could change the way business was done in Angola and, in the process, deliver cost-effective, reliable, and environmentally friendly energy solutions.  The idea was to build a fully functioning enterprise from the ground up, leverage local know-how, invest in training, and partner with an international manufacturer.

28.      Machado and AE first put their vision to the test in 2013, when AE initiated its first significant project in Angola—the construction of Malange Power Plant.  Although this was a relatively small project relative to the Angolan power grid, it permitted AE to prove the viability of its founding principles to the Angolan government and show that AE could deliver cost-efficient and reliable solutions in line with international standards.

A20

29.     After additional successes with projects in Angola, AE and senior executives from GE entered into discussions regarding a "mega power" deal that AE could market to Angola using GE technology and international financing.

30.     To that end, AE engaged with the government of Angola, proposing to have Angola commission AE (in collaboration with GE Co. and the various entities controlled by it) to fulfill significant infrastructure projects in line with the country's development objectives reflected in published guidance.  The projects AE discussed with Angola would call for AE to install new power-plant facilities using more than half a dozen GE-manufactured power turbines (among other equipment); AE would also service existing and new power plants under long-term contracts, and build out the country's water infrastructure.  By mid-2017, AE was in advanced discussions with Angola to work on a number of significant and high-priority projects.

II.     **ANGOLA SECURES FINANCING FROM U.S.-BASED GE CAPITAL UNDER A FACILITY THAT ALLOWS GE TO BE PAID BY ANGOLA DIRECTLY IN THE UNITED STATES FOR AE'S OBLIGATIONS TO GE**

31.     One of the main obstacles that stood in the way of Angola signing contracts with AE commissioning power projects was Angola's ability to obtain financing for such projects. This hurdle was overcome, however, when GE Capital, General Electric's U.S.-based financial arm, agreed to provide funding to Angola for such projects via a $1 billion credit facility (the "Facility") that would be used to finance Angola's power-grid development goals.  In turn, Angola agreed to assume the obligation of relevant state-owned entities to pay GE back for the financing by way of a "sovereign guarantee" of repayment.[1]

32.     AE was not a party under the Facility and was not involved in the negotiations between GE and Angola, but given that the U.S. financing would be obtained by Angola solely to

---

[1] *See generally* Embassy of the Republic of Angola in Japan, *GE Invests USD 1 Billion in Angola*, https://www.angola.or.jp/2017/01/26/ge-invests-usd-1-bilion-in-angola (last visited Aug. 17, 2022).

A21

pay for AE's projects, AE was provided information on the contemplated financing structure and also the opportunity to provide suggestions based on AE's experience in the region.  As relevant to this dispute, AE's understanding of the Facility's key characteristics is, among others, that:

    a.  GE Capital, acting on behalf of GE and backed by the credit of GE, would provide $1.1 billion in financing to Angola's finance ministry (MINFIN) for the sole purpose of permitting Angola to pay AE to complete contracts for the power and water projects then under advanced discussions.  The sole purpose of the financing, which MINFIN would draw on, would solely be to permit MINEA to pay AE for the power projects then being negotiated between AE and MINEA.

    b.  Although the financing agreement on its face allowed multiple draws, it was initially anticipated that the entire $1.1 billion would be drawn upfront by MINFIN; MINEA would pay AE upfront all the amounts due under the OSCs; and AE would in turn pay GE upfront what GE was due under contracts between AE and GE by which AE had agreed to purchase certain goods and services.

    c.  As a matter of mechanics, it was expected and agreed that GE Capital, as lender, would send a substantial portion of the $1.1. billion in funds from the United States drawn by Angola directly into the accounts of GE entities receiving payment on account of supply contracts between AE and GE, some of which were in the United States.  GE explained that it wished to use a "direct funding" mechanism to effectuate in a single payment transfer what would be in reality three different commercial transactions: (a) Angola drawing funds from GE; (b) Angola paying AE for the goods and services to be performed under contracts

between those parties, and (c) AE paying GE pursuant to the supply contracts

under which AE would purchase GE-manufactured equipment.

d.   The balance of funds would go directly to AE, and AE could and would use it to

pay obligations to its other suppliers and counterparties, as well as employees, and

it would derive a profit from the balance.

33.   The foregoing structure is reflected in an internal GE document, which is

consistent with the structure designed by GE and Angola, and was shared with AE:



34.   According to GE internal documents, the use of "**USD contracts**" on "[a]ll GE

contracts" (including both the supply contracts with AE and the GE Capital Credit Facility) had

another benefit—it avoided "FX risks" (*i.e.*, currency risks) to the GE organization and allowed

GE to rely on New York's stable and transparent banking system (while mitigating Angolan

A23

corruption risks).  Ex. 1.[2]  Similarly, other internal GE documents explain that GE's use of the

facility "for payment of GE equipment and services contract with AE [in U.S. dollars] shifts the

AR [(or account-receivable)] payment risk from AE" by turning it into a sovereign obligation.

35. Angola's President approved the $1.1 billion GE Capital facility in the summer of

2017.

### III. ANGOLA AND AE AGREE TO 13 "ON-SALE CONTRACTS" THAT WERE FINANCED UNDER GE CAPITAL'S U.S. DOLLAR-DENOMINATED FACILITY

36. By the end of July 2017, once the GE Capital financing facility was approved,

Angola also signed, through MINEA, ENDE, and PRODEL, a total of 13 contracts with AE for

$1.148 billon, and the parties understood and agreed that payment for those contracts would be

made through the GE Capital facility out of its USD accounts in the United States.  The projects,

known as the "On-Sale Contracts" or "OSCs," included the following:

a. OSC 1 was signed on 23 July 2017 and required AE to install a power plant

deploying two new TM2500s at the New Menongue plant.

b. OSC 2 was signed on 23 July 2017 and involved the improvement of the New

Cuito Power Plant using GE gensets.

c. OSC 3, which was initially signed on 9 December 2014 and originally called for

AE to improve the infrastructure at the Cabinda power plant, had been modified

---

[2] A version of this document was first obtained from non-party General Electric ("GE") via a proceeding initiated pursuant to 28 U.S.C. § 1782 in the U.S. District Court for the Southern District of New York, *In re Aenergy, S.A.*, Case No. 1:19-mc-00542-VEC (S.D.N.Y.).  Although discovery material in that proceeding is subject to a protective order between GE and AE, General Electric in a later proceeding expressly permitted the document attached here as Exhibit 1 to be publicly docketed, thus placing this document outside the scope of that protective order.  *See Aenergy, S.A. v. Republic of Angola*, Case No. 1:20-cv-03569-JPC (S.D.N.Y), Dkt. 8 (letter from GE counsel), Dkt. 10-1 (public docketing of exhibit).

to require the installation of a power plant using three new TM2500 turbines at a different site in Angola (Quileva).

d.  OSC 4, signed on 23 July 2017, was a long-term maintenance agreement ("CSA") to maintain the Cabinda power plant.

e.  OSC 5, signed on 23 July 2017, required AE to install GE aeroderivative products.

f.  OSC 6, signed on 23 July 2017, was a five-year, $350-million contract that required AE to service and maintain a power plant known as "Soyo I" using GE technology.

g.  OSC 7 was signed on 23 July 2017, and required AE to supply a power plant using up to two new TM2500s, and to provide a "bank" of spare parts (some manufactured by GE and some not) from which Angola could draw to support its needs for servicing its turbine fleet on an ongoing basis.

h.  OSC 8 was signed on 23 July 2017, and involved maintenance needs (including supplying parts) at the Boavista I Thermal Power Station.

i.  OSC 9 was signed on 23 July 2017, and required AE to supply spare parts at a power plant in Namibe.

j.  OSC 10, signed on 23 July 2017, required AE to install a power plant in Viana.

k.  OSC 11 was signed on 17 July 2017 with ENDE. It entailed nearly twenty energy projects in rural parts of Angola using industrial generators, home generators and photovoltaic kits.

A25

l.  OSC 12 was signed on 21 July 2017 and involved the construction of water systems and the development of Angola's water infrastructure in rural parts of the country.

m.  OSC 13 was signed on 23 July 2017 and involved the installation of one TM2500 turbine, to use as a back-up.

37.   Collectively, these OSCs expressly called for AE to provide MINEA with power plant projects using eight GE-manufactured TM2500 turbines, in addition to other goods and services.

a.  The OSCs were only entered into following approval of the GE Capital facility and it was understood and agreed that payment for the completion of the projects would occur through disbursements requested by the Ministry of Finance from the GE Capital facility, from USD accounts of GE in the United States.  As the memo accompanying the credit facility between GE and Angola made clear, the facility was designed so that both Plaintiff Aenergy and various GE entities through a "loan [that would] be disbursed directly from EFS to pay [AE and] GE directly," including GE entities/divisions based in the United States such as GE Gas Power Systems and GE Power Generation Services.  Ex. 1, at 3.  This credit facility memo also anticipated a positive return on investment for U.S.-based GE Co. through 2024.  *Id.* at 4-5.

b.  And significantly, the execution of each of these OSCs indicated that MINEA, ENDE, and PRODEL's assent was dependent upon authorization from the Minister of Energy and Water as well as the President of Angola.  Upon signing each of the OSCs, it was AE's understanding that any changes or material

15

A26

decisions concerning the OSCs would ultimately be made by the President of the Republic of Angola, that the Republic itself would essentially be party to the agreements, and that all the obligations under the OSCs would be supervised and directed by the Republic, acting through the President and Minister of Energy and Water, and subject to the Republic of Angola's ultimate control.

38.     Even before being paid for any of the work under the OSCs, AE began performing – and on some occasions provided performance even before the OSCs were signed as the OSCs reflected agreements that had been reached before then for AE to provide goods and services to Angola.

**IV.     GE CAPITAL APPROVES A PARTIAL DISBURSEMENT FROM THE FACILITY**

39.     In mid-2017, after the OSCs were signed, AE issued invoices to Angola for payment of all the work to be provided under the OSCs, and which would occur through the U.S.-based GE Capital Credit Facility.  AE's invoices collectively covered Angola's purchase of eight TM2500s from AE and various services performed by Plaintiff under the OSCs.

40.     In October 2017, PRODEL and ENDE issued letters of intent to consider purchasing four additional GE-manufactured turbines that AE had already contracted to obtain from GE, subject to Angola concluding additional legal and other analyses.

41.     All seemed to be on track for the $1.1 billion disbursement from the GE Capital Facility to occur by year-end 2017.  This included the new Presidential administration opining that the contracts issued by the prior administration were awarded in accordance with Angolan law and procedure, and the Minister of Energy and Water (the same individual who had served in that capacity in the prior administration) requesting the performance of the work.

42.     However, in early November 2017 Angola revealed that, contrary to expectations, MINEA desired to pay for only a fraction of the OSCs, and so MINFIN would draw only a fraction of the GE Capital facility amount rather than the total of $1.1 billion.

43.     Although AE had submitted to MINEA for approval all of its invoices for work completed under the OSCs, MINEA approved AE invoices worth only approximately $625 million, a number later increased to $644 million.

44.     In light of Angola's decision to draw less than the full amount of the Facility at one time, GE Capital agreed to allow Angola to make a partial draw, which it did.

45.     Following this, on or about December 24, 2017, Angola's MINFIN made a utilization request under the GE Credit Facility.  The request stated that Angola wished to borrow from the GE Credit Facility to make payments owed under the OSCs.  Angola's request directed the capital agent under the GE Capital Facility to direct the proceeds of the loan to various accounts for AE and GE, in amounts that had previously been negotiated between AE and GE (reflecting amounts that AE agreed to pay GE under agreements between AE and GE to which Angola was not a party).

46.     Pursuant to these requests and an arrangement negotiated between GE and AE, of the approximately $644 million that was borrowed by Angola and disbursed by GE Capital, approximately $376 million in U.S. dollars was disbursed from GE accounts in the United States to other GE accounts in the United States and elsewhere in satisfaction of certain AE obligations to GE under the AE-GE supply contracts.  The balance went to AE accounts.

//

//

//

17

A28

**V.     AE PERFORMS UNDER THE ON-SALE CONTRACTS UNTIL ANGOLA REPUDIATES THEM IN 2019**

47.     Although Angola did not pay AE upfront for all the work to be performed under the OSCs, AE continued to have obligations under the OSCs and continued to perform its obligations thereunder, while Angola continued to ask for performance.

48.     Then, in early January 2019, following a dispute between AE and General Electric over the terms of their commercial arrangement, MINEA sent AE a letter stating that it had learned of "irregularities" in the GE Capital Facility and therefore intended to terminate the OSCs and transfer those contracts to GE.

49.     The stated "irregularities" were in fact based on the lie of GE executives, who while operating in the United States and abroad claimed that, even though AE had invoiced Angola only for 8 turbines, Angola had paid AE for 12 turbines by way of the December 2017 disbursement.  This lie was based on the unrelated fact that, for its own U.S. accounting purposes, GE considered that the payment it received from AE paid GE for AE's acquisition from GE of 12 turbines.  But GE was not a party to the OSCs, AE was not a party to the financing agreement, and Angola was not a party to the AE-GE contracts, and AE had never invoiced Angola for more than 12 turbines.  As a result, there was no basis for this GE lie.

50.     Nevertheless, around this time (approximately May 2019) GE executives acting in the United States began to coordinate GE's takeover of the OSCs.  According to an internal GE document circulated among GE employees and U.S.-based GE executives such as GE Co.'s Frederic Ribieras and GE Capital's Susan Flanagan, "MINEA ha[d] officially communicated [to General Electric] their intention to transfer the existing on-sale contracts away from AE to GE"

and that there were "3 key work streams to be executed in parallel."  One of GE's workstreams

was termination of the OSCs so that GE could take them over:[3]

### Where are we today?

- MINEA has officially communicated their intention to transfer the existing on-sale contracts away from AE to GE

- 3 key work steams to be executed in parallel … target closure in 2Q

    - MINEA to terminate existing on-sale contracts with AE

    - GE / AE commercial contracts to be terminated

    - GE / MINEA commercial negotiations and new contract execution

51.      Given the foregoing communication, it is evident that in response to MINEA's

plan, U.S.-based GE executives expended resources to assist with GE's takeover of the OSCs,

and that GE took affirmative steps in the United States that led to Angola's repudiation of the

OSCs.  Indeed, GE's false allegations ultimately led Angola to terminate *all* of AE's contracts.

52.      Thus, on August 23, 2019, the President of Angola authorized MINEA to

terminate the OSCs and to seize the four turbines that GE had alleged had been paid for by

MINEA.  The decree recited that the GE Capital facility had been a condition for the execution

of the OSCs (given that the OSCs would be paid through that facility), and that, *inter alia*, in

light of purported "irregularities" regarding the GE Capital facility (*i.e.*, GE's lie), the OSCs

would need to be terminated.  The President therefore directed their termination.  The President

also authorized the Minister to take possession of the turbines and to take such steps as "may be

necessary to ensure the physical or financial conclusion of the works included in the scope of the

terminated agreements with General Electric, under the GE Capital credit line."

---

[3] Discussion of this internal GE document and the image below are publicly available. *See, e.g.*, *Aenergy, S.A. v. GE Capital EFS Financing, Inc.*, Case No. 22-cv-1054, Dkt. 3 at ¶ 134.

A30

53.     On September 2, 2019, pursuant to the President's decree, MINEA sent AE a letter formally terminating the OSCs on its own behalf and on behalf of the Republic and PRODEL and ENDE (the "Termination Letter").  This termination of the OSCs by MINEA would not have been possible without the Angolan President's decree authorizing their termination.

54.     Following the termination of AE's contracts, Angola made no further payments under the OSCs despite having insisted on AE completing further work, and despite AE doing so.

55.     Further, as a direct result of the Republic's and MINEA's termination of the OSCs, GE declared the termination of its own contracts with AE, stating that the termination of the OSCs had rendered impossible continued performance of the underlying products and services contracts between AE and GE (including but not limited to contracts with GE Packaged Power, Inc., a U.S. legal entity).  *See* Ex. 2.[4]  At the same time, GE demanded payment of certain sums under those contracts – sums that, but for the termination of the OSCs, would have been paid directly in the United States via the GE Capital facility (*see supra* ¶¶ 32, 37).  Ex. 2 at 2. But for the termination, GE would have provided additional goods and services under those contracts to AE and Angola, and, for those additional goods and services, GE would have received substantial sums via the GE Capital facility beyond the sums demanded in November 2019 (well more than an additional $200 million).  Under the facility, GE was expecting to receive a total of $670 million, but it received only $376 million given that Angola repudiated the OSCs.  All the payments to GE (and AE) would have all been made in USD out of accounts in the United States belonging to GE Capital.  Moreover, a significant amount of the revenue that

---

[4] *E.g.*, Ex. 3 (contract # 1027850 with GE Packaged Power, Inc., requiring payment to Citibank in New York City).

A31

would have gone to GE would have been paid in U.S. dollars into GE's U.S. bank accounts, but that did not happen because of Angola's repudiation.

## VI.    BACKGROUND ON RELATED ACTIONS AND APPEALS

56.    AE sought to have Angola reconsider its position through administrative proceedings, but to no avail.

57.    AE appealed Angola's decision to terminate the OSCs to MINEA; MINEA denied that administrative appeal on September 30, 2019.  AE then appealed that decision to the President of Angola, who denied it on November 13, 2019 in a one-sentence decision.  After the President denied AE's challenge, AE filed an appeal in the Angolan Supreme Court, and provided that Court with evidence obtained from GE in the United States pursuant to 28 U.S.C. § 1782.  But, to date, and since the filing of the action in January 2020, the Angolan Supreme Court has done nothing—disregarding its own procedural deadlines without explanation—and the Republic, the respondent in those administrative proceedings, only responded to AE's filings well after the deadline for doing so under Angolan law.[5]

58.    Given that the Angolan Supreme Court bypassed the procedural deadlines set forth in Angolan law, and with a limitation period approaching, in May 2020, AE and its wholly-owned subsidiary, Combined Cycle Power Plant Soyo, S.A., initiated an action for damages in the SDNY against the Defendants in this action and various GE entities.  In the SDNY action, the plaintiffs alleged that Angola had taken their property in violation of international law, and improperly terminated their contracts.  The SDNY dismissed those claims on *forum non*

---

[5] Although the Angolan Supreme Court was required to advise AE of any jurisdictional issues within days of the filing, it ignored that deadline.  Moreover, the Republic only had 30 days to respond to the filing under Angolan law, but the Angolan government missed the deadline, and served its response only after it was sued in the United States – in September 2020, six months after the deadline.  Then the Angolan Supreme Court, in turn, took another seven months to serve AE a copy of the Angolan government's response – which under Angolan law AE should have received in February 2020 but AE did not obtain until March 2021, more than a year later.

*conveniens* grounds in May 2021 because New York would be inconvenient for Angola's witnesses and Angola had an interest in having its own courts adjudicate the dispute. *Aenergy, S.A. et al. v. Republic of Angola et al.*, 20-cv-3569 (JPC), 2021 WL 1998725 (S.D.N.Y. May 19, 2021). That judgment was affirmed by the Second Circuit on appeal. *See Aenergy, S.A. et al. v. Republic of Angola et al.*, 31 F.4th 119 (2d Cir. 2022). The plaintiffs subsequently sought review by the United States Supreme Court on a petition for a writ of certiorari, but that petition was denied on January 9, 2023. *See Aenergy, S.A. et al. v. Republic of Angola et al.*, 143 S. Ct. 576 (2023).

59.    It must be noted, however, that neither the SDNY in the first instance nor the Second Circuit on appeal ever held that AE could seek money damages in Angolan court as a result of Angola's failure to pay Plaintiff for the work performed under the OSCs; and indeed, Angolan court is not an adequate or available forum given the mandatory limitation period that applied and applies there to the initiation of the relevant administrative proceeding in Angola.

60.    Following the decisions of the US courts, Angola plainly took the position that these were dispositions on the merits of the claims and took actions demonstrating Angola's bad faith toward AE, as well as Angola's willingness to make misrepresentations in U.S. courts.

   a.   First, although Angola had placed the disputed turbines on hold, Angola quickly took steps to install the turbines that had been in dispute and to hook them to the power grid there, as first revealed by the Angolan Ministry of Energy on March 18, 2022. Ex. 4.

   b.   Second, the President of Angola publicly (and wrongly) announced on June 9, 2022 that the U.S. courts had twice adjudicated Plaintiff's claims on the merits, once in the SDNY, and the second time on appeal. Ex. 5. This announcement by

A33

Angola is false and demonstrates Defendants' unwillingness to pay Plaintiff the money it is owed for goods, services, and work performed under the OSCs.

c.  Furthermore, AE understands that, around this time, the Angolan Government seized two <u>additional</u> turbines belonging to AE (TMs 13 and 14) that were being held in a third-party warehouse located in Angola.  AE did not learn of this development until early December 2022, and learned of it second-hand; AE is not aware of being served with process initiating seizure or other legal proceedings related to these turbines.  AE understands and alleges on information and belief that these turbines are being used by Angola and PRODEL at a power plant in Cabinda.

61.     In June 2022, Mr. Machado filed a notification of dispute under the bilateral investment treaty ("BIT") between Portugal and the Republic of Angola due to certain expropriations of property by Angola.[6]  The purpose of Mr. Machado's notification was to request negotiations with the Republic of Angola in light of the Republic's treaty obligations under the BIT.  On December 8, 2022, Angola formally rejected Mr. Machado's June 2022 notification/request.

62.     In doing so, the Republic stated that, contrary to what Angola's lawyers had represented to the SDNY and Second Circuit, the turbines in question were <u>not</u> being "provisional[ly]" administratively sequestered by a custodian reporting to the Angolan courts, but rather these turbines had been turned over from the Angolan court-appointed trustee to PRODEL, and PRODEL had actually installed the turbines to the power grid in June 2021 – *months* before Angola's lawyers told a United States Court of Appeals that the turbines were

---

[6] A copy of the Portugal-Angola BIT is publicly available at https://investmentpolicy.unctad.org/international-investment-agreements/treaties/bit/101/angola---portugal-bit-2008- (last visited Feb. 15, 2023).

A34

under "provisional" administrative control.  *See, e.g.*, Case No. 21-1510 (2d Cir.), Dkt. 103 at 41

(Brief for Angolan Defendants dated October 13, 2021).

63.    Apparently seeking to place a fig leaf on its lies, the Republic told Mr. Machado

that PRODEL and Angola were using the turbines because Angola needed power and also to

"ensure the conservation and storage of the turbines in good condition."  AE rejects the position

taken by the Republic in its December 2022 letter.

## VII.   ACTS AND EFFECTS IN THE UNITED STATES GIVING RISE TO AND DIRECTLY RESULTING FROM ANGOLA'S COMMERCIAL BREACHES

64.    As stated herein, the Republic, MINFIN, MINEA, PRODEL, and ENDE engaged

in commercial conduct and the claims herein are based on Defendants' commercial activity.

65.    For the reasons set forth herein, Defendants are properly sued in the United States

and not subject to immunity because Plaintiff's claims against them are "based upon a

commercial activity carried on in the United States by the foreign state" and/or because they are

based upon "act[s] performed in the United States in connection with a commercial activity of

[Defendants] elsewhere" and/or because they are based upon "an act outside the territory of the

United States in connection with a commercial activity of [Defendants] elsewhere" that

"cause[d] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

66.    To begin, the conduct described herein constitutes "commercial activity" under

the FSIA in that the entry into, performance under, and repudiation of the OSCs are all conduct

taken as a private market participant rather than a market regulator, as is the obtaining of

financing from a private U.S. entity to pay AE for those contracts.

67.    Moreover, as described in this complaint, the necessary U.S. connection is

present, including specifically and without limitation:

a. Payments were made from the U.S. Dollar-denominated, U.S.-based GE Capital Credit Facility on which Angola drew, and further payment would have been made out of the United States but for the breach of the contract by Angola. Indeed, the contracts herein were signed only once the US-based financing was structured, and it was structured in such a way as to occur in the United States and outside of Angola, to avoid access to the Angolan system. Ex. 1.

b. On or about December 28, 2017, as noted above, GE Capital made a disbursement of $644 million out of US accounts to pay AE for work under the OSCs. This included a payment to GE Power of approximately $376 million in U.S. Dollars from accounts at Deutsche Bank in New York, to accounts in New York for further credit either in the United States or abroad. These payments were made by GE Capital using funds that Angola drew from the GE Capital Facility to pay for AE's invoices to MINEA (to pay AE for eight turbines and additional goods and services), and the money was directed to GE directly to ensure that GE would be paid from the GE Capital facility on account of amounts due by AE to GE under the AE-GE supply contracts.

c. AE purchased the turbines at issue in the OSCs from GE in U.S. Dollars.

d. GE manufactured the engines for all the TM2500 turbines at issue in this case in the United States, and these were initially shipped from the United States.

e. It was expressly agreed between AE and GE in 2017 that, upon payment of further sums by Angola to AE under the OSCs beyond the amounts disbursed in December 2017 (*see supra* ¶¶ 42-46), AE would directly pay GE for further goods and supplies that AE had subcontracted to or otherwise committed to

purchase from GE so as to satisfy its own obligations under the OSCs.  Such

payment would occur under the direct-payment feature of the GE Capital Facility,

meaning that a significant portion of the funds would be sent directly from GE

Capital accounts in the United States to GE Power accounts in the United States

and elsewhere.  Angola's failure to pay AE the further amounts requested herein

has directly resulted in GE not receiving further payments from AE, via

disbursements occurring in and through GE accounts in the United States.

*See supra* ¶ 55.

    f.   As the President of Angola recently acknowledged in public, Defendants'

decision to terminate its contracts with AE was based in its view that AE was an

"intermediary" between Angola and GE, and it resulted in Angola having a

"direct link with the American General Electric" and GE's U.S. business

operations.  Ex. 5 at 4.

**VIII.   DESPITE ANGOLA'S WAIVER OF ITS RIGHT TO ARBITRATE CLAIMS
ARISING FROM ITS TERMINATION OF THE ON-SALE CONTRACTS
AND SOYO II AND WITHOUT PREJUDICE TO ITS RIGHT TO INVOKE
THAT WAIVER, AENERGY PROPOSES ARBITRATING THIS DISPUTE IN
LONDON**

68.     On January 25, 2023, Angola filed its motion to dismiss or stay this case

(Dkt. 19-1), arguing among other things that the claims in issue should be arbitrated under

arbitration clauses in the OSCs.  AE maintains that Angola has waived any right to arbitrate by,

*inter alia*, obtaining a prior decision sending the SDNY case to Angolan court, and that the

arbitration clauses do not apply to the present litigation.

69.     Nevertheless, on February 10, 2023, through its counsel and while reserving its

rights, AE emailed Defendants (via counsel) a proposal to arbitrate this dispute in a forum in

A37

which AE's witnesses would not be in danger of physical harm (as they are in Angola). *See* Ex. 6. AE did so while maintaining its position that Angola had already waived any right to arbitrate and otherwise reserving its rights, in an effort to resolve the parties' forum dispute.

70.    Through its February 10 letter, AE proposed a binding arbitration that would resolve the claims in this case. Among other things, AE's proposed arbitration would be seated in London, England (a neutral forum for both Plaintiff and Defendants, and the location where any dispute arising under the GE Capital facility was to be resolved), and would be conducted in English, which is also the language in which any dispute arising under the GE Capital facility was to be resolved. If Defendants agree to this proposal, then AE and Defendants would stipulate to a stay of these proceedings pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*

71.    As of the filing of this First Amended Complaint, Defendants have not yet responded to AE's proposal. Plaintiff clearly informed Defendants that failure to respond to their proposal by February 24, 2023, would be considered a further waiver of the right to arbitrate the claims at issue in this case. Ex. 6 at 2.

<u>**COUNT ONE**</u>

**BREACH OF CONTRACT—FAILURE TO PAY**
***(As Against All Defendants)***

72.    Plaintiff repeats and realleges paragraphs 1 through 71 as if fully set forth herein.

73.    The OSCs were binding and enforceable contracts.

74.    AE fully performed its obligations under the OSCs, and satisfied all conditions to performance.

A38

75.     Defendants breached the OSCs by failing to pay substantial amounts for work, goods, and services that Defendants actually obtained and claimed to have obtained from AE under the OSCs.

76.     AE suffered damages as a cause of this breach, namely it was not paid for the substantial work, goods, and services that Defendants obtained and claimed to have obtained from AE under the OSCs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.     Grant judgment against all Defendants, and award Plaintiff such damages, including compensatory damages, as may be proved at trial, as well as costs.

2.     Enter an order requiring Defendants to pay pre- and post-judgment interest.

3.     Grant Plaintiffs such other and further relief as the Court deems just and proper.

DATED:   New York, New York           Respectfully submitted,
         February 15, 2023

                                       **HOLWELL SHUSTER & GOLDBERG LLP**


                                       By:  _____ */s/ Vincent Levy* _____ .

                                       Vincent Levy
                                       Kevin D. Benish
                                       425 Lexington Avenue, 14th Floor
                                       New York, NY 10017
                                       (646) 837-5151
                                       vlevy@hsgllp.com

                                       *Counsel for Plaintiff*

A39

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.** | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 22-cv-2514-TNM |
| **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** | **DECLARATION OF HENRIQUE ABECASIS IN SUPPORT OF THE ANGOLAN DEFENDANTS' MOTION TO DISMISS COMPLAINT** |
| *Defendants.* | |

Henrique Abecasis declares under penalty of perjury, under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a licensed attorney and am co-counsel to The Republic of Angola, The Ministry of Energy and Water of the Republic of Angola ("MINEA"), The Ministry of Finance of the Republic of Angola ("MINFIN"), Empresa Pública de Produção de Electricidade, EP ("PRODEL"), and Empresa Nacional de Distribuição de Electricidade ("ENDE") (collectively, the "Angolan Defendants"). I have personal knowledge of the facts stated in this declaration.

2.      I earned my law degree from the University of Lisbon in 1973 and have been practicing law since then. I am a partner of the law firm Henrique Abecasis, Andersen Guimaraes & Associados ("HAAG"), which I founded in 1992. HAAG is headquartered in Lisbon, Portugal. HAAG specializes in, among other things, the representation of Angolan entities in international transactions, arbitration and litigation, including specifically in the areas of administrative and public procurements and energy.

1

A40

3.      I am an advisor to The Republic of Angola and The Ministry of Energy and Water of the Republic of Angola, in Angola, concerning the matters raised in parallel proceedings filed in Angola, including the "seizure" action pending in the Provincial Court in Luanda, Angola, as well as the challenge of the administrative decision to terminate the power plant contracts pending in the Supreme Court in Luanda, Angola.

4.      True and correct copies of the power plant contracts are attached as Exhibits 1 through 13. Formal translation of the arbitration clauses are attached as Exhibit 14.

5.      To my knowledge and after due inquiry, the power plant contracts were all negotiated in Angola and were executed in Angola, and each of these agreements identifies the parties as Angolan entities, with Angolan addresses; requires Plaintiff, Aenergy, S.A. ("Aenergy") to perform services and provide supplies to Angola in Angola; and requires payment for services in Kwanzas and requires payment to be made to the bank account chosen by Aenergy (and Aenergy never chose for payment to be made to any account in the United States). A true and correct copy of an invoice summary by contract, showing each disbursement to Aenergy's bank accounts, is attached as Exhibit 15.

6.      As alleged in ¶ 47 of the Complaint, on September 2, 2019 MINEA sent Aenergy a letter formally terminating the power plant contracts.   A copy of that letter as a "Loose Translation" provided by counsel for Aenergy is attached as Exhibit 16.

7.      Aenergy initiated a separate appeal of the termination of the power plant contracts. A true and correct copy of a translation of that appeal is attached as Exhibit 17. In that appeal, Aenergy alleged that MINEA harmed Aenergy by terminating the power plant contracts, and that as a result MINEA owes Aenergy compensation and indemnity to Aenergy. Id., at ¶¶239, 256-

2



257, 658-661 and petition (at the end). Although specifically mentioning its purported right to compensation, Aenergy did not request payment of compensation in the appeal.

8.     Other than me, all of the individuals related to the Angolan Defendants with knowledge of the underlying facts giving rise to the judicial proceedings referenced in this declaration, as well as this litigation in Washington, D.C., and all of their documents, are located in Angola. Furthermore, all of Aenergy's documents should normally be located in Angola and should be available in Angola as a matter of Angolan law.

Executed on this __24__ day of January, 2023.

_____
Henrique Abecasis

3

A42

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **AENERGY, S.A.** | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 22-cv-2514-TNM |
| **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** | **SUPPLEMENTAL DECLARATION OF HENRIQUE ABECASIS IN SUPPORT OF THE ANGOLAN DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| *Defendants.* | |

Henrique Abecasis declares under penalty of perjury, under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      AE is an Angolan company, incorporated under Angola law and with head office in Angola.

2.      The United States is not a convenient forum for the parties to this litigation.

3.      The relevant contracts in this dispute are in Portuguese and require English translations. The laws of Angola apply to govern the contracts enforcement and interpretation. Copies of the pertinent parts of the contracts and their English translations are attached to my Declaration, dated January 24, 2023, as Exhibits 1-13.

4.      Through the contracts, the parties agreed that arbitration is the proper and exclusive forum for resolution and none of the contracts provide for arbitration or litigation in the United States. See my Declaration, dated January 24, 2023, Translations of the Arbitration Forum Selection Clauses, Exhibit 14.

1

5.      AE has already sought resolution of its claims regarding the rescission of the contracts in the courts in Angola, seeking equitable contract remedies in Angola asking the Angolan court to address the essential subject matter of this dispute, including any asserted failures or improprieties by the Angolan court's trustee.

6.      As part of the judicial proceedings in Angola, on October 8, 2019 Angola sought, and on December 15, 2019 obtained, a provisional remedy from the Provincial Court of Luanda.

7.      The provisional remedy is like a prejudgment unit of replevin or attachment as authorized by Angolan law. The court placed four (4) disputed turbines and associated equipment into the possession of a trustee (IGAPE) appointed by the court to secure and preserve these assets pending adjudication of the Parties' rights.

8.      The order did not transfer title to the property to the Angolan government. Rather, title remains with AE, though temporary possession has been transferred to IGAPE pending resolution of the Parties' claims.

9.      IGAPE has authority to deploy and use the assets under its trust to prevent their waste, which it did in this case with approval of the attorney general. Accordingly, these four turbines have been connected to the grid in Angola. In the event the Angolan court does not determine the right of Angola to acquire these turbines (Angola's claim in the process), then Angola will be required to pay AE the fair value for their use during this period.

10.      Resolution of this dispute in Angola is proper because the key events surrounding AE's claims occurred in Angola, including the letters indicating Angola's agreement to buy more turbines and the termination of the contracts.

11.      The Angolan government is at the heart of this case and the unavailability of Angolan state officials in this Court will prevent full and fair adjudication. Further, the

2

A44

difficulty of accessing sources of proof and other evidence, the unavailability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses do not lend themselves to an easy, inexpensive, or expeditious process if trial is in the United States.

12.     In addition to prohibitive costs for travel, translating testimony from non-English speaking witnesses, or those that would prefer to testify in another language, would be a costly and difficult endeavor.

13.     Translation for Angolan state officials who prefer to testify in their country's official language would result in significant cost to the parties and delay to the court, which militates strongly in favor of Angola as a more appropriate forum for this litigation. The same is true of many relevant documents including the contracts at issue and related many written communications which will require translation from Portuguese to English.

14.     PRODEL and ENDE were created by Presidential Decree No. 305/14, of November 20, 2014, as public companies that succeeded the public companies ENE and ENEL, which were dissolved by the same Presidential Decree. A true and correct copy of the aforementioned Presidential Decree with a certified English translation is attached hereto as **Exhibit 1.** This Decree approved the statutes of each of these public companies, which are now governed by those statutes, by the legislation applicable to public companies (Law No. 11/13, of 3.9 - Basic Law on Public Companies), by the rules of commercial law and by the other rules of private law in force (art. 2 of the statutes). A true and correct copy of Law No. 11/13 with a certified English translation is attached hereto as **Exhibit 2**.

15.     Under art. 4 of Presidential Decree No. 305/14, PRODEL became the public company responsible for the exploration of the power generation centers, having

3

A45

as its main object, in accordance with art. 4 of its statute, the production of electricity in the Public Electricity System, and may additionally carry out other industrial and commercial activities, either directly or in association with third parties, **by decision of its Board of Directors**.

16.     Pursuant to art. 5 of Presidential Decree No. 305/14, ENDE became the public company dedicated exclusively to the commercialization and distribution of electricity, in the Public Electricity System, having as its main object, pursuant to art. 4 of its statute, the distribution of electricity nationally, in the scope of the Public Electricity System, through the operation of the infrastructure of distribution grids in high, medium and low voltage, and may additionally carry out other industrial and commercial activities, either directly or in association with third parties, **by decision of its Board of Directors**.

17.     The head offices of PRODEL and ENDE are in Luanda and, under the terms of art. 3 of their respective statutes, either company may, by decision of the Board of Directors, establish and close branches, agencies or other forms of representation anywhere in the national territory or abroad.

18.     Under the terms of art. 6 of the respective statutes, the company's governing bodies are the board of directors and the supervisory board.

19.     Under the terms of art. 7 of their respective statutes, the Boards of Directors, composed of seven members, appointed and dismissed by the President of the Republic, as the Holder of Executive Power, are the management bodies of each of the companies, and are accountable to the Government.

20.     Under the terms of art. 8 of the respective statutes, **the boards of directors are empowered to act on behalf of the companies, and are responsible for the exercise of all powers necessary to ensure the management and development of the**

A46

**companies and the administration of their assets, and particularly to: (i) represent the companies in and out of court, either as Plaintiffs or as Defendants, as well as to confess or transact in any actions; (ii) approve the participation in or association with other companies, as well as the exercise of new activities or the termination of existing ones; (iii) approve the acquisition and alienation of goods and financial assets; (iv) manage and perform acts relating to the corporate purpose of the companies; (v) decide on the contracting of short, medium or long term loans.**

21.     Under the terms of art. 14 of the respective statutes, **each of the companies is bound before third parties by the acts of the board of directors** when performed on its behalf, each of the companies being bound by the signature of two members of the board of directors, one of them being the president, or of two directors especially authorized by the board of directors, or of a representative, mandated especially for the purpose by the board of directors.

22.     The Government has superintendence powers on the companies and art. 25 of their statutes includes in such powers: (i) fixing the strategic objectives for the company's activity; (ii) regulating the exercise of the activity of the economic sector in which the company is inserted; (iii) analyzing the technical, economic and financial information on the company's activity and taking the appropriate measures.

23.     Under the terms of art. 27 of the statutes, the patrimonies of the companies are made up of the whole of the assets, rights and obligations received, acquired or contracted for or in the course of their business, including an initial capital provided by the state, **and the companies freely manage and dispose of their patrimonies**. According to article 43 of the statutes, **only the respective patrimonies of the companies are liable for their obligations.**

A47

24.     In terms of art. 7 of law no. 11/13, **public companies are entities endowed with legal personality and with administrative, financial and patrimonial autonomy, and their legal capacity covers all the rights and obligations necessary for the pursuit of their corporate purpose.**

25.     **Public companies are subject to tax law** and to the payment of taxes established by law (art. 8) **and are subject to competition law**; relations between public companies and between them and the State and other public entities must not result in situations that may impede, distort or restrict competition (art. 10).

26.     Public companies are endowed with **management autonomy** and **their management is the responsibility of their Boards of Directors**, with no state bodies or other public entities having the right to interfere in their management and operation, except in the cases and in the ways prescribed by law and **in any case the Government must not interfere in the day-to-day management of the companies** (art. 20).

27.     State superintendence over public companies is exercised by the Holder of Executive Power, the Minister responsible for the public business sector and the Minister responsible for the sector of activity of the company and include the monitoring and control the implementation of the policies and programs defined for such sector that are the company's responsibility (art. 43).

28.     The lack of prior approval or authorization determines the legal ineffectiveness of the operations or acts subject to the approval or authorization of the superintendence of the Executive Branch, but the superintendence must not interfere in the day-to-day management of the companies (art. 43).  Considering the hallmarks of independent instrumentalities identified by the Supreme Court in <u>Bancec</u>:

28.1    Prodel and Ende were created by law, which prescribes their powers and duties as follows:

6

A48

    a) Any of them can exercise other commercial or industrial activities, either directly or in association with third parties by decision of the respective Board of Directors;

    b) Any of them can establish and close branches, agencies or any other form of representation in Angola or abroad by decision of the respective Board of Directors;

    c) Their Boards of Directors have power to act on their behalf and are responsible for the exercise of all powers necessary to ensure the management and development of the companies and the administration of their patrimonies, and particularly to: (i) represent the companies in and out of court, either as Plaintiffs or as Defendants, as the companies can sue and be sued, as well as to confess or transact in any actions; (ii) approve the participation in or association with other companies, as well as the exercise of new activities or the termination of existing ones; (iii) approve the acquisition and alienation of goods and financial assets; (iv) manage and perform acts relating to the corporate purpose of the companies; (v) enter any contracts, including the contracting of short, medium or long term loans.

    d) Any of the companies is bound by the acts of the respective Board of Directors.

28.2    The companies were established as separate juridical entities with administrative, financial and patrimonial autonomy, with legal independent capacity to all rights and obligations required to pursue their social objects.

28.3    Each company is managed by a Board of Directors appointed by the President of Republic, acting as the Holder of the Executive Power.

7

A49

28.4    The companies administer and freely dispose of their patrimonies and only the companies' patrimonies are liable for the companies' debts. The companies are subject to the tax laws and to the payment of taxes as any private entity and they are subject to competition law as distinct economic enterprises.

28.5    The Government can supervise the companies and accompany the respective performance under the strategies defined for the respective sector of activity, but the Government must never interfere in the day-to-day management of the companies.

29.    After rescission of the contracts with AE, MINEA started negotiations with GE of new contracts which would assure the completion of the unfinished work under AE's rescinded contracts, which would be done under GE Capital financing. Such negotiations failed and GE never took AE's contracts or entered new contracts with the same scope.

30.    The power plant contracts do not mention the G.E. credit facility or require the Angolan Defendants to pay Plaintiff from that credit line.

31.    There is a criminal investigation of AE pending in Angola. As part of that investigation, Angolan authorities seized two additional turbines. These turbines have not been deployed by the trustee.

32.    AE never designated any US accounts the place for payment of any sums due under the contracts.

33.    The power plant contracts do not require any payment to be made from the GE credit facility, and Angola was free to make payments to AE under the contracts from any source of its choosing.

8

A50

Executed on this eight day of March, 2023.

_____
Henrique Abecasis

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.** | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 22-cv-2514-TNM |
| **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** | **DECLARATION OF MICHAEL EHRENSTEIN, ESQ. IN SUPPORT OF THE ANGOLAN DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| *Defendants.* | |

I, Michael Ehrenstein, Esq., pursuant to 28 U.S.C. 1746, hereby declare:

1. I am admitted *pro hac vice* to practice before this Court.

2. I am a Partner in Ehrenstein | Sager, 2800 Ponce De Leon Blvd., Suite 1400, Coral Gables, Florida 33134 and, in this capacity, represent the Angolan Defendants in the above-named case.

3. I submit this Declaration in support of the Angolan Defendants'' Motion to Dismiss Plaintiff's First Amended Complaint, dated February 15, 2023 (Dkt. No. 22). This Declaration is submitted alongside the Angolan Defendants' Memorandum of Points and Authorities in Support of this Motion, dated March 8, 2023, the Declaration of Henrique Abecasis dated January 24, 2023 and its Exhibits, and the Supplemental Declaration of Henrique Abecasis dated March 8, 2023.

4. A true and correct copy of the letter I sent to Plaintiff's counsel Vincent Levy, Esq. dated February 24, 2023 is attached hereto as **Exhibit 1**.

1

A53

I declare under penalty of perjury that the forgoing is true and correct.

Executed in Coral Gables, Florida on March 8, 2023.

Michael Ehrenstein, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AENERGY, S.A., <br><br> *Plaintiff,* <br><br> v. <br><br> REPUBLIC OF ANGOLA; MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA; MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA; EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP; and EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE, <br><br> *Defendants.* | Civil Action No. 1:22-cv-02514-TNM |

**DECLARATION OF ALBERTO SÉRGIO RAIMUNDO IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I, Alberto Sérgio Raimundo, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      My name is Alberto Sérgio Raimundo, and I am an attorney admitted to practice law in the Republic of Angola, registered at Ordem dos Advogados de Angola (the Angolan Bar Association) with the Professional card number 477.

2.      I am the managing partner and founder of the law firm Sérgio Raimundo & Associados, with a main office located in Rua Hélder Neto, nr. 50, Bairro de Alvalade, Luanda, Angola.  My practice focuses on litigation, arbitration, and other disputes.  I am also a University Lecturer in the Law Schools of the University Agostinho Neto and of the Catholic University of Angola.

3.      As the founding partner of my law firm, I have personally participated in hundreds of trials in Angolan courts and tribunals since 2005.  I base this declaration on my experience, and my

1

A55

knowledge of the facts stated herein by virtue of my representation of Plaintiff Aenergy S.A. ("AE")
in the Angolan civil proceeding and the Angolan Supreme Court proceeding that are both described
below.

4.    I provide this declaration in support of the papers filed by AE in opposition to
Defendants' motion to dismiss, and to provide the Court with (i) a description of the proceedings that
have been pending in Angola since 2019; (ii)  information regarding Angolan law and procedure;
(iii) details regarding the legal relationship between the Republic of Angola, PRODEL, and ENDE;
and (iv) information on other recent developments that bear on AE's ability to receive due process if
it were required to litigate this case in Angola.  Where appropriate, I respond to certain statements
made by Mr Henrique Abecasis.  *See* Dkts. 25, 26.

5.    By Presidential Decree of 23 August 2019, the President of Angola authorized
termination of the AE's on-sale contracts by Ministry of Energy and Water ("MINEA"), not
PRODEL or ENDE, and declared that MINEA (acting for PRODEL and ENDE) is the lawful owner
of four turbines that had been acquired by AE from certain GE affiliates, and the President authorized
MINEA to take actions necessary to obtain custody of these turbines.  MINEA (not PRODEL or
ENDE) issued a notice pursuant to the same on 2 September 2019, terminating the OSCs and taking
further actions.  The grounds stated for termination of the contracts in these two government decrees
and for seizure of the turbine are assertions that (a) AE supposedly engaged in irregularities (which
AE disputes) and (b) that there was a deterioration in the relationship between AE and GE.

6.    I am aware of two sets of civil proceedings involving AE in Angola arising from the
termination of these contracts.  The first is a civil proceeding that the Angolan Government initiated
against AE for an injunction authorizing the seizure of four turbines.  The second set of proceedings
consists of two cases initiated by Plaintiffs in Angolan Supreme Court, seeking to invalidate the
administrative decisions made by the Angolan Government terminating Plaintiffs' contracts.  In none

A56

of these proceedings is AE seeking its damages, and at this juncture it is impossible for AE to do so, which I discuss below at ¶¶ 22–29.  Moreover, none of them seeks to resolve whether Angola owes AE money for unpaid work, which I understand to be the question at issue in the DC litigation.[1]

<div align="center">

**Background About The Angola
Turbine Civil Lawsuit**

</div>

7.      On 4 October 2019, the Government of Angola, acting through its Office of Public Prosecutor, initiated an *ex parte* civil proceeding in Luanda Provincial Court to restrain the four turbines referenced in the Presidential Decree of 23 August 2019.  The request is enclosed as **Exhibit R-1**, along with a translation.

8.      The Public Prosecutor asserted that AE used fake letters and state funds (which AE vehemently disputes) to buy four more turbines than were contemplated in the 13 "On-Sale Contracts" (OSCs) between the Republic of Angola and AE, which Angola stated was a breach of the OSCs that required their termination and the seizure of these four turbines.  *See id.*  Angola asserted that the turbine seizure was appropriate because AE was part of a *' foreign group"* (*i.e.*, not Angolan). *Id.* ¶ 74.

9.      On 29 November 2019, the Luanda Provincial Court held an *ex parte* hearing on the request for preliminary relief.  A transcript of the hearing is enclosed as **Exhibit R-2**, along with a translation.  At the *ex parte* hearing, the witnesses called by the Government of Angola asserted that AE had bought four turbines beyond the number set forth in the 13 OSCs by using fake letters. *See id.* Mr Neto, the President of PRODEL, also stated that a presidential decree would have been necessary to change the OSCs to add four turbines, and that letters from PRODEL would be insufficient.  *Id.*

10.      On 5 December 2019, the Luanda Provincial Court issued an order preliminarily restraining the turbines.  A copy of this preliminary order is attached hereto as **Exhibit R-3**.

---

[1] As discussed below, Mr. Abecasis also mentions criminal proceedings; AE has not been received formal notice of any such proceedings, and I was surprised to learn about them via Mr. Abecasis' supplemental declaration.

A57

11.     On 6 December 2019, the Government of Angola, through the state-owned and state-controlled IGAPE (Instituto de Gestão de Activos e Participações do Estado - Institute of Assets Management and State Holdings, *see* Ex. R-1 ¶ 75), took custody of the four turbines and other equipment that had been at AE's facilities.

12.     On 16 December 2019, AE provided papers seeking to set aside the temporary injunction, and, on 17 January 2020, AE supplemented its submission with evidence received in the interim period from General Electric in the United States pursuant to 28 U.S.C. § 1782.

13.     By order dated 4 June 2020, the Luanda Provincial Court rejected AE's arguments, ruling (1) that although AE's evidence was timely submitted, the Luanda Provincial Court would not consider it (for reasons that, despite having reviewed the decision several times, the undersigned does not follow), and (2) that AE's defense (without the evidence that the court declined to consider) failed as a matter of law and would be preliminarily rejected.  A copy of this order is enclosed as **Exhibit R-4**, along with a translation.

14.     The court's order deprived AE of the right to make a defense that it was guaranteed under Angolan law, specifically article 406, nr 3 of the Angolan Code of Civil Procedure, which provides that *"The injunction defense shall be immediately notified to the counterparty to present opposition, providing the relevant duplicates, following then, without any more motions, the terms of the summary trial"*.  In my experience, the fact that AE was deprived of its legal rights in this proceeding is a strong sign that the Republic of Angola is prejudiced against Plaintiff AE, and that AE will not be given fair treatment in Angola's judicial system (which is controlled by the President of Angola's political party).

15.     AE appealed this ruling on 29 June 2020.  Angolan procedure gave the Court five days to provide notice to AE of a procedural decision on this appeal.  However, as of the date of this

declaration, nearly three years later, no such notice has been received, and AE's right to appeal has effectively been denied for almost three years without entry of an order.

16.     Under Angolan law, in order to obtain permanent rather than temporary relief in this proceeding, Angola was required to file papers requesting a plenary process.  The Government of Angola filed those papers on 17 March 2020.  Angola's pleading is enclosed as **Exhibit R-5**, along with a translation.  Angola again asserted that AE had used fake letters and state funds (which AE disputes) to acquire four turbines beyond the number of turbines contemplated in the 13 OSCs, thus breaching the contracts and requiring their termination and seizure of the turbines.  On 22 July 2020, AE filed papers in opposition to Angola's submission of 17 March 2020.  To my knowledge (in my capacity as AE's attorney in those proceedings), there has been no further filing, order, hearing, proceeding or any other development whatsoever since that date.

<div align="center">

**Background About The Plaintiff's<br>Administrative Proceedings**

</div>

17.     Separately from the turbine proceedings launched by Angola, AE and its wholly-owned subsidiary, Combined Cycle Power Plant Soyo, S.A. ("CCPP"), have pursued administrative proceedings.  These are requests through the executive branch and the judicial branch of Angola asking for reconsideration and review of agency action (in this case, MINEA).  These are not claims for damages.

18.     Following issuance of MINEA's notice of termination of AE's contracts with MINEA, PRODEL, and ENDE, AE filed an administrative challenge with MINEA, requesting that MINEA reverse its decision on the ground that it was improper under the administrative law.

19.     MINEA rejected the administrative appeal on 30 September 2019.  AE appealed the agency's denial administratively to the President of Angola on 4 October 2019.  The President of Angola denied AE's challenge in a decision that AE received on 13 November 2019.  The Office of

<div align="center">5</div>

<div align="center">

A59

</div>

the President issued a legal memorandum in connection with that denial dated 28 October 2019; I enclose a copy of that memorandum as **Exhibit R-6**.

20.     On 13 January 2020, AE filed an administrative case in the Supreme Court of Angola, requesting review of the President's denial under Angola's administrative procedure act.  AE also submitted evidence obtained from GE in the United States under 28 U.S.C. § 1782 in support of its application.  AE asserted that the grounds stated for invalidation (namely, the supposed irregularities and loss of partnership between AE and GE) were improper grounds for terminating the OSCs.  The case did not concern or request a determination of the amounts due by Angola to AE.  Although Angola was required to respond within 30 days, AE did not receive Angola's response until early 2021, and AE replied in March 2021.

21.     CCPP followed a similar procedure after Angola terminated the "Soyo II Concession," which was a twenty-five year concession and related contracts awarded to CCPP under which CCPP was to build and do work related to a new power plant in the Zaire province of Angola.  CCPP filed an administrative challenge with MINEA on 27 November 2019.  MINEA did not issue a decision, and the challenge was therefore deemed denied by operation of Angolan law.  CCPP then appealed to the President of Angola on 26 February 2020.  The President also did not issue a decision, and the challenge was also deemed denied by operation of Angolan law.  On 22 July 2020, CCPP filed an administrative challenge in the Supreme Court of Angola, again requesting review of the President's denial under Angola's administrative procedure act, and taking the position that the termination was improper.  As far as I am aware, Angola has never filed answering papers in this process.

22.     Under Angolan procedure, these administrative judicial proceedings were meant to be abbreviated and expedited.  Thus:

        a)  The Government of Angola was meant to have 30 days to file its opposition to AE's and CCPP's initial submission.

b) The Court would then have issued a decision about any measures of inquiry requested.

c) Thereafter, the parties would have had 20 days to present their closing arguments in writing, and the Attorney General's representative would have had 15 days to provide a legal opinion to the Court.

d) The Supreme Court would then decide the matter in 30 days.

23.     Although the entire case was therefore required to be resolved within less than six months of filing in early 2020, there has been no order, filing, hearing, conference, proceeding, or other development of any sort in the AE case since AE filed its reply in March 2021, and there has been no order, filing, hearing, conference, proceeding, or other development in the CCPP case since July 2020, when that case was filed.

**Neither Of The Angolan Proceedings**
**Involve A Claim For Damages**
**And Not One Of Them Involves The**
**Dispute At Issue In The DC Action**

24.     AE and CCPP are not seeking damages (nor could damages be awarded) in any of the actions pending in Angola. In the Turbine Civil Lawsuit that I refer to above (¶¶ 4-13), AE is the respondent in an equitable case that Angola initiated to seize turbines.  AE is not seeking and could never have sought in these proceedings any of the damages sought in Washington, D.C. – namely, damages for unpaid work – given that the case does not even concern those issues.

25.     As noted, the purpose of the Administrative Proceedings that I refer to above is to reverse the termination decisions of MINEA in respect of the contracts between Angola and AE and Angola and CCPP.  That procedure does not permit an award of damages. Indeed, AE explicitly states in at ¶ 661 of its administrative proceeding complaint that any potential compensation *"would be claimed in an autonomous process in appropriate time"*.  In other words, AE was reserving its rights

to seek damages (which were not available in the administrative suit) in a separate proceeding, at the *"appropriate time"* (in other words, later).

26.     Moreover, not one of the cases pending in Angola concerns the question of how much money Angola owes to AE for unpaid work.  The issue in the turbine case is whether Angola is entitled to a restraint on four turbines, and the two administrative cases concern whether Angola properly terminated Plaintiffs' contracts based on the grounds stated in the termination notices (*i.e.*, the supposed irregularities and loss of partnership).  As a result, not one of the cases concerns the question of how much money Angola owes to AE for unpaid work – the issue in this case.

27.     If AE had pursued damages in Angola against the Government of Angola for this unpaid work, it would have had to file another action, under a separate procedure of the law permitting damages actions for breaches of state contracts.  This is not the same procedure as either (a) the stagnated process Angola initiated to expropriate AE's turbines, or (b) the dormant administrative processes AE and CCPP started in the Supreme Court of Angola.

28.     During the administrative process, AE obtained a copy of a 28 October 2019 legal opinion issued to the Office of the President of Angola (*see* Ex. R-6, referenced above at ¶ 17). The opinion recognizes that the administrative process AE and CCPP initiated is different from an action for damages for breach of contract under Angolan law.

29.     Mr Abecasis also acknowledges that AE does not have a claim for damages pending in any proceedings in Angola.  *See* Dkt. 25 ¶ 7; Dkt. 26 ¶ 5.

**AE Cannot Bring A Damages Claim
Against The Angolan Defendants
In An Angolan Court**

30.     It is my understanding that the Angolan Defendants' primary position is that AE should bring its single claim for damages for unpaid work against Angola in Angola rather than in this Court.  It is not possible to file such a claim in Angola court.

31.     Even assuming AE could bring a claim for damages against the Angolan Defendants in Angola (AE cannot, and Mr Abecasis does not suggest otherwise), there is today <u>no claim</u> that could be asserted which might result in <u>damages</u> being awarded to AE.  This is because, today, there is no Angolan court that would have subject-matter jurisdiction over the claim that AE asserts here.  Mr Abecasis never suggests a contrary position.

    a)  If this contract claim for damages were to be filed in Angola, it would be governed by Angola's Public Contracts Law, specifically Article 329 of that law, which imposes a mandatory legal obligation for parties seeking damages to file their claims within 180 days of the date on which a public contract is terminated. Damages claims under the OSCs are governed by the Public Contracts Law, and under Article 21 of Angola's Regulations on Administrative Litigation Proceedings (Law No. 4-A/96 of 5 April 1996) this 180-day limitation period is mandatory and cannot be waived, because Article 329 is considered jurisdictional under Angolan law, as it is a "*Prazo de Caducidade*" (jurisdictional time-limit), rather than a mere "*prescrição*" (statute-of-limitations defense).[2]

    b)  This means that there is no Angolan court that can hear Plaintiff's contract claim for damages, because it has been more than 180 days since MINEA terminated the OSCs, and because Angola cannot waive this jurisdictional requirement.  Angola has never been able to and could not voluntarily waive or extend this limitation in Angolan court.

---

[2] Art. 298 of the Angolan Civil Code states a *caducidade* controls unless there is <u>express</u> reference to a *prescrição*.  Angola's Public Contracts Law does not contain any express reference to a *prescrição*, which makes very clear that the 180-day jurisdictional time bar cannot be waived or circumvented under Angolan law.

**The Republic Of Angola**
**Dominates And Controls**
**PRODEL And ENDE On**
**A Day-To-Day Basis**

32.      In his supplemental declaration, Mr Abecasis discusses the structure and operations of

PRODEL and ENDE, two of the Defendants in this action that are wholly owned and controlled by

the Republic of Angola and its ministries (specifically, MINEA).  Although Mr Abecasis maintains

that the law creating PRODEL and ENDE (Presidential Decree No. 305/14 of 20 November 2014)

and Angola's Basic Law on Public Companies (Law No. 11/13 of 3 September 2013) established

PRODEL and ENDE as *"separate juridical entities"* (Dkt. 26 ¶ 28.2), the truth is that those laws and

the facts surrounding PRODEL and ENDE's operations reveal the Republic of Angola to be in

control of their day-to-day operations.  Mr Abecasis concedes this to some extent in his supplemental

declaration, but I wish to further highlight the matter and clarify what Mr Abecasis misstates.

33.      PRODEL and ENDE are 100% owned by the Republic of Angola.

34.      It is true that, as Mr Abecasis acknowledges, the President of Angola has the power to

appoint and fire the Boards of Directors for PRODEL and ENDE.  *See* Dkt. 26 ¶¶ 19, 28.3; *see also*

Decree No. 305/14, art. 7(3).  But the Republic's control over PRODEL and ENDE goes much

further.  Not only does the Executive Branch of the Angolan Government set the salary for PRODEL

and ENDE's Board of Directors (art. 16(2)) and appoint their Supervisory Boards (art. 17), the two

entities are completely dominated by the Angolan Government, which is demonstrated by the facts

underlying the Republic's formation and termination of the OSCs (discussed at ¶¶ 4–5, 7, 17 above)

and the evidence I provide below.

35.      Under article 4(5) of their implementing legislation, PRODEL and ENDE cannot

create new subsidiary companies, *"incidentally carry out other industrial or commercial activities"*,

or even make agreements with third parties unless PRODEL and ENDE are *"previously authorized"*

A64

to do so by government ministers.  Dkt. 26-1 at 18, 28.  Relatedly, a significant responsibility of the Boards of Directors for ENDE and PRODEL is to *"Submit for the approval or authorization of the Minister responsible for the Public Business Sector and the Minister responsible for the Activity Sector the acts and documents that, under the terms of the law or statute, must be so"*.  Decree No. 304/14, art. 8(3)(j); Dkt. 26-1 at 19, 29.

36.    Under article 36(3) of their implementing legislation, Angola's Minister of Economy, rather than PRODEL or ENDE representatives, is responsible for determining what *"reserves and funds [are] deemed necessary"* for PRODEL and ENDE, meaning that neither of these entities has ultimate control over its budgets and profits.  Dkt. 26-1 at 15, 35.  In any event, PRODEL and ENDE lack financial autonomy, because their budgets are *"reinforced with state appropriations"* by the Republic, which is a necessity.  Decree No. 305/14, art. 5(2); art. 35I; Dkt. 26-1 at 8, 18.  This is necessary to the survival of PRODEL and ENDE because revenues for power generation and power distribution coming from the applicable tariffs and revenues do not cover the operating costs for PRODEL's and ENDE's activities.

37.    In light of the fact that PRODEL and ENDE are not able to survive without being funded by the Angolan Government through its Public State Budget, it is unsurprising that PRODEL and ENDE *"are subject to financial control"* by the Government (Law No. 11/13, art. 9), which means that the regular economic management of the entities is determined MINEA and other Angolan Government officials.

38.    The implementing legislation for PRODEL and ENDE expressly permits the *"Government's intervention"* in the entities' affairs, provided that the intervention *"is exercised by the competent bodies"* of the Angolan Government.  Decree No. 305/14, art 24; Dkt. 26-1 at 23, 33. The Republic's invasion into the operations of PRODEL and ENDE is extensive in that the Republic can *"impose[]"* on  PRODEL and ENDE *'fixed prices or social objectives that are not economically*

11

A65

*profitable"*.  Art. 29(2)(b); Dkt. 26-1 at 23, 33.  A common example of this is seen in the unsustainably low tariffs and other charges that ENDE and PRODEL issue for their power generation services.  It is clear that such policies benefit the Republic of Angola and not PRODEL and ENDE as separate corporate entities.

39.     The Republic's intrusion into the affairs of PRODEL and ENDE is also evident based on the Ministry of Finance's ("MINFIN") direction of financial policy for these entities.  For instance, the International Monetary Fund recently recognized that it was MINFIN, not PRODEL, that was responsible for *"implementing a time-bound plan"* to clear certain arrears that were held in PRODEL's name.  *See* **Exhibit R-7** at 70–71.  And it is the President of Angola and MINFIN that control how PRODEL's and ENDE's debts are settled, a fact that was publicly recognized in September 2020 by national news outlets.  *See* **Exhibit R-8**.  In my experience, no company (whether in Angola or elsewhere) that is truly separate and autonomous from the Angolan Government would be controlled and directed to this extent, and this evidence refutes the claim of Mr Abecasis that ENDE and PRODEL are able to *'freely manage and dispose of their [assets]"* and that they are responsible for their own assets.  *Contra* Dkt. 26 ¶ 23.  If that were the case, MINFIN would not be in charge of settling PRODEL's debts (I understand MINFIN does the same for ENDE).

40.     Mr Abecasis correctly recognizes that the Republic of Angola has *"superintendence powers on the companies"*, such that the Government's powers include, among other things, *'fixing the strategic objectives for the company's activity"*.  Dkt. 26 ¶ 22.  Through this mechanism, the Angolan Government regularly imposes its will on PRODEL and ENDE.  One example of this is the mandate for low energy prices that is dictated by the Angolan Government and that makes PRODEL and ENDE economically unsound without direct financial assistance from the Angolan Government.

41.     In light of the foregoing, the provision of the Basic Law providing that *"The superintendence must not interfere in the current management of the companies"* (article 43(5)) has

A66

no practical force in the context of PRODEL and ENDE due to the provisions of Angolan law that I have identified, and due to the interest of the Angolan Government in dominating every aspect of the country's energy sector. *Contra* Dkt. 26 ¶ 28.

**The Republic Of Angola Directs And
Controlls Every Aspect Of The
Relationship Between AE And
PRODEL And ENDE**

42.     The extent of the Angolan Government's domination of PRODEL and ENDE becomes even clearer when one observes the power the Government exercised during the negotiation, performance, and termination of the OSCs.  At every moment, the Republic of Angola was deciding what would happen and ordering ENDE and PRODEL to carry out what the Government wanted.[3]

43.     In addition to their implementing legislation, Angola's Basic Law on Public Companies (Law No. 11/13 of 3 September 2013) and Angola's Public Procurement law (Law No. 9/16 of 22 January 2021), both of which apply to ENDE and PRODEL, show that the entities are subject to the wishes and interference of the Angolan Government.

44.     ENDE and PRODEL had no authority to enter into the OSCs with AE without approval from the Republic itself, as is outlined in Basic Law articles 43 and 44, which make the Angolan Government responsible for many critical operations of PRODEL and ENDE, including: *"monitoring and controlling the policies and programs"* of ENDE and PRODEL (art. 43(3)), signing contracts (art. 44(2)), and authorizing investments (art. 44(2)).  Thus, the OSCs could only be signed after the President of Angola issued a series of presidential decrees in July and August 2017.  *See* **Exhibit R-9**.  Without these decrees, PRODEL and ENDE would not have been allowed to sign the

---

[3] The Angolan Government is able to exercise this power over ENDE and PRODEL largely because important contracts such as the OSCs *"require the prior approval of the Holder of the Executive Power or whoever he delegates"*.  Law No. 11/13, art 6(6); Dkt. 26-2 at 7.  It is also due to the fact that, pursuant to Angola's Public Procurement Law, any expense of PRODEL and ENDE that costs most than USD $ 990,000 must be approved by MINEA.

OSCs.  And it was through these decrees that <u>MINEA was a contracting party to each of the OSCs</u>, and not just ENDE/PRODEL.[4]

45.     Further evidence of the Angolan Government's control over PRODEL and ENDE can be seen in the fact that those entities were powerless to amend the OSCs without first receiving approval from the Angolan Government.  In fact AE was often required to meet with MINEA officials instead of PRODEL or ENDE officials.  *See* **Exhibit R-10**.  And even when ENDE and PRODEL officials were involved in meeting with AE, the entities could not act without prior approval from the Angolan Government.  For example, in November 2018, there was a proposal to amend the OSCs to purchase additional turbines; this necessitated a request from the Minister of Energy and Water directed to the President of Angola seeking permission to amend the OSCs.  *See* **Exhibit R-11**.

46.     And the termination of the OSCs was done by <u>MINEA</u>, not by PRODEL and ENDE. Evidence submitted by the Republic of Angola in this case acknowledges this fact.  Specifically, at Dkt. 25-16, the Republic has submitted the OSC termination decree sent to AE, which is issued on MINEA letterhead and signed by the Minister of MINEA's Chief of Staff, dated 2 September 2019, on the instruction of the President of Angola, by decree of 23 August 2019.

47.     There is ample additional evidence that the Angolan Government controlled every aspect of PRODEL's and ENDE's decision-making as regards the OSCs.

   a)  By Presidential decree dated 23 August 2019, the President of Angola authorized <u>MINEA</u> not just to terminate the OSCs but also to commence discussions with GE

---

[4] It must be noted that, because of the Basic Law on Public Companies and the low USD $ 990,000 threshold in Angola's Procurement Law, the Angolan Government – usually acting through MINEA or MINFIN – almost always exercised control over contracts with AE, and the Government was itself a party to these contracts.  In addition to the OSCs, the Angolan Government regularly directed PRODEL and ENDE to enter into agreements for minor things like maintenance and service agreements.  PRODEL and ENDE cannot enter even these agreements without approval from MINEA or MINFIN if the contracts cost more than USD $ 990,000.

to take over the work that was previously set forth in the OSCs that would soon be terminated.  As Mr Abecasis states, thereafter, "*MINEA [not ENDE and PRODEL] started negotiations with GE of new contracts*".  *See* Dkt. 26 ¶ 29.

b) MINEA asserted on 30 September 2019 that *"the contracting party in all of them [the OSCs] was MINEA"*, and that *"We [MINEA] hereby clarify that the legal autonomy of state-owned companies is not an impediment for them to act on behalf of MINEA, via a delegation of the Ministry's authority.  Such was the case in these instances, and thus we clarify the relationship between these entities, pursuant to which it is always possible to the delegating party to bestow any powers on the delegated party in what concerns the contracting third party, as it so happened in the termination that Aenergy opposed to"*.  A copy of this document is enclosed as **Exhibit R-12**, along with a translation.

c) The Republic again emphasized this same point on 28 October 2019, when in its Legal Opinion in the Civil House, the Angolan Presidency stated that *"The decision to terminate the agreement was signed by MINEA's Chief of Staff under the powers delegated unto MINEA, formalised by an order contained in the notification of the Presidential Decree that authorised that termination"*.  Ex. R-6 ¶ 6.

d) At the turbine proceeding, Mr Neto, the President of PRODEL, testified under oath that PRODEL did not have the authority to change the OSCs in any respects without a decree authorizing the same issued by the President of Angola.  Ex. R-2 at Translation p.3 (*"[Mr Neto] replied that the chairman of the board of directors does not have the necessary authority to alter the scope of the agreements, and certainly not the loan agreements which were approved by the hierarchically*

15

A69

*superior holder of the Executive Power"*.).  Mr Neto also testified that *"the State"*, rather than PRODEL and/or ENDE, "paid for the purchase of" turbines from AE.  *Id.* at Translation p.2.

48.     And the Angolan Government – <u>not</u> PRODEL and ENDE – is the entity that has seized turbines belonging to AE and claims to have a right to take them, even though the Republic of Angola would have no claim to that property if it were distinct from PRODEL and ENDE.  As Mr Abecasis himself observes, in the Turbine Civil Lawsuit discussed above (¶¶ 4-13), it is *"Angola's claim"* that it is *"the right of Angola [not ENDE or PRODEL] to acquire these turbines"*.  Dkt. 26 ¶ 9.  Again, if PRODEL and ENDE were genuine and legally distinct entities, the Angolan Government would have no such claim to this property.

49.     The foregoing confirms that Angola considered the OSCs with AE to be contracts with the Republic of Angola and MINEA, with PRODEL and ENDE serving as alter egos or agents of the Republic of Angola or MINEA under Angolan law.

**New And Recent Developments
Demonstrate AE Will Not Get Due
Process In Angola**

50.     It must be noted that AE's dispute with Angola is a politically sensitive matter in Angola that has been the subject of regular media coverage and commentary by Angolan government officials.  At each stage, the Angolan government has publicly opposed Plaintiff's attempts to recover on their injuries.  And, as I discuss below, since the United States Court for Southern District of New York rendered its decision in May 2021 and the United States Court of Appeals for the Second Circuit heard argument on AE's appeal in February 2022, the Angolan Government has become even more hostile towards AE and even more aggressive in persecuting AE (even in violation of Angola's own laws).  In my view, given my experience, it is therefore very unlikely that AE will obtain a fair

A70

hearing on its claims if this particular case is ordered to be adjudicated in Angolan court – which in any event would be futile since Plaintiffs cannot recover for damages there. *See* ¶¶ 28-29, above.

51.     It is important to understand that the President of Angola is the leader of the People's Movement for the Liberation of Angola ("MPLA"), the political party that has ruled Angola since 1975 without any interruption.  The MPLA exerts substantial control over all branches of Angola's government, including the judiciary.  The vast majority of judges in high courts are nominated to those positions by members of the MPLA (either the President or leadership in the National Assembly, which is also MPLA-affiliated).

52.     This might seem inconsequential but for the fact that the President of Angola has publicly opposed AE's attempts to seek redress in Angolan courts; the fact that the Angolan Government has permanently seized AE's property in violation of Angolan law; and the fact that the Angolan Government now says it is carrying out *"criminal investigations"* into AE without providing any notice or due process to AE in those proceedings.

53.     On March 18, 2022, after AE argued its appeal in the United States Court of Appeals for the Second Circuit but before that court rendered its decision, MINEA took steps to connect AE's turbines to the Angolan power grid.  Mr Abecasis notes this now (*see* Dkt. 26 ¶ 9), but to my knowledge neither AE nor the Angolan courts were ever notified by Angola that AE's property had been given to the Angolan Government so that AE's turbines could be installed.

54.     According to Mr Abecasis, IGAPE, the depositary of AE's turbines referenced above to whom the Turbine Court supposedly gave temporary possession, *"has authority to deploy and use the assets under its trust to prevent their waste"*, and that is why AE's property *"[has] been connected to the grid in Angola"* at the instruction of Angola's Attorney General.  Dkt. 26 ¶ 9.

55.     I was surprised to read this statement, because this is not consistent with Angolan law, and this development suggests Angola is not following its own laws as regards its treatment of AE.

17

56.     From the moment it was appointed as depositary of the seized assets, IGAPE was subject to the legal regulations deriving from the Angolan Civil Code and the Angolan Code of Civil Procedure.  Relevant articles of the Angolan Civil Code and the Angolan Code of Civil Procedure (with translations) are enclosed as **Exhibit R-13**.  The relevant Angolan Civil Code and Civil Procedure provisions governing IGAPE are as follows:

a)  Article 1187 of the Civil Code sets out that a depositary such as IGAPE is obliged to (a) safeguard the deposited asset (here, AE's turbines); (b) immediately advise the depositor (here, AE) when it knows of any danger threatening the asset or of any third-party claiming rights over the asset, provided that the fact is unknown to the depositor; and (c) to return the asset with its revenues.

b)  Article 1188 of the Civil Code states that, in the event of theft or deprivation of possession of the asset (for reasons not attributable to the depositary), the depositary is released from its obligations, but must immediately inform the depositor.

c)  Article 1189 of the Civil Code establishes that the depositary cannot use the assets deposited—again, AE's turbines—or give them to another person or entity without the authorization of the depositor (AE in this instance).

d)  Article 1190 of the Civil Code provides that a depositary such as IGAPE can only store the asset in a different manner from that agreed upon when there is reason to assume that the depositor would approve the modification if he knew the circumstances that justify it.  However, the depositary must inform the depositor of said modification as soon as it is possible to communicate it.

e)  Article 402 of the Angolan Code of Civil Procedure defines seizure as the judicial apprehension of an asset in all matters not contravened by the laws governing

18

A72

attachment.  Nothing further is stated in that section with regard to the destination of the seized assets and the terms of their respective deposit.  As a result, the provisions of Angolan law governing the law of attachment are fully applicable.

f)   Under Articles 855 and 843(1) of the Code of Civil Procedure, IGAPE and any other depositary has a duty to protect movable assets under their protection with the diligence and zeal of a reasonable person (*bonus pater familiae*), and with the obligation of providing legal reports on its administration of the assets under its trusteeship.

g)   Article 845 of the Code of Civil Procedure entitles any intervening party to request the removal of a depositary who no longer fulfils its duties.

h)   Article 851 of the Code of Civil Procedure allows the anticipated sale of assets in case they are perishable or when there is a major advantage in anticipating the sale.  Such authorisation may be requested by the attaching creditor, by the debtor, or by the depositary itself.  *However*, the owner of an asset being held by a depositary must be given notice before a sale takes place, and a court must authorize such sale for it to be valid under Angolan law.

i)   Civil Procedure Code Article 854 obliges the depositary to present the assets it has received within 5 days after being ordered to do so.  Otherwise, the depositary may be punished with imprisoned for an amount of time corresponding to the value of the deposit.  This is calculated at 20 Kwanzas per day.

57.   As the foregoing provisions of Angola's Civil Code and Code of Civil Procedure demonstrate, IGAPE did not have the power to hand over AE's turbines to a third party, let alone the Angolan Government, since the Government is the entity that seized AE's property in the first place.

19

A73

58.     Furthermore, IGAPE – which I believe acted under the control of the Angolan Government – and the Government itself violated multiple applicable laws in installing AE's turbines (which Angola now confesses despite withholding that information in the past):

a)   IGAPE breached Article 1187(a) and (c) of the Civil Code as it failed to keep the assets that were in its custody and placed itself in a situation where it was unable to return them.

b)   IGAPE also violated article 1189 of the Civil Code because it delivered assets that were in its custody to the Angolan Government without the authorization from AE.

c)   And IGAPE violated Article 843(1) of the Code of Civil Procedure, because it did not administer the assets with the zeal and diligence required of a reasonable person.  IGAPE disposed of the assets and placed itself in a situation where it was unable to administer them.

59.     Furthermore, Angola's Courts and the Angolan Government – through its Attorney General, according to Mr Abecasis (*see* Dkt. 26 ¶ 9) – violated Angolan laws by refusing to give AE notice of the transfer and installation of AE's turbines and by refusing to render a judicial order authorizing that sale.  These actions are contrary to Article 851 of the Code of Civil Procedure (discussed above).  That Angola's Attorney General, <u>not a court</u>, approved the use of AE's property, and that AE never received notice of this order are state actions that raise serious concerns about AE being able to receive fair and impartial treatment in Angola if it is forced to litigate in Angola.

60.     Another recent instance that signals AE will not receive fair and impartial treatment in Angola has to do with public remarks from the President of Angola, who (as noted above) exerts overwhelming influence on Angola's judiciary:  Shortly after the United States Court of Appeals for the Second Circuit rendered its decision on 13 April 2022, the President of Angola on 9 June 2022 announced during a nationally televised press conference that *"the Angolan State should maintain [a]*

*direct link with the American General Electric"*, and that AE is a *'foreigner"* over which Angola has

*"no reason to lose"* its relationship with GE.  An excerpt of the transcript from that press conference,

along with a translation, was previously filed with this Honorable Court at Dkt. 22-5.

61.     Finally, in a new development revealed by Mr Abecasis in his supplemental

declaration dated 8 March 2023, Angola has apparently initiated a *"criminal investigation"* of AE,

and took two more of AE's turbines as part of that investigation.  Dkt. 26 ¶ 31.  As I have noted, I am

co-counsel for AE and I represent AE in Angola.  Despite this fact, I have never received notice from

the Angolan government that two of AE's turbines were seized as part of any criminal investigation

into AE, and I am not aware of AE ever receiving such notice from the Government of Angola.

Mr Abecasis's supplemental declaration in this action is the first such notice.

62.     That fact, plus the fact that Angola has seized an *additional* 2 turbines belonging to

AE, lead me to further believe that AE will not receive the fair and impartial treatment in Angolan

courts consistent with internationally accepted standards of due process.

63.     I believe evidence of this can further be found in the statement of Mr Abecasis that

these 2 turbines *"have not been deployed by the trustee"*, Dkt. 26 ¶ 31, as there are public reports,

which I believe to be true, that Angola is installing these two turbines more than 1000 kilometers

from the place where they were seized.

64.     Given these developments and the status of other proceedings in Angola's courts

which I have discussed above, I do not believe AE will receive an impartial hearing in Angola on its

claim pending before this Court, especially since the President of Angola himself, to whom the

judiciary answers, has prejudged the merits of AE's cases against Angola while denouncing AE as a

*'foreigner"* and intermeddler that got in the way of Angola's relationship with GE; since Angola has

permanently seized AE's property without compensation and hooked up AE's turbines to the national

A75

power grid; and since Angola now says (via Mr Abecasis) that it has launched a secret *"criminal investigation"* that appears to be a complete sham.

**Angolan Courts
Do Not Allow Remote Testimony**

65.     I close by observing some important points of Angolan procedure and evidence that may be useful to the Honorable Court in evaluating AE's case before it.  The Angolan Civil Procedure Code provides that all witnesses must provide testimony <u>in court</u> and cannot appear remotely, subject to narrow exceptions:

a)   All party witnesses must provide testimony in court and have no ability to testify remotely or in writing.  Art. 556.  Persons entitled to bind corporate parties are deemed parties, and they must testify in person.

b)   Non-party witnesses are generally required to testify in person.  Art 621.

c)   There is a narrow and rarely used exception permitting non-party witnesses outside the judicial district to provide written testimony in answer to questions, but this exception does not permit cross-examination and it must be approved by the court.  Art. 623.  For witnesses abroad, it is not enforceable.

d)   Certain enumerated officials of the Angolan government may provide testimony from their residences or the offices from which they work.  Art. 624.

e)   The President may testify from a location of his choice.  Art. 625.

66.     Moreover, written statements of third-party witnesses are very uncommon:

> The common procedure with witnesses is that they give oral evidence at trial, not written witness statements. Such evidence, together with any document tendered, is recorded as evidence-in-chief. The other party can cross-examine the witness. Subject to the court's discretion, re-examination may be directed on matters referred to in cross-examination. Judges are allowed to question witnesses directly. A witness cannot be recalled without the leave of the court.[5]

---

[5] Herbert Smith Freehills, Dispute Resolution in Africa 23 (Sept. 2016), https://tinyurl.com/2mjr594p.

A76

67.     I am the founding partner of the law firm Sérgio Raimundo & Associados, and I have personally participated in hundreds of trials in Angolan courts.  I have never seen or heard of a witness testify remotely in a civil court case in Angola, which is unsurprising given these rules.

68.     I note that there are rules permitting remote testimony in limited <u>criminal</u> cases, but those do not apply to civil cases, and the existence of rules permitting remote testimony in limited criminal cases shows it is <u>not</u> permitted in civil cases.

69.     I also note that in 2014, Judge Antonio Jolima Jose, a member of the Angolan judiciary, authored an academic thesis on testimonial evidence in Angolan civil cases.[6]  He noted that *"in most countries"*, witnesses were allowed to provide testimony *"via videoconference"*.  He cited the example of Section 623 of the *Portuguese* Civil Procedure Code which provided that *"Any and all witnesses who reside outside of the court's judicial district . . . may . . .  be heard by the court by videoconference to take place during the trial session"*.  Judge Jose explained that *Angolan courts are different*.  As he wrote, in Angola, *"unfortunately no law or statute sets forth a disposition similar to Section 623 of the Portuguese Civil Procedure Code"* – in other words, no law in Angola permits remote testimony in civil cases.  He added that, *"Obviously, in Angola's case, in the absence of such a legal disposition, the courts need to resort to the testimony given by indirect witnesses more frequently"* – *i.e.*, hearsay – which he said raised due-process concerns as *"indirect witnesses"* lack first-hand knowledge.  Judge Jose therefore proposed that Angolan law should be changed to permit witnesses to testify remotely by videoconference in Angolan civil cases:

> For all these reasons, and with the purpose of minimizing the current situation, it is our position that civil procedure in Angola be adapted to the new norms in witness testimony and the possibility of a witness being heard by videoconference be legally adopted. This mechanism avoids unnecessary travel by the witness, and lightens the associated costs which are traditionally born by the witness themself.  It shall also have the effect, logically, of preventing the so-frequent substitution of a direct witness/or an indirect witness, which shall strongly contribute to the execution of justice and the prevalence of the material truth.

---

[6] https://repositorio.ual.pt/bitstream/11144/642/1/Tese_vfinal_Jolima1.pdf.

A77

The relevant civil laws and rules in Angola have not been changed since 2014, meaning that, as Judge Jose wrote, remote testimony is still not allowed in Angolan civil cases.

70.     I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on March 28, 2023 in Luanda, Angola.

ALBERTO SÉRGIO RAIMUNDO

24

A78

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AENERGY, S.A. *Plaintiff,* <br><br> v. <br><br> **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** <br><br> *Defendants.* | CIVIL ACTION NO. <u>22-CV-2514-TNM</u> <br><br> **DECLARATION OF LINO DIAMVUTU, PhD IN SUPPORT OF THE ANGOLAN DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |

**STATEMENT OF OPINION**

I, Lino Diamvutu, PhD, pursuant to 28 U.S.C. 1746, hereby declare:

I.    <u>QUALIFICATIONS AND INSTRUCTIONS</u>

1.      I am a Professor at the Faculty of Law of Agostinho Neto University (Angola) and have practiced law in Angola for 22 (twenty-two) years. I graduated from the Faculty of Law of the University of Brussels (Belgium), concluded my Master's Degree at Agostinho Neto University (Angola) and I have a PhD in Legal Civil Sciences of the Faculty of Law of the University of Lisbon (Portugal).

2.      The views expressed in this Opinion are based on my knowledge as an academic and over 22 (twenty-two) years acting as a legal adviser. This knowledge has been gained during my career as Professor at the Faculty of Law of Agostinho Neto University, in Luanda. I have been teaching Civil Law for the past 14 (fourteen) years and I am now the Head of Civil Law at the Faculty of Law of Agostinho Neto University. I have also been teaching International Arbitration for 11 (eleven) years (2012 to 2023), Company Law, Financial Markets, Oil and Gas in the LLM's at the

Faculty of Law of Agostinho Neto University. I am a Visiting Professor at the Faculty of Law of the University of Lisbon. I also act as an Arbitrator in domestic and international arbitrations. A copy of my CV, which is current as of today, is annexed as **Exhibit A**.

3.       Additionally, I have published books, written scientific articles for both Angolan and foreign journals, and spoken at conferences on matters related to Angolan law and, in particular, international commercial arbitration. I also have been cited as an author of reference in Court of Appeal judgments in Portugal in the field of international arbitration.

4.       I have been asked by the Republic of Angola, the Angolan Ministry of Energy and Water, the Angolan Ministry of Finance, and two corporations owned by the State of Angola to provide an opinion as expert on Angolan law with regard to the issues stated in paragraph 6 below.

5.       To prepare this opinion as expert, I have been provided and have reviewed materials relating to <u>Aenergy, S.A. v. Republic of Angola et al</u>, Case No. 22-cv-2514-TNM (D.D.C.), in particular the First Amended Complaint, dated February 15, 2023 ("Complaint").   My understanding of the claims presented in the case is as follows:

5.1.    Plaintiff Aenergy, S.A. ("AE") has filed suit in the United States District Court for the District of Columbia, bringing claims against the Republic of Angola, the Ministry of Energy and Water of the Republic of Angola, the Ministry of Finance of the Republic of Angola, Empresa Pública de Produção de Electricidade, EP (PRODEL) and Empresa Nacional de Distribuição de Electricidade (ENDE) owned by the State of Angola (the "Angolan Defendants").

2

A80

5.2.    Plaintiff's Complaint alleges that the Angolan Defendants entered into a total of 13 contracts with Plaintiff, and the parties understood and agreed that payment for those contracts would be made through the GE Capital facility. The contracts allegedly aimed to construct, extend, refurbish and maintain power plants in Angola, signed by duly-authorized representatives of PRODEL and ENDE or National Directorate of Water, as applicable.

5.3.    Plaintiff alleges that the Angolan Defendants have breached these contracts by failing to pay substantial amounts for work, goods and services that the Angolan Defendants have obtained from Plaintiff under the On-Sales Contracts. Plaintiff also alleges that it suffered damages caused by this breach, namely that it was not paid for the substantial work, goods and services that the Angolan Defendants allegedly obtained from Plaintiff under the On-Sales Contracts.

5.4.    I also understand that there are other proceedings pending in Angolan courts that relate to Plaintiff' claims in this case:

      5.4.1.  I understand that Plaintiff has already sought review of the termination of the Power Contracts in the Supreme Court of Angola.

      5.4.2.  I understand further that the Provincial Court in Luanda already determined the seizure of equipment (four turbines) from Plaintiff's warehouse, as an injunction procedure.

6.      The Angolan Defendants have asked that I provide an opinion as expert on Angolan law (my "Opinion") with regard to:

      6.1.    Whether and under what terms Angolan civil procedural law provides for the possibility of a witness or party to proceedings before an Angolan court

3

A81

(including adversarial proceedings) to alternatively provide testimony before a foreign court, particularly a Portuguese one.

6.2.    Whether the period established in Angolan law for the exercise of a claim arising from supplies provided and services rendered in performance of an administrative contract and the possibility for the party in whose favor the period is established to waive that benefit or to enter into agreements modifying the duration of the same period. What is meant by substantive term (extinction of the right) and what is the distinction between prescription and forfeiture and their respective legal regimes, taking into account what is established in art. 329 of law no. 9/16 of 14 September 2016 (Angolan public contracts law)?

6.3.    Whether the seizure of property in judicial attachment proceedings in any way modifies the right of ownership over the property. What are the powers of administration of the depositary of seized property and what are the means of reaction of the owner of the property against acts of the depositary? What is the depositary's liability for acts detrimental to the owner of the goods?

6.4.    What is the nature of the legal entities of the public companies PRODEL and ENDE, and what are the powers of the Executive Branch in relation to them?

6.5.    Whether the fact that one of the parties to an arbitration agreement defends itself in proceedings brought before a court of law by the other party without raising the plea of defection of a voluntary arbitral tribunal constitutes a waiver to submit to arbitration other disputes, covered by the same agreement.

6.6.    If a commercial company with its registered office in Angola, registered in Angola, taxed in Angola, even if all its capital is held by foreign citizens, is, for all intents and purposes, an Angolan company, it can only cease to be an

Angolan legal entity by redomiciliation in another country, in compliance with the requirements and procedures established for this purpose by Angolan law.

7.     In order to prepare my Opinion, I draw upon my general expertise as an academic and practitioner with the qualifications outlined above. Further, in light of the legal questions to be considered, I have reviewed the following sources of Angolan law:

7.1.     Constitution of the Republic of Angola, published in 2010;

7.2.     Code of Civil Procedure of 1961, approved by Decree-Law no. 44129/1961;

7.3.     Civil Code of 1966, approved by Decree-Law no. 47344/1966;

7.4.     Decree-Law 4-A/96, of 5 of April 1996;

7.5.     Treaty on legal and judicial cooperation between Angola and Portugal in force since May 5, 2006;

7.6.     Voluntary Arbitration Law nº 16/03, of 25 July 2003 ("VAL");

7.7.     Commercial Companies' Law, approved by Law no. 1/04, dated the 13th of February 2004;

7.8.     Basic Law of the Public Companies Sector, approved by Law no. 11/13, of 3 September 2013;

7.9.     Public Contracts' Law, approved by Law no. 9/16, of 16 June 2016; and

7.10.     Resolution 34/06, of 15 May 2006, which approves the Government's engagement in Arbitration as means of resolving disputes over available rights.

8.     This Opinion has been written taking into account the Angolan law.

9.     I have written this opinion myself in English. The views I express in this Opinion are in conformity with my genuine beliefs about the matter at hand. If deemed necessary, I am able to provide oral testimony in English.

**II.**    **OPINION**

**(A)** **Whether and under what terms Angolan civil procedural law provides for the possibility of a witness or party to proceedings before an Angolan court (including adversarial proceedings) to alternatively provide testimony before a foreign court, particularly a Portuguese one**

10.    Where a party before an Angolan court (including in adversarial proceedings) wishes to provide testimony from a witness or party located abroad and not present in Angola, the rules of procedure applicable to civil actions permit parties to obtain testimony through depositions.  Pursuant to Article 623 (1) of the Code of Civil Procedure (Inquiry by letter), when the witnesses reside outside Angola, the party may request that the testimony be provided with the support of the foreign court in the place where the witness is located. A letter is to be forwarded for their inquiry, reflecting questions to be asked, or if the questions have not yet been determined, the topics of inquiry for the testimony.  In this case, the Angolan Court would issue <u>a rogatory letter</u> addressed to the American Court within the jurisdiction where the witness is located to request that the witness be inquired by this court. <u>The adversarial process is conducted according to the same procedure</u>.

11.    In the specific case of witnesses living in Portugal, there is a <u>treaty on legal and judicial cooperation between Angola and Portugal</u> in force since May 5, 2006, granting to the nationals of a Contracting State access to the courts of the other Contracting State[1], and settling a simplified process for notifications and depositions of those nationals (entities included). From this treaty I highlight the following provisions as of specific interest:

_____

[1] Article 1 of the Treaty.

6

A84

12.     It is not mandatory for persons residing (nationals or no nationals of the Contracting States who just residing in one of the Contracting States) in the territory of one State to appear as declarants, witnesses or experts before the courts of the other State[2].  The performance of judicial acts, like depositions and testimonies shall be requested directly by the courts of one Contracting State to the courts of the other Contracting State by means of a letter rogatory signed and authenticated by the seal of the requesting authority or, in urgent cases, by telegram[3].

13.     Thus, persons residing in Portugal who are not obliged to appear personally before the Angola Courts, shall provide its testimony before the courts of Portugal, by the letter rogatory. The attorneys of the parties can attend the hearings and cross examine the witnesses or declarants. A full transcript of the depositions is sent to the Angolan court and incorporated in the lawsuit.

14.     In case such persons agree to travel to appear before the court in Angola, they have guaranteed <u>immunity</u> and the right to compensation by Angola of the expenses and damages resulting from such travel. <u>While they remain in the territory of the requesting State, the declarants, witnesses or experts who have been summoned, whatever their nationality, shall not be subjected to criminal prosecution there, nor shall they be liable to be arrested, deprived of their property or identification papers, or otherwise deprived of their personal liberty for acts or convictions which took place before they left the territory of the requested State</u>[4].

15.     Each Contracting State can request service of judicial acts (including the service of documents, the producing of evidence and the requesting of documents in the possession of the other party or third parties) directly, through its diplomatic and

---

[2] Article 3 (1) of the Treaty.
[3] Article 4 (1) of the Treaty.
[4] Article 3 (3) of the Treaty.

A85

consular agents, on its own nationals who are in the territory of the other Contracting State[5]

16.     In summary, under the rules of procedure a witness or party before an Angolan court (including adversarial proceedings) has mechanisms to provide testimony from a witness or party located abroad by alternatively providing testimony before a foreign court, particularly a Portuguese one.

17.     In the case of international arbitrations, under the Voluntary Arbitration Law ("VAL"), the arbitral tribunal may function in different places, even abroad. Pursuant to Article 17 of VAL: "The place of arbitration shall be determined by agreement of the parties in the arbitration agreement or in a subsequent writing and, failing agreement until the acceptance of the first arbitrator, shall be fixed by the arbitrators. Unless otherwise agreed by the parties, the provisions of the preceding paragraph are without prejudice to the arbitral tribunal meeting at any place it considers appropriate for consultations among its members or the performance of any procedural acts".

18.     Evidentiary proceedings may be held elsewhere than at the seat of the arbitration. A distinction is made between the legal seat of arbitration and the factual seat of arbitration. Although the legal seat of the arbitration is in Angola, the arbitral tribunal may meet anywhere in or outside the country. Thus, in the context of an arbitration proceeding, the arbitral tribunal may, without any legal or other consequences, hold witness hearing sessions outside the Angolan territory, in particular, in Portugal.

---

[5] Article 9 of the Treaty.

A86

**(B) Whether the period established in Angolan law for the exercise of a claim arising from supplies provided and services rendered in performance of an administrative contract and the possibility for the party in whose favor the period is established to waive that benefit or to enter into agreements modifying the duration of the same period. What is meant by substantive term (extinction of the right) and what is the distinction between limitation period or time-bar and expiry and their respective legal regimes, taking into account what is established in art. 329 of law no. 9/16, of 16 June 2016 (Public contracts law)?**

19.    Angolan law provides a 20-year limitation period for commencement of claims based on breach of contract. Pursuant to Article 309 of the Civil Code: "The ordinary term of limitation is twenty years". Contractual liability results from the violation of a claim or obligation.

20.    Angolan law provides a 3-year limitations period for the "wrongful taking" claims[6]. Non-contractual, tort, or aquilian liability arises from the violation of duties of conduct imposed on all persons and corresponding to absolute rights, or even from the practice of certain acts that, although lawful, produce damage to others.

21.    The litigated contracts are deemed as administrative contracts of acquisition of movable property and services (and not works contracts on which would apply the 180 days' time limitation). Upon Law no. 9/16, of 16 June 2016, on Public Contracts, each type of public contract is subject to a specific regulation. The litigated contracts are deemed as contracts of acquisition of movable property and services, with

---

[6] Pursuant to Article 498 (1) of the Civil Code, the right to compensation prescribes within a period of three years, counting from the date in which the injured person became aware of the right that belongs to him, although with no knowledge of the person responsible and the full extent of the damages, without prejudice to the ordinary statute of limitations if the respective period has elapsed from the harmful event.

a specific applicable framework (which is different from the applicable framework for works contracts).

22.     Pursuant to Article 329 (<u>Expiry</u>) of Law no. 9/16, of 16 June 2016 (Public Contracts' Law): "<u>When the deadline established by law is not otherwise</u>, the actions must be filed within <u>one hundred and eighty days</u> from the date of notification to the contractor of the decision or resolution of the body competent to perform definitive acts, by virtue of which any right or claim of the contractor is denied or the owner of the work claims a right that the other party does not consider to be founded" (emphasis added). <u>In this case, we are not dealing with work contracts and, in any case, the deadline would be different if they were</u>.

23.     According to the Article 353 of Law no. 9/16, of 16 June 2016, whether otherwise not regulated, on such law or other specific law, for contracts of acquisition of movable property and services, it is subsidiarily applicable the <u>general rules on administrative law</u> and, in the absence of those, <u>the civil law</u>.

24.     <u>The only time limitations are those related to the substantive limitation period of 20 years for claims based on breach of contract and 3 years for the wrongful taking claims</u>. The alleged breaches of contracts occurred in 2017. Their breach of contract claims would not be time barred until 2037.

25.     In the Angolan law, there is a difference between <u>expiry</u> (*caducidade*)[7] and <u>limitation period</u> (*prescrição*)[8]. The <u>limitation period</u> is the institute by virtue of which the counterparty may stop the exercise of a right, <u>when</u> it does not occur during a

_____

[7] Article 331 of the Civil Code.
[8] Article 298 of the Civil Code.

10

A88

certain period of time indicated by law, which varies from case to case. <u>Expiry</u> is similar to limitation period or prescription[9]. However, it has some differences:

25.1.    Limitation period or prescription deadline only results from the law; expiry may derive from the law or from the will of the parties[10].

25.2.    The statute of limitation is non-extendable[11]. Transactions intended to modify the legal limitation periods or to facilitate or otherwise hinder the conditions under which the limitation period takes effect are null and void[12]. The expiry is derogable[13]. Transactions modifying the expiry regime are valid, provided they do not involve matters beyond the parties' control or fraud to the legal limitation rules[14].

25.3.    The waiver of the limitation period is only permitted after the limitation period has elapsed[15]. Transactions whereby the expiry is waived are valid, provided they do not involve matters beyond the parties' control or fraud against the legal limitation rules[16].

26.    Expiry extinguishes the right. Article 329 of Law no. 9/16 (Public Contracts' Law) deals with expiry, which is waivable by <u>its beneficiary</u>. <u>However, it does not apply to the contracts in question</u>.

---

[9] CARLOS ALBERTO BURITY DA SILVA, General Theory of Civil Law, 2nd Ed., Luanda, 2014, p. 670.
[10] Article 298 (1) and (2) of the Civil Code.
[11] Article 300 of the Civil Code.
[12] Article 300 of the Civil Code.
[13] Article 330 of the Civil Code.
[14] Article 330 of the Civil Code.
[15] Article 302 of the Civil Code.
[16] Article 302 of the Civil Code.

A89

**(C)** **Whether the seizure of property in judicial attachment proceedings in any way modifies the right of ownership over the property. What are the powers of administration of the depositary of seized property and what are the means of reaction of the owner of the property against acts of the depositary? What is the depositary's liability for acts detrimental to the owner of the goods?**

27.     Seizure is a precautionary procedure consisting of provisional assignment of assets to secure a claim. The assets in question must be seizable[17].

28.     The seizure does not imply the total withdrawal of the powers of the holder of the assets that are the object of the seizure, although it determines that the acts of disposal of the assets in question will be ineffective in relation to the applicant of the seizure[18]. Thus, the seizure consists of an encumbrance on the right of the holder of the asset on which it is focused, which translates into its seizure to answer for the credit in question.

29.     Once the seizure is declared, the seized goods are delivered to a depositary, who guards and administers them on behalf of the state. In this way, the debtor loses the power to dispose of the assets in such a way as not to jeopardize his creditor's assets. The seizure may, in certain cases, result in the owner losing possession of its goods, which are seized and a trustee is appointed for them. The powers of enjoyment that are part of the owner's right are thus transferred to the court, which will exercise them through a depositary. It can be concluded, therefore, that the arrestee's property rights are diminished, limited or restricted, but he remains the owner.

30.     The depositary does not hold the powers of a judicial body, but is an entity who cooperates temporarily with the bodies in charge of the administration of justice, and may or may not be the arrested person himself. In a seizure, it is precisely

---

[17] Article 402 (2) of the Code of Civil Procedure and Art. 622 (2) of the Civil Code.
[18] Article 622 (1) of the Civil Code.

12

the depositary who is in charge of <u>promoting the safekeeping of the property that has been attached</u>, and his duties are, as can be seen, extremely important, since he is charged with the duties of <u>safekeeping</u>, <u>administration</u> and <u>restitution of the property, when it is legally required of him</u>.

31.      In addition to the general duties of his function, the depositary is charged with the <u>duties of administering the property with the diligence and zeal of a good family man</u> (*bonus pater familiae*) and with the obligation to render accounts and, should he fail to fulfill his duties, he will be removed from office at the request of any interested party, and will be notified to respond in accordance with the law, as results from the wording of Articles 843 and 845 of the Code of Civil Procedure.

32.      <u>The depositary will be responsible for the losses that, due to his fault</u>, may result to the assets entrusted to his administration. If the depositary fails to comply with the duties to which he is bound, he may incur civil liability for any damage caused, under the terms of Article 483 of the Civil Code.

33.      When <u>ordered</u>, the depositary will, under the terms of 854 of the Code of Civil Procedure, be required to hand over the goods he has received and, if he fails to present them within five days, he will be imprisoned for the time corresponding to the value of the deposit, but the imprisonment may not exceed two years.

**(D) What is the nature of the legal entities of the public companies PRODEL and ENDE, and what are the powers of the Executive Branch in relation to them?**

34.     PRODEL and ENDE were created by Angolan Presidential Decree No. 305/14 of November 20, 2014 (the "Decree")[19]. The same Decree approved their organic statutes (bylaws). PRODEL is a company of strategic interest, with legal personality and administrative, financial, patrimonial and management autonomy[20]. It is governed by its organic statute, by the complementary rules of execution, by the legislation applicable to public companies and, insofar as not specifically regulated, by the rules of Commercial Law and other rules of private law in force[21]. The main objective of the PRODEL is the generation of electricity within the Public Electricity System (PES), under the terms and conditions of the respective concessions or licenses[22].

35.     ENDE is a company of strategic interest, with legal personality and administrative, financial, patrimonial and management autonomy[23]. It is governed by its organic statute, by the complementary execution norms, by the legislation applicable to public companies and, insofar as not specifically regulated, by the rules of Commercial Law and other rules of private law in force[24]. The main objective of ENDE is the distribution of electricity on a national level, within the scope of the Public Electricity System (PES), through the exploration of the infrastructure of distribution networks, in a public service regime, under the terms of the General Electricity Law and its Regulations[25].

---

[19] Articles 4 and 5 of the Presidential Decree.
[20] Article 1 of Annex II, Organic statute of PRODEL.
[21] Article 2 of Annex II, Organic statute of PRODEL.
[22] Article 4 of Annex II, Organic statute of PRODEL.
[23] Article 1 of Annex III, Organic statute of ENDE.
[24] Article 2 of Annex III, Organic statute of ENDE.
[25] Article 4 of Annex III, Organic statute of ENDE.

A92

36.     The Decree establishes that PRODEL and ENDE are each managed by a board of directors which is responsible for exercising all the powers necessary to ensure the management and development of the company and the administration of its assets[26]. The board of directors is comprised of seven members, five executive and two-non executive, one of them being the President, whose designation must be included in the act of appointment[27]. The Decree states that the Board of Directors is vested with powers to act on behalf of the company, and shall exercise them within the limits of the law and these Bylaws[28]. PRODEL's and ENDE's board of directors is responsible for exercising all the powers necessary to ensure the management and development of the company and the administration of its assets[29]. Specifically, the Decree establishes fifteen items with which the board of directors is tasked, including: (a) approving the company's management objectives and policies; (b) approving the annual and multi-year activity and financial plans and annual budgets; (c) representing the "company in and out of court"; (d) approving the acquisition and alienation of assets and financial stakes; and (e) contracting for short, medium, and long-term loans[30].

37.     Both PRODEL and ENDE have the autonomy to manage and dispose of their own assets. The Decree confirms that PRODEL and ENDE each have the capacity to enter contracts[31]. PRODEL and ENDE are bound before third parties by the acts of the Board of Directors, when performed in its name on behalf of the company, in compliance with its powers and of the respective regulations, or any legally constituted

---

[26] Article 7 of Annex II, Organic statute of PRODEL and Article 7 of Annex III, Organic statute of ENDE.
[27] Article 7 (2) of Annex II, Organic statute of PRODEL.
[28] Article 8 (1) of Annex II, Organic statute of PRODEL.
[29] Article 8 (2) and (3) of Annex II, Organic statute of PRODEL and Article 8 (2) and (3) of Annex III, Organic statute of ENDE.
[30] Article 8 (3) of Annex II, Organic statute of PRODEL and Article 8 (3) of Annex III, Organic statute of ENDE.
[31] Article 14 of Annex II, Organic statute of PRODEL and Article 14 of Annex III, Organic statute of ENDE.

of these, legally constituted and within the powers established in its Organic statutes[32]. Finally, the Decree confirms that both PRODEL and ENDE can each be sued and are represented in and out of court by the Chairman of the Board of Directors[33]. The directors of the company are liable the company for damages caused by acts or omissions practiced with or omissions practiced with the breach of legal or statutory duties or statutory duties, unless proven otherwise[34].

38.     Furthermore, PRODEL and ENDE each have a body called "Fiscal Council" which is responsible for supervising and managing the companies' financials. PRODEL's and ENDE's Fiscal Council are comprised of three members, appointed by Joint Order from the Minister responsible for the Public Enterprise Sector and Finance[35]. The Decree establishes eleven items with which PRODEL's and ENDE's Fiscal Council are tasked, including: (a) issuing opinions on the budget and operations of PRODEL's and ENDE's financials; (b) issuing opinions on PRODEL's and ENDE's financial statements; (c) certifying that PRODEL's and ENDE's assets belong to them; and (d) supervising the bookkeeping for PRODEL and ENDE[36].

39.     Both PRODEL and the ENDE, as Public Enterprises are public legal persons endowed with <u>administrative and financial autonomy</u>, created with the aim of pursuing state purposes and subject to <u>its superintendence</u>.  <u>The superintendence is the power to define the direction of the activity to be developed by public legal entities that exercise forms of indirect administration</u>. Article 43 of the Basic Law of the Public

---

[32] Article 14 of Annex II, Organic statute of PRODEL and Article 14 of Annex III, Organic statute of ENDE.
[33] Article 10 of Annex II, Organic statute of PRODEL and Article 10 of Annex III, Organic statute of ENDE.
[34] Article 15 of Annex II, Organic statute of PRODEL and Article 15 of Annex III, Organic statute of ENDE.
[35] Article 17 of Annex II, Organic statute of PRODEL and Article 17 of Annex III, Organic statute of ENDE.
[36] Article 18 of Annex II, Organic statute of PRODEL and Article 18 of Annex III, Organic statute of ENDE, approved by the Presidential Decree.

A94

Companies Sector (Law no. 11/13, of 3 September 2013) establishes that the underline superintendence of the Executive Power to Public Companies is exercised by the Holder of Executive Power. The minister responsible for the sector of activity of the company proceeds, within the scope of the delegated powers, to the follow-up and control of the policies and programs defined for the sector and whose implementation is the company's responsibility[37].

40.    Pursuant to Article 25 of the PRODEL and ENDE' Bylaws or Organic statutes, approved by the Decree, the superintendence of the PRODEL is exercised by the Holder of the Executive Power, or by the Minister with delegated powers for the purpose. In particular, under the terms of the legislation in force, they shall be responsible for: (a) To set the strategic objectives for the company's activity and the general framework in which it should develop, so as to ensure its harmonization with the Government's global and sectorial policies and with the national macroeconomic plan national macro-economic plan; (b) To regulate the exercise of the activity of the line of business to which the company must be subordinate and to supervise its compliance its compliance; (c) To analyze the technical, economic and financial information; (d) To take the appropriate measures, in accordance with the law.

41.    It results from the same Article that the Minister responsible for the business sector of the company is responsible, within the scope of the delegated powers, for the follow-up and control of the policies and programs defined for the sector and whose implementation is the company's responsibility. The lack of prior approval or authorization determines the legal ineffectiveness of the operations or acts subject to the approval or authorization of the superintendence of the Executive Power. In this case, the Minister responsible is MINEA, the Minister of Energy and Water.

---

[37] Article 43 (3) of the Law no. 11/13 of 3 September 2013.

A95

42.     In the use of the power to (sub)delegate that was given in the Presidential Decrees (as the power of the Minister to delegate derives directly from the law), the Minister delegated in PRODEL and ENDE the signature of 12 contracts; therefore, PRODEL and ENDE entered (executed) the contacts as representatives (on behalf) of MINEA in the sense that the effects of their acts were produced in the legal sphere of MINEA. They did not act as instrumentalities of Angola, but as legally separated persons and this was the reason for the need of a specific delegation of powers. They did not act as agents, but as representatives by specific mandate. <u>Thus, they cannot be considered as "alter ego" of MINEA nor of Angola.</u>

**(E) <u>Whether the fact that one of the parties to an arbitration agreement defends itself in proceedings brought before a court by the other party without raising the plea of defection of a voluntary arbitral tribunal constitutes a waiver to submit to arbitration other disputes, covered by the same arbitration agreement</u>**

43.     In Angolan law, the execution of an arbitration agreement produces two types of effects: a positive and a negative effect[38]. The positive effect consists in the fact that each of the parties now has a potestative right to provoke the constitution of the arbitral tribunal to settle the disputes arising between them. The negative effect of the arbitration agreement is that it bars access to the state court. If one of the parties disregards the arbitration agreement and brings a court action, the other party will raise the dilatory objection of omission of the arbitral tribunal provided for in Article 494(h) of the Code of Civil Procedure[39].

---

[38] LINO DIAMVUTU, *The arbitration agreement in Angolan Law*, Almedina, 2016, p. 155.
[39] LINO DIAMVUTU, *The arbitration agreement in Angolan Law*, Almedina, 2016, p. 155.

A96

44.     The defendant's waiver of arbitration can only be verified if the defendant did not raise in its answer to the plaintiff's claim before the court the said exception of arbitral tribunal's omission, since this exception of arbitral tribunal's omission is not known by the state judge of its own motion. If the defendant did not raise the objection of arbitral tribunal avoidance, this does not affect the possibility of submitting to arbitration the matters or issues that were not submitted to the court for consideration, which may be dealt with in the arbitral forum. If the defendant has raised the objection of omission of the arbitral tribunal in its defence, there is no waiver to arbitration with respect to the set of matters or issues covered by the arbitration agreement entered into by the parties.

45.     The negative effect of the arbitration agreement does not preclude an application to the court before or during arbitration proceedings for a preliminary injunction. This is obviously an exception to the negative effect of the arbitration agreement[40]. The fact of applying to the court for a protective order such as a seizure does not constitute a waiver of the arbitral tribunal. Article 22(2) of the Voluntary Arbitration Law (VAL) clearly gives the parties a choice between the arbitral tribunal and the court for interim measures, whether or not the arbitral proceedings have already been commenced. If the provisional measure must be requested before the arbitral proceedings have been instituted, it must be requested directly before the court, as indicated in Article 22, paragraph 2 of the VAL. In fact, the urgency of the conservatory or anticipatory injunction, intended to guarantee the effectiveness of a right, may not be compatible with the time required to constitute the arbitral tribunal (which often exceeds the 30-day period), and the request for the granting of the injunction before the court

---

[40] LINO DIAMVUTU, *The arbitration agreement in Angolan Law*, Almedina, 2016, p. 156.

A97

should not be denied on the grounds of preclusion of the arbitral tribunal, under penalty of denial of justice[41].

46.     The Judgement of December 5, 2019[42], from the Judge of Law of the Civil and Administrative Chamber of the Provincial Court of Luanda ordered that four (4) turbines deposited in the Plaintiff's warehouse, located in Luanda, be arrested and delivered to the IGAPE - Instituto de Gestão de Activos e Participações do Estado (Institute for the Management of State Assets and Participations) trustee (or depository) in the records of the Precautionary Arrest Procedure. The 4 seized turbines were not included in any of the contracts signed by the parties. Therefore, the Precautionary Proceeding cannot at any time represent a waiver by the Angolan Defendants to arbitration.

47.     Furthermore, since the Angolan Defendants have argued in their opposition to the action brought by the Plaintiff in Angola before the administrative court that the issue of the validity of the termination of the contracts is a matter to be submitted to arbitration, it is appropriate for the arbitral tribunal to decide the issue. The invocation of a competent arbitral forum by the Angolan Defendants for the issues raised by the Plaintiff in the action before the Angolan judicial court is a plea of exception.

48.     In effect, in Angolan law, the arbitral tribunal has jurisdiction to appreciate its own jurisdiction. This is called the principle of "competence-competence". The positive effect of the competence-competence principle consists in the attribution of competence to the arbitrator to decide on his or her own competence to

---

[41]  MANUEL GONÇALVES; SOFIA VALE; LINO DIAMVUTU, *Commented Voluntary Arbitration Law – Angola*, Almedina, 2013, pp. 94-95.
[42] Case no. 074/2019 – E.

A98

adjudicate the dispute[43]. The positive effect of the principle of competence-competence is recognized in Angolan law (Article 31 (1) of VAL)[44]. The negative effect of the principle of competence-competence prohibits the court to which a party has appealed, either for the assessment of the competence of the arbitral tribunal or for the decision on the merits of the case, despite the existence of an arbitration agreement, from deciding on issues concerning the existence or validity of the arbitration agreement before the arbitral tribunal has ruled on such issues[45]. In other words, the negative effect of the principle of competence-competence translates into a preference or priority that the arbitrators have over the state court in hearing questions concerning the validity, effectiveness or enforceability of the arbitration agreement[46]. The negative effect of the principle of competence-competence prolongs the negative effect of the arbitration agreement[47].

49.     In the VAL, the negative effect of the competence-competence of the arbitral tribunal results indirectly from the fact that the law excludes the possibility of the decision on its competence being anticipated by the court (Article 31(3))[48]. The court may only review the jurisdiction of the arbitral tribunal after a decision on the merits of the case has been rendered: in an action for annulment of the arbitral award, in an appeal against the arbitral award or in an opposition to the enforcement of the arbitral

---

[43] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorisation*, Almedina, 2020, p. 230.
[44] JOSÉ ANTÓNIO LOPES SEMEDO, "Voluntary Arbitration in Angola: Regulatory Framework and Perspectives", in *II Congress of the Arbitration Center of the Portuguese Chamber of Commerce and Industry - Interventions*, Almedina, 2009, p. 24.
[45] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorization*, Almedina, 2020, cit., p. 230.
[46] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorization*, Almedina, 2020, p. 230.
[47] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorization*, Almedina, 2020, p. 230.
[48] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorization*, Almedina, 2020, p. 236.

A99

award[49]. Under the VAL, the parties may only argue the lack of jurisdiction of the court, as well as the irregularity of its constitution, until the presentation of the defense on the merits of the case, or together with it, or at the first opportunity available to them after the knowledge of a supervening fact that gives rise to any of the aforementioned defects[50]. The arbitral tribunal is then called upon to decide on its jurisdiction by issuing an interlocutory decision (Article 31(2) of VAL). The decision by which the arbitral tribunal declares itself competent to decide the matter *sub judice* can only be appreciated by the court after the arbitral award has been rendered[51].

**(F)** **If a commercial company with its registered office in Angola, registered in Angola, taxed in Angola, even if all its capital is held by foreign citizens, is, for all intents and purposes, an Angolan company, it can only cease to be an Angolan legal entity by redomiciliation in another country, in compliance with the requirements and procedures established for this purpose by Angolan law.**

50.     Pursuant to Article 3(1) of the Commercial Companies' Law: "the commercial companies' personal law is the law of the State in which its main and effective headquarters is located". Thus, a commercial company with its registered office in Angola, registered in Angola, taxed in Angola, even if all its capital is held by foreign citizens, is, for all intents and purposes, an Angolan company.

51.     It results from the Judgment of December 5, 2019 of the Judge of Law of the Civil and Administrative Chamber of the Provincial Court of Luanda that the Plaintiff has its headquarters in Urban district of Ingombotas, Avenida 4 de Fevereiro, Kilamba Building, 14th floor, in Luanda, Republic of Angola. Thus, the Plaintiff is an

---

[49] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorization*, Almedina, 2020, p. 236.
[50] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorization*, Almedina, 2020, p. 236.
[51] LINO DIAMVUTU, *Favor Arbitrandum – Towards a theorization*, Almedina, 2020, p. 236.

Angolan Company. Also in the Complaint[52], the Plaintiff states that "Plaintiff AE (formerly known as Aenergy, S.A.) is a Portuguese-shareholder-owned corporation constituted under the laws of the Republic of Angola in 2012."

52.     Under the terms of Article 3(6) of the Commercial Companies Law "<u>A company that has its effective head office in Angola may transfer it to another country, maintaining its legal personality, if the law of that country so provides</u>". It can only cease to be an Angolan legal entity by redomiciliation in another country, in compliance with the requirements and procedures established to Article 3(6) of the Commercial Companies Law.

---

[52] Civil Action No. 22-cv-2514 (D.D.C.) First Amended Complaint, February 15, 2023, p. 4.

I hereby reaffirm that the views expressed in this Legal Opinion reflect my personal independent opinion on the Angolan Law applicable to the facts.

I declare under penalty of perjury, under the laws of the United States, pursuant to 28 U.S.C. § 1746, that all of the foregoing is true and correct.

Executed on this 19th April, 2023 in Luanda, Angola.

LINO DIAMVUTU, PhD

**Contacts:**
Tel: +244 912 521 687
@: l_diamvutu@yahoo.com.br

**Profile:**
https://www.linkedin.com/in/lino-diamvutu-66306bb2/
http://www.fd.ulisboa.pt/angola/

A102

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AENERGY, S.A. | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. <u>22-cv-2514-TNM</u> |
| REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE, | DECLARATION OF HENRIQUE ABECASIS IN SUPPORT OF THE ANGOLAN DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THE ANGOLAN DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S <u>FIRST AMENDED COMPLAINT</u> |
| *Defendants.* | |

I, Henrique Abecasis, declare under penalty of perjury, under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.        I am over the age of 18 years, I am a licensed attorney and I am co-counsel to The Republic of Angola, The Ministry of Energy and Water of the Republic of Angola ("MINEA"), The Ministry of Finance of the Republic of Angola ("MINFIN"), Empresa Pública de Produção de Electricidade, EP ("PRODEL"), and Empresa Nacional de Distribuição de Electricidade ("ENDE") (collectively, the "Angolan Defendants"). I have personal knowledge of the facts stated in this declaration. I earned my law degree from the University of Lisbon in 1973 and have been practicing law since then. I am a partner of the law firm Henrique Abecasis, Andersen Guimaraes & Associados ("HAAG"), which I founded in 1992. HAAG is headquartered in Lisbon, Portugal. HAAG specializes in, among other things, the representation of Angolan entities in international transactions, arbitration and litigation, including specifically in the areas of administrative and public procurements and energy.

1

A103

2.     I am an advisor to The Republic of Angola and The Ministry of Energy and Water of the Republic of Angola, in Angola, concerning the matters raised in parallel proceedings filed in Angola, including the "seizure" action pending in the Provincial Court in Luanda, Angola, as well as the challenge of the administrative decision to terminate the power plant contracts pending in the Supreme Court in Luanda, Angola.

3.     The Angolan Defendants never took permanent possession or of title to Aenergy, S.A.'s ("Aenergy") purported turbines.

4.     Four turbines were seized pursuant to a process akin to a prejudgment writ of execution to ensure Aenergy's payment of amounts it owes to Angola.

5.     Those turbines remain subject to administration pursuant to an order appointing a custodian to preserve them.

6.     The Custodian properly permitted use of these four turbines to avoid dissipation and waste.

7.     Aenergy did not file any claim in the process challenging the acts of administration of the turbines by the Custodian.

8.     As the turbines belong to Aenergy, the latter is entitled to compensation for their use and for any damages arising from fault of the Custodian, such compensation to be considered in the final accounts of the proceeding.

9.     Two additional turbines have been seized in a criminal proceeding.

10.     These turbines remain in MINEA's possession, as custodian appointed by the court, and have not been attached to the grid or otherwise used.

Executed on this 19th day of April, 2023.

_____
Henrique Abecasis

2

A104

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.** | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 22-cv-2514-TNM |
| **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** | **SUPPLEMENTAL DECLARATION OF MICHAEL EHRENSTEIN, ESQ. IN FURTHER SUPPORT OF THE ANGOLAN DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| *Defendants.* | |

I, Michael Ehrenstein, Esq., pursuant to 28 U.S.C. 1746, hereby declare:

1.     I am admitted *pro hac vice* to practice before this Court.

2.     I am a Partner in Ehrenstein | Sager, 2800 Ponce De Leon Blvd., Suite 1400, Coral Gables, Florida 33134 and, in this capacity, represent the Angolan Defendants in the above-named case.

3.     I submit this Supplemental Declaration in further support of the Angolan Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, dated February 15, 2023 (Dkt. Nos. 24-27; First Amended Complaint at Dkt. No. 22). This Supplemental Declaration is submitted alongside the Angolan Defendants' Reply Memorandum of Points and Authorities in Support of this Motion, dated April 19, 2023 and the Declaration of Professor Lino Diamvutu, PhD dated April 19, 2023 and the Declaration of Henrique Abecasis dated April 19, 2023.

4.     Plaintiff Aenergy S.A. ("Plaintiff") previously pursued an action for damages against the Angolan Defendants for termination of the power plant contracts in New York in Aenergy v. Angola, Case No. 1:20-cv-03569 (S.D.N.Y.) (the "New York Case"). The action

1

resulted in an extensive record including hundreds of pages of exhibits and several expert declarations. After considering these ample submissions, the New York Case dismissed Plaintiff's complaint based on *forum non conveniens*, a decision which was affirmed by the Second Circuit. Aenergy SA v. Republic of Angola, 2021 WL 1998725 (S.D.N.Y. May 19, 2021) *aff'd* 31 F.4th 119 (2d Cir. 2022), *cert. denied* 2023 WL 124091 (2023).

5.     As many of the legal and factual issues raised in the New York Case are relevant here, this Supplemental Declaration provides materials from the New York Case for the Court's reference in this case. Each Exhibit was retrieved directly from the docket for the New York Case using the PACER system.

6.     Professor Lino Diamvutu, PhD who has also submitted a Declaration dated April 19, 2023 in support of the Motion, previously submitted declarations in the New York Case. True and correct copies of two of those prior declarations are attached hereto as **Exhibit A** (dated December 2, 2020) and **Exhibit B** (April 30, 2021).

7.     Professor Sofia Vale, an Angolan law expert instructed by the GE Defendants in the New York Case also submitted declarations in that matter. A true and correct copy of her declaration dated September 18, 2020 is attached hereto as **Exhibit C**.

I declare under penalty of perjury that the forgoing is true and correct.

Executed in Coral Gables, Florida on April 19, 2023.

Michael Ehrenstein, Esq.

A106

**EXHIBIT A**

**Selected Overview of the Angolan Defendants' Arguments in the Motio**
**draw upon Dkt. Nos. 43, 45-1, 45-2, and 45-3**

| Evidence at Issue in Plaintiff's Motion to Strike | The Angolan Defendants' Motion to Dismiss | Plaintiff's Opposition | The A |
|---|---|---|---|
| **Dkt Nos 45-1, 45-2, 45-3** (all materials from the New York Court docket):<br><br>• Declaration of Professor Lino Diamvutu dated December 2, 2020<br><br>• Declaration of Professor Lino Diamvutu dated April 30, 2021<br><br>• Declaration of Professor Sophia Vale dated September 18, 2020 | Motion Dismiss described the voluminous and detailed proceedings before the New York Court, stating that "following careful examination of the record which included hundreds of pages of exhibits and seven expert declarations," the New York Court granted the Angolan Defendants' Motion to Dismiss in that case based upon *forum non-conveniens*.<br><br><u>See</u> Motion to Dismiss at p. 9.<br><br>The Angolan Defendants requested that the Court take judicial notice of public record materials, including the decisions of the New York Court and the Second Circuit, as well as the ongoing legal proceedings in Angola.<br><br><u>See</u> Motion to Dismiss at p. 8 and fn.8. | Plaintiff ignored the Angolan Defendants' reliance on and incorporation of arguments presented to the New York Court.<br><br>Plaintiff failed to address or otherwise acknowledge the Angolan Defendants' request for judicial notice, nor did Plaintiff challenge the arguments which directly referred to the "record" in the New York case. The term "judicial notice" does not appear in the Opposition. | Further t Defenda Court tal New Yor Reply at evidence Court's o testimon which se the New that an a exists an dismisse *convenie* decision Defenda issue pre<br><br><u>See</u> Mot Reply at 1, 45-2, New Yor |

| Evidence at Issue in Plaintiff's Motion to Strike | The Angolan Defendants' Motion to Dismiss | Plaintiff's Opposition | The A |
|---|---|---|---|
| **Dkt No 43** - Declaration of Professor Lino Diamvutu dated April 19, 2023, paragraphs 43–49 (Part II.E) | Angolan Defendants asserted that Angolan arbitration law applies: "These agreements, each in Portuguese, include a clause requiring resolution of disputes exclusively through application of Angolan law in binding arbitration in Luanda, Angola.  Specifically, these contracts state, in relevant part: This Contract is subject to Angolan law." <br><br> <u>See</u> Motion to Dismiss at p. 7. | Rather than relying upon the stated law in the arbitration clauses (Angolan law), Plaintiff asserts that U.S. arbitration law applies. | The A responde U.S. law Angolan regardles to the de contendi Angolan parties' a to rely on is the sai <br><br> <u>See</u> Repl |

2

| Evidence at Issue in Plaintiff's Motion to Strike | The Angolan Defendants' Motion to Dismiss | Plaintiff's Opposition | The A |
|---|---|---|---|
| **Dkt No 43** - Declaration of Professor Lino Diamvutu dated April 19, 2023, paragraphs 10–33 (Parts II.A, II.B, and II.C).<br><br>**Dkt Nos 45-1, 45-2, 45-3** (all materials from the New York Court docket):<br><br>• Declaration of Professor Lino Diamvutu dated December 2, 2020<br><br>• Declaration of Professor Lino Diamvutu dated April 30, 2021<br><br>• Declaration of Professor Sophia Vale dated September 18, 2020 | Plaintiff repeatedly agreed in writing to arbitrate any disputes in Angola and under Angolan law. Failing to disclose these arbitration clauses in its pleading, and in disregard of its contractual obligation to arbitrate, Plaintiff seeks to relitigate its claim in this Court.  For many of the same reasons supporting the Angolan Defendants' argument on *forum non conveniens*, Plaintiff's claim against the Angolan Defendants must be dismissed in favor of the arbitration to which the parties agreed.<br><br><u>See</u> Motion to Dismiss at pp. 30-32 | Plaintiff argues that the Angolan Defendants waived their right to arbitrate by participating in proceedings pending before Angolan courts.<br><br>Alternatively, Plaintiff contends that their claims fall outside the scope of the arbitration clauses.<br><br>Plaintiff fails to recognize that an arbitration clause is a forum selection clause and insists that the Angolan Defendants have the initial burden to establish that Angola is an adequate alternative forum. | In circur mandato between burden is show wh transfer t which th fails to r the initia court cor and rend upon var legal exp<br><br>The Ang submitte from Pro demonst an adequ the dispu<br><br><u>See</u> Repl |

A109

| Evidence at Issue in Plaintiff's Motion to Strike | The Angolan Defendants' Motion to Dismiss | Plaintiff's Opposition | The A |
|---|---|---|---|
| **Dkt No 43** - Declaration of Professor Lino Diamvutu dated April 19, 2023, paragraphs 34–42 (Part II.D) | PRODEL and ENDE were created as separate entities by an Angolan law prescribing their powers and duties. Specifically, Presidential Decree No. 305/14 of November 20, 2014 (the "Decree") created new public companies, Empresa Publica de Producao de Electricidade (PRODEL), and Empresa Nacional de Distribuicao de Electricidade (ENDE).<br><br>See Motion to Dismiss at p. 37 | Plaintiff seeks to obtain jurisdiction through the declaration of Alberto Sergio Raimundo, which describes a capitalization and funding relationship between the Republic and PRODEL and ENDE. | A funding<br>enough t<br>separate<br><br>PRODEL<br>formed a<br>"legal pe<br>administr<br>patrimon<br>authority<br>are each<br>directors<br>for exerc<br>necessar<br>manager<br>the comp<br>administr<br>including<br>company<br>objective<br>approving<br>and multi<br>financial<br>budgets;<br>"compar<br>(d) appro<br>and alien<br>financial<br>contracti<br>and long<br>PRODEL |

4

| Evidence at Issue in Plaintiff's Motion to Strike | The Angolan Defendants' Motion to Dismiss | Plaintiff's Opposition | The A |
|---|---|---|---|
| | | | autonom<br>dispose o<br><br>The decl<br>Diamvut<br>argumen<br>separatel<br><br>See Repl |

A111

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **AENERGY, S.A.**, |
| Plaintiff, |
| v. |
| **REPUBLIC OF ANGOLA**, *et al.*, |
| Defendants. |

Case No. 1:22-cv-02514 (TNM)

<u>**MEMORANDUM OPINION**</u>

This is a case about forum-shopping.  Plaintiff Aenergy, S.A. alleges that the Republic of Angola unlawfully terminated several utility contracts awarded to it by the Angolan government.  Aenergy sought to have those contracts reinstated in Angolan court, and that case remains pending.  Soon after, Aenergy filed a lawsuit seeking damages for breach of contract in the Southern District of New York.  The court dismissed that suit under the doctrine of *forum non conveniens*.  The Second Circuit affirmed.

 Aenergy takes another swing in this district.  It again sues Angola and various arms of Angola's government for breach of contract.  Defendants again move to dismiss.  The Court will grant that motion.  Aenergy cannot overcome the prior dismissal's preclusive effect.  And regardless, this Court agrees with the well-reasoned decisions of the Southern District and Second Circuit and finds that this case belongs in an Angolan court.

**I.**

Aenergy is an Angolan energy company owned by a Portuguese citizen, Ricardo Machado.  Am. Compl. (Compl.) ¶ 28, ECF No. 28.  Between 2014 and 2017, Aenergy inked 13 contracts with Defendants Empresa Pública de Produção de Electricidade, EP ("PRODEL") and

1

A112

Empresa Nacional de Distribuição de Electricidade ("ENDE").  *See id.* ¶ 36.  These utility companies are subsidiaries of the Angolan Ministry of Energy and Water.  *See id.* ¶¶ 12–13.

The contracts at issue required Aenergy to construct, supply, and maintain power plants and water infrastructure in Angola.  *See id.* ¶ 36.  Together, these utility contracts are worth over a billion dollars.  *See id.*

Aenergy worked with General Electric ("GE") and some of its corporate affiliates to fulfill the contracts.  *See id.* ¶¶ 14-16.  In particular, the contracts required Aenergy to install turbines manufactured by GE Packaged Power, Inc.  *See id.* ¶ 37.  Angola also partnered with GE.  To fund its infrastructure projects, Angola entered a financing agreement with General Electric Capital Energy Financial Services, Inc. ("GE Capital"), the financial arm of GE.  *See id.* ¶ 31.  GE Capital provided one billion dollars in credit to Angola in exchange for a sovereign guarantee of repayment.  *See id.*  Under the terms of the agreement, GE Capital would disburse money from the credit facility at the request of the Angolan Ministry of Finance.  *See id.* ¶ 37.

Ordinarily, Angola would have transferred funds from GE into its own accounts to pay Aenergy.  Then Aenergy would have used a portion of those funds to pay GE Packaged Power for the turbines.  *See id.* ¶ 32(b).  To simplify this arrangement, Angola and GE Capital added a "direct funding" mechanism to their financing agreement.  *See id.* ¶ 32(c).  This mechanism allowed GE Capital to transfer the money owed to Aenergy by Angola directly into Aenergy accounts.  *See id.* ¶ 32(d).  Similarly, GE Capital would directly transfer the funds owed to GE Packaged Power for the turbines into its accounts.  *See id.* ¶ 33.  This funding mechanism created efficiencies by avoiding transferring funds through the Angolan government as an intermediary.  *See id.* ¶ 32(c).

2

A113

After the Angolan government finalized the financing arrangement, Aenergy began performance and invoiced the Angolan government for its work. *See id.* ¶¶ 38-39. In December 2017, Angola withdrew $644 million of its GE credit, sending $277 million to Aenergy and $367 million to GE Packaged Power. *See id.* ¶ 46.

Things went south in early 2019. A dispute arose between Aenergy and GE over the terms of their turbine supplier agreement. *See id.* ¶ 48. GE claimed that even though Aenergy had invoiced Angola only for eight turbines, Angola had paid Aenergy for 12 turbines. *See id.* ¶ 49. By Aenergy's account, this was a "lie" based on a GE accounting error. *Id.*

Soon after, Angola's president directed the Ministry of Energy and Water to terminate the utility contracts over concerns about the "irregularities" in the number of turbines Aenergy had purchased. *See id.* ¶ 48. The Angolan government claimed that Aenergy had purchased four turbines without its approval. *See* Mot. to Dismiss (MTD) at 5, ECF No. 24. And Angola revealed its intention to transfer the utility contracts directly to GE. *See* Compl. ¶ 48. Angola viewed Aenergy as an "intermediary" between Angola and GE—and the Angolan government decided to cut out the middleman. *See id.* ¶ 67(f).

In August 2019, the president formally authorized the Ministry of Energy and Water to terminate the contracts with Aenergy. *See id.* ¶ 52. The president also authorized the minister to seize the four turbines that Aenergy had bought from GE. *See id.* The minister then provided Aenergy notice of the contract termination in a letter. *See id.* ¶ 53. Following the termination, Angola made no more payments to Aenergy. *See id.* ¶ 54.

In response, Aenergy launched an international legal campaign. *See id.* ¶¶ 56-59. Aenergy started in Angola. First, it appealed Angola's decision to terminate the contracts to the Ministry of Energy and Water. *See id.* ¶ 57. The Ministry denied that appeal. *See id.* Aenergy

3

then appealed that decision to the president. *See id.* After he denied its appeal, Aenergy appealed to the Supreme Court of Angola. *See id.* That appeal remains pending. *See id.*

A few months after filing that appeal, Aenergy decided to try its luck with U.S. courts. *See id.* ¶ 58. It sued the Republic of Angola, the Ministry of Energy and Water of Angola, the Ministry of Finance of Angola, PRODEL, and ENDE (together, "the Angolan Defendants") in the Southern District of New York. *Id.* It also sued three GE entities for their role in the kerfuffle. *Id.* Aenergy explains that it decided to initiate parallel proceedings there because the Angolan Supreme Court had missed procedural deadlines and a limitations period was approaching for some of its claims. *See id.*

Aenergy brought ten claims against the various Defendants. *See* Compl., *Aenergy, S.A. v. Republic of Angola (Aenergy I)*, No. 20-cv-3569 (S.D.N.Y. May 7, 2020), ECF No. 1. Against the Angolan Defendants, Aenergy asserted six claims, including breach of contract, unjust enrichment, taking of physical assets, taking of intangible assets, and conversion. *Id.* ¶¶ 227–77. Against the GE Defendants, Aenergy alleged tortious interference with contract and tortious interference with prospective business relations. *Id.* ¶¶ 278–89. And Aenergy asserted an accounting claim and aiding and abetting claim against them all. *Id.* ¶¶ 290–98.

All Defendants moved to dismiss, arguing, among other things, that *forum non conveniens* warranted dismissal in favor of an Angolan forum. *See Aenergy I*, No. 20-cv-3569, 2021 WL 1998725, at *7 (S.D.N.Y. May 19, 2021). In a 29-page opinion, Judge Cronan agreed with Defendants and dismissed on *forum non conveniens* grounds without reaching Defendants' other arguments. *See id.* at *20. Aenergy then appealed to the Second Circuit.

The Second Circuit affirmed in a published opinion. *See Aenergy. S.A. v. Republic of Angola (Aenergy II)*, 31 F.4th 119, 124 (2d Cir. 2022). Aenergy then sought panel rehearing and

A115

rehearing en banc. *See* Pet. for Reh'g or Reh'g En Banc, No. 21-cv-1752 (2d Cir. May 11, 2022), ECF No. 125. Those requests were denied. *See* Order, No. 21-cv-1572, ECF No. 130. Undeterred, Aenergy filed a writ of certiorari with the Supreme Court, which was also denied. *See* 143 S.Ct. 576 (2023) (mem.).

Two months after the Second Circuit denied rehearing and rehearing en banc, Aenergy filed a new Complaint here. This time around, Aenergy dropped its claims against the GE Defendants. But it sued the same Angolan Defendants, narrowing its Complaint to one count of breach of contract. *See generally* Compl.

Defendants now move to dismiss. They argue that (1) they are immune from suit under the Foreign Sovereign Immunities Act ("FSIA"); (2) this suit is precluded by the prior New York litigation; (3) the Court should dismiss this case under the doctrine of *forum non conveniens*; (4) this suit is subject to mandatory arbitration; (5) the pending parallel proceedings in Angola justify abstention; and (6) Aenergy fails to state a claim against each Defendant.[1]

The Court agrees that Aenergy is precluded from relitigating the Southern District's and Second Circuit's comprehensive decisions. Even if Aenergy were entitled to another chance, the result would be the same: this suit belongs in Angola and should be dismissed on *forum non conveniens* grounds. The Court will thus grant Defendants' motion to dismiss.

## II.

Courts use the doctrine of *forum non conveniens* "to deal with inappropriate forum-shopping." *Hueter v. Kruse*, 610 F. Supp. 3d 60, 66 (D.D.C. 2022). It is a threshold inquiry that permits dismissal "when considerations of convenience, fairness, and judicial economy so

---

[1] The parties request oral argument on the pending motions. Because the Court finds the parties' submissions sufficient to decide the issues, it declines this request. *See* LCvR 7(f).

A116

warrant." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 432 (2007) (cleaned

up).  The doctrine is most often invoked when the alternative proposed forum is foreign.  *See*

*Hueter*, 610 F. Supp. 3d at 67.  And unlike the statutes governing venue within the federal-court

system, dismissal rather than transfer is the proper remedy.  *See id.*

 Defendants submit that the Southern District's *forum non conveniens* dismissal precludes

Aenergy from challenging the doctrine's application here.  They rely on issue preclusion, also

called "collateral estoppel."  *See Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 12 (D.D.C.

2021).

 Under that doctrine, "once a court has decided an issue of fact or law necessary to its

judgment, that decision may preclude relitigation of the issue in a suit on a different cause of

action involving a party to the first case."  *USPS v. Am. Postal Workers Union*, 553 F.3d 686,

696 (D.C. Cir. 2009) (cleaned up).  Relevant here, collateral estoppel works to guard against "the

expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance

on judicial action by minimizing the possibility of inconsistent decisions."  *Taylor v. Sturgell*,

553 U.S. 880, 892 (2008) (cleaned up).

 Collateral estoppel applies to *forum non conveniens* dismissals.  Generally, "[i]f one

federal court dismisses an action on the basis of *forum non conveniens*, a second federal court in

which the case is brought is bound by that decision."  14D Wright, Miller, Cooper & Freer,

*Federal Practice & Procedure* § 3828.5, at 730 (4th ed. 2013); *accord Amore ex rel. Estates of*

*Amore v. Accor, S.A.*, 484 F. Supp. 2d 124, 129 (D.D.C. 2007).  The party invoking collateral

estoppel bears the burden of showing that the doctrine applies.  *See In re Subpoena Duces Tecum*

*Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 743 (D.C. Cir. 2006).

Collateral estoppel makes a "prior determination of a legal or factual issue" conclusive in a later case when (1) "the same issue now being raised" was "contested by the parties and submitted for judicial determination in the prior case" and (2) the issue was "actually and necessarily determined" in that prior case. *Id.* (cleaned up). Preclusion must also not be unfair to the party it is asserted against. *See id.*

The Court takes each requirement in turn.

### A.

The Court first considers whether the *forum non conveniens* issue before it is the "same" as in the prior case. *Id.* "Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." 18 Wright, Miller & Cooper, *Federal Practice & Procedure* § 4425 (2d ed. 2012 update). Aenergy argues that the issue presented here is different both because of recent factual developments and because the Second Circuit employs a different *forum non conveniens* standard. Aenergy is wrong.

### 1.

Consider first Aenergy's argument about changed factual circumstances.

A *forum non conveniens* dismissal is appropriate only when "an adequate alternative forum is available to hear the dispute." *In re Air Crash over the S. Indian Ocean on March 8, 2014*, 946 F.3d 607, 612 (D.C. Cir. 2020) (*Air Crash*). Here, as in its prior suit, Aenergy claims that Angolan courts are inadequate because the Angolan judiciary will not provide due process. *See Aenergy II*, 31 F.4th at 131–32; Opp'n at 26–30. The Second Circuit agreed that a lack of due process may render a forum inadequate, but it rejected Aenergy's argument. It found that

Aenergy had not made the "rare" showing of inadequate procedural safeguards in the proposed foreign forum. *See* 31 F.4th at 131.

Aenergy argues here that recent developments now show that it will be deprived of due process in Angola. To be sure, a plaintiff may avoid the preclusive effect of a *forum non conveniens* determination by showing "a change in the *material* facts underlying the judgment." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 679 n.24 (5th Cir. 2003) (emphasis added). The problem for Aenergy is that its new factual allegations are not materially different from those that controlled the outcome in *Aenergy II*.

First, Aenergy says that "Angola effectively admitted that its lawyers lied to the Second Circuit about the Angolan judicial process concerning [its] property." Opp'n at 27. According to Aenergy, Angola had represented that the seized turbines were under "provisional administrative control" when really Angola knew those turbines had been turned over to a state-controlled energy company. *Id.* at 27–28. Second, Aenergy says that since the Second Circuit ruled, Angola has seized two more turbines as part of a criminal investigation that "appears to be a sham." *Id.* at 28.

Angola disputes these allegations. But even accepting Aenergy's characterizations as true, Aenergy still loses. The Second Circuit specifically rejected similar allegations in holding that Aenergy had not shown it would be deprived of due process in Angola. *See* 31 F.4th at 132. It reasoned that Aenergy's "argument that the seized turbines went to state-owned power companies that have since deployed them . . . suggests at most that the Angolan court's trustee has failed to fulfill its obligations." *Id.* (cleaned up). And there, as here, Aenergy "ha[d] proffered no evidence that Angola's courts cannot . . . address this asserted failure." *Id.*

8

Relatedly, the Second Circuit found Aenergy's claims about the turbines immaterial because those allegations concerned executive, not judicial, misconduct.  *See id.*  Aenergy "d[id] not dispute that the Angolan judiciary is independent from the executive branch."  *Id.*  Nor did it allege that an Angolan court "committed any other impropriety" concerning the turbines' seizure.  *Id.*  Aenergy's new complaints about its turbines similarly fail to undermine the integrity of Angolan courts.  If Aenergy is right that Angola's executive has unlawfully seized more of its turbines or otherwise acted improperly, that fact does not materially alter the *forum non conveniens* analysis employed by the Second Circuit or this Court.

For this same reason, Aenergy's new allegations about the Angolan president's public statements are also immaterial.  It claims that he held a press conference in which he stated that U.S. courts had twice adjudicated Aenergy's claims on the merits and denounced Aenergy as a "foreigner."  Opp'n at 29.  But this too fails to move the needle.  The president's comments are immaterial to the Second Circuit's *forum non conveniens* determination, which focused on evidence of judicial misconduct.  And a misstatement of the basis for dismissal shows little.

Aenergy does levy some new allegations against the Angolan judiciary.  It argues that it will not receive due process in Angola because the Angolan Supreme Court is moving too slowly and missed procedural deadlines.  Aenergy complains that briefing concluded two years ago, and "there has been no activity whatsoever in a case that was supposed to be resolved, by Angolan procedural rule, in a matter of months."  *Id.* at 30.

The Court disagrees that this is material.  That the Angolan Supreme Court is allegedly moving too slowly does not show "inadequate procedural safeguards."  31 F.4th at 132 (cleaned up).  More, Aenergy itself cites a World Bank study showing that it takes, on average, over 3.5 years to receive a disposition on a commercial dispute after suing.  *See* Opp'n at 37.  It has not

9

A120

even been that long since Aenergy filed a statement of case in the Angolan Supreme Court. *See* Opp'n at 30. So Aenergy's impatience with the Angolan judiciary does not show it will be deprived of a fair chance to get relief.

The Second Circuit cautioned that "it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." 31 F.4th at 132 (cleaned up). Aenergy's new allegations about further executive misconduct and its complaints about the pace of its Angolan case do not materially alter the considerations underlying *Aenergy II*. They amount to little more than the type of petty complaints frustrated litigants could lodge against any court system.

Aenergy alleges another material factual change, this time about the Southern District's decision to give Aenergy's choice of forum less deference. The Southern District found that Aenergy's preference for a U.S. court received less deference because its decision to file there implies forum-shopping. *See* 2021 WL 1998725, at *10. Aenergy argues that this finding was "focused principally" on the short amount of time—a few months—that passed between the filing of the Angolan cases and *Aenergy I*. Opp'n at 32. And because more than three years have passed since the Angolan cases were filed, Aenergy says this Court must revisit the Southern District's conclusion.

Not so. The Southern District did not focus on the time between its filing in Angola and the Southern District. The court was clear. It explained that because Aenergy "first chose a different forum to litigate," Aenergy's "decision to file suit in this District thus smacks of forum shopping." 2021 WL 1998725, at *10. The Second Circuit agreed, explaining that the district court had "ample basis" for that finding "as Aenergy 'first chose a different forum to litigate the

10

A121

termination of the'" utility contracts and "'thus far . . . has not found success in those Angolan proceedings.'"  31 F.4th at 129 (quoting *id.*).

There is no mention of the short amount of time between suits.  The point is that Aenergy filed anew in a potentially more favorable forum after not getting the results it wanted in Angola. So the Court disagrees that the time that has passed since the filing of *Aenergy I* is material to either the district or circuit courts' *forum non conveniens* analysis.

Aenergy has alleged no new material facts requiring this Court to revisit the prior rejections of its due process and deference arguments.

**2.**

Aenergy also argues that collateral estoppel is inapplicable because the D.C. Circuit employs a different *forum non conveniens* standard than the Second Circuit.  *See* Opp'n at 33. This is incorrect.

True, issue preclusion does not apply if the second action involves application of a different legal standard.  *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015). And Aenergy correctly notes that, in this circuit, a foreign sovereign defendant can only invoke defenses that are "equally available to private individuals."  *See Philipp v. Federal Republic of Germany*, 894 F.3d 406, 416 (D.C. Cir. 2018).  Aenergy claims that this is not true in the Second Circuit because there "'greater weight' is given to defendants in 'lawsuits against foreign states.'"  Opp'n at 33 (quoting *Aenergy II*, 31 F.4th at 127).

But Aenergy mischaracterizes the Second Circuit's holding.  The court merely explained that "the principles underlying the *forum non conveniens* doctrine apply with *equal weight*— indeed, in *some* cases *perhaps* with greater weight—to lawsuits against foreign states."  31 F.4th at 127 (emphasis added).  The court thus rejected Aenergy's claim that the doctrine is

11

inapplicable in FSIA cases, *id.* at 126, and it did not articulate a heightened standard for foreign sovereigns.  Indeed, the Second Circuit stated that the policy considerations animating the *forum non conveniens* doctrine are "*not* applicable to every lawsuit involving a foreign sovereign."  *Id.* (emphasis added).  So Aenergy is wrong that a different legal standard applies here.

Aenergy has not shown a significant intervening factual change nor that the Second Circuit applied a different legal standard than what governs in this district.  So Aenergy raises the same issue here as in the prior action.  *In re Subpoena Duces Tecum*, 439 F.3d at 743.

**3.**

Aenergy has another argument about the Second Circuit's holding.  Recall that collateral estoppel requires the "same issue" to have been "contested by the parties and submitted for judicial determination."  *Id.*

The Second Circuit found that Angola provided an adequate forum because it "permits litigation of the subject matter of the dispute."  31 F.4th at 130 (cleaned up).  The court explained that "even if [Aenergy] cannot recover damages on its breach of contract claim against Angola, it has sought equitable contract remedies in Angola."  *Id.* at 131.  This "allow[s] the Angolan court to address the essential subject matter of the dispute."  *Id.*

Aenergy now claims that the Second Circuit concluded sua sponte that Aenergy's petition for equitable relief before the Angolan Supreme Court sufficed to show that Angola provided an adequate forum.  Opp'n at 25.  So, Aenergy says, this issue was not actually "contested by the parties" nor "submitted for judicial determination."  *Id.* (quoting *Jack Faucett Assocs., Inc. v. AT&T Co.*, 744 F.2d 118, 125, 128 (D.C. Cir. 1984)).  Not so.

In its opening appellate brief, Aenergy argued that Angolan courts are inadequate because "[l]oss of the contract-breach claims against Angola would deprive [it] of a key legal

12

A123

theory for hundreds of millions in damages." *See* Appellant Br. at 39, No. 21-cv-1510 (2d Cir. Sept. 9, 2021), ECF No. 87.  And the Angolan Defendants in their briefing countered that Aenergy "filed and [is] prosecuting lawsuits in Angola over the same contracts and property at issue."  Appellee Br. at 36, No. 21-cv-1510 (2d Cir. Oct. 13, 2021), ECF No. 103.  The Second Circuit agreed with Defendants, finding that Aenergy's pursuit of equitable remedies for breach of contract showed that Angola provides an adequate forum.  So this issue was "contested by the parties and submitted for judicial determination in the prior case."  *In re Subpoena Duces Tecum*, 439 F.3d at 743 (cleaned up).

The first requirement for issue preclusion is satisfied.

## B.

Second, the Court considers whether the *forum non conveniens* issue was "actually and necessarily determined" in *Aenergy II*.  *Id.*  It was.  Aenergy litigated the issue before both the district court and the Second Circuit on appeal.  And the *forum non conveniens* issue was necessary to both courts' judgments.  Indeed, they relied exclusively on *forum non conveniens* to dismiss the claims in *Aenergy I*.  *See* 2021 WL 1998725, at *20; 31 F.4th at 135.

Aenergy responds that the Southern District and Second Circuit never determined that it could bring the claim asserted here in Angolan court.  Recall that Aenergy brought ten claims in *Aenergy I*—two of which were for breach of contract.[2]  Judge Cronan reasoned that because Aenergy's eight other claims could be brought in Angola, that forum permits litigation of the

---

[2] Along with breach of contract, Aenergy alleged against the Angolan Defendants unjust enrichment, taking of physical property in violation of international law, taking of intangible assets in violation of international law, conversion, accounting, and aiding and abetting.  *See Aenergy I*, Compl. at 71–79, 83, No. 20-cv-3569 (S.D.N.Y. May 7, 2020), ECF No. 1.

A124

subject matter of the dispute and thus is adequate. *See* 2021 WL 1998725, at *12–*13. Aenergy says this case is different because its only claim is for breach of contract.

The Court disagrees. Aenergy does not assert that it lost its chance to bring those other eight claims in Angola. It simply declined to plead them here, apparently to avoid the holdings of two other courts that found this case belongs in Angola. That Aenergy chose to limit its Complaint to a claim that it argues is time-barred does not mean that the subject matter of the dispute cannot be litigated in Angola.

And even if Aenergy is right that its artful pleading undermines the preclusive effect of the district court's adequacy determination, Aenergy cannot avoid the holding of *Aenergy II*. There, the Second Circuit relied on Aenergy's pursuit of equitable remedies in finding that Angolan courts could address the essential subject matter of the dispute. The Second Circuit did not consider Aenergy's ability to bring other claims in Angola. *See* 31 F.4th at 131–32. It was sufficient that Aenergy was before the Angolan Supreme Court seeking reinstatement of the utility contracts. *See id.* So *Aenergy II* necessarily determined that Aenergy's pending suit in Angola provided an adequate forum for its breach of contract claims.

Finally, collateral estoppel applies only when its application does not work a basic unfairness to the party contesting the preclusive effect of the prior judgment. *In re Subpoena Duces Tecum*, 439 F.3d at 743.

The Court sees no "basic unfairness" here. Aenergy already had multiple chances to argue this case does not belong in Angola. And its "incentives to litigate the point now disputed were no less present in the prior case, nor are the stakes of the present case of vastly greater magnitude." *Martin v. DOJ*, 488 F.3d 446, 455 (D.C. Cir. 2007) (cleaned up). There is no

indication on this record that the "prior proceedings were seriously defective." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971).

Aenergy has repeatedly argued that its claims should remain in a U.S. court. The Court finds no circumstances sufficient to allow Aenergy to avoid the preclusive effect of the prior decisions. Aenergy has pointed to no factual developments material to the application of the *forum non conveniens* criteria. Nor has it shown that those criteria differ in this circuit. Aenergy is thus collaterally estopped from relitigating the prior *forum non conveniens* dismissal here.

## III.

Even if issue preclusion did not require dismissal, this Court would still dismiss Aenergy's complaint on *forum non conveniens* grounds.

A party seeking a *forum non conveniens* dismissal must show both "(1) that an adequate alternative forum is available to hear the dispute, and (2) if so, that the balance of certain public and private interest factors strongly counsels in favor of trying the dispute in the alternative forum." *Air Crash*, 946 F.3d at 612. Courts weigh the public and private interest factors against "the degree of deference the plaintiff's choice of forum deserves." *Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 948 (D.C. Cir. 2019). This "determination is committed to the sound discretion of the trial court." *Id.* (cleaned up).

In this posture, the Court accepts as true Aenergy's factual allegations and draws all reasonable inferences in its favor. *See id.*

## A.

The Court first considers whether Angola is an adequate alternative forum.

15

A126

"Generally, an alternative forum is adequate if the defendants are subject to service of process there and the forum permits litigation of the subject matter of the dispute." *Heuter*, 610 F. Supp. 3d at 67.

Aenergy does not dispute that Defendants are subject to service of process in Angola. Rather, it contends that its breach of contract claim cannot be brought in Angolan courts, challenging the second part of the standard. Opp'n at 24–25; Compl. ¶ 7. Aenergy submits that this claim is barred by a nonwaivable limitations period. The Court credits this allegation. Even so, it does not follow that Angola is an inadequate forum.

When the forum "would provide a plaintiff at least some remedy," the second requirement is satisfied. *Air Crash*, 946 F.3d at 613. "Undeniably, the defendant faces a rather low bar for establishing that the alternative forum is adequate." 14D Wright, Miller, Cooper & Freer, *Federal Practice & Procedure* § 3828.3, at 648–49 (4th ed. 2013). Defendants argue that Angolan courts are adequate for the same reasons given in *Aenergy I* and *Aenergy II*.[3] *See* MTD at 35.

The Court joins those well-reasoned decisions. Angolan courts provide Aenergy with a remedy for its contract dispute. Aenergy filed administrative appeals challenging Angola's termination of the utility contracts. Compl. ¶¶ 56–57. And after Aenergy lost its final administrative appeal, it appealed that decision to the Angolan Supreme Court, seeking reinstatement of the contracts. *See id.*

---

[3] The Court rejects Defendants' argument that it need not show Angola is an adequate forum because the utility contracts contain mandatory forum selection clauses. *See* MTD at 23–27. The contracts contain arbitration clauses, but those clauses do not dictate where arbitration must proceed and thus are not forum selection clauses. *See* Declaration of Henrique Abecasis (Abecasis Decl.) Ex. 14, ECF No. 25-14 (translation of arbitration clauses).

Aenergy responds that this is not good enough because it is barred from seeking damages.  This argument fails.  The alternative forum need not "have identical causes of action or identical remedies to be deemed adequate."  *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 292 (D.D.C. 2011).  As the Second Circuit reasoned, Aenergy's chance at equitable relief before the Angolan Supreme Court provides "at least some remedy" for its contract dispute.  *Air Crash*, 946 F.3d at 613.

Next, Aenergy reprises its argument that Angolan courts are inadequate because it will be denied due process.  *See* Opp'n at 26–30.  This claim is unpersuasive.  To be sure, "an alternative forum is inadequate if the plaintiff will be treated unfairly there."  *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 574 (D.C. Cir. 2010) (cleaned up).  But Aenergy has not made that showing.

Aenergy focuses most of its due process argument on the "recent developments" that it claims undermine the Second Circuit's rejection of this same argument.  This Court has already explained why these new factual allegations are not enough to revive Aenergy's due process argument.  These allegations fail to show that Aenergy will be treated unfairly by Angolan courts for the same reasons.

Aenergy's other arguments are also unpersuasive.  It merely levels generalized criticisms of the independence of Angola's judicial branch.  *See* Opp'n at 26–27.  For instance, they quote "journalist and activist Rafael Marques," who has argued that there is "no separation of powers" in Angola and its judiciary has become "an epicenter of corruption."  *Id.*  Similarly, it points to a report by nonprofit Freedom House which concludes that "[c]orruption and political pressure from the ruling MPLA party contribute to the judiciary's general inefficiency and undermine its independence."  *Id.* at 27 (citation omitted).  These submissions fail.

"General allegations of deficiency" are insufficient to "warrant the conclusion that a foreign forum is inadequate." *MBI Grp.*, 616 F.3d at 575 (cleaned up). Indeed, the D.C. Circuit concluded that "reliance on a *State Department* report expressing concern about the impartiality of the [foreign] court system . . . is unavailing" to show inadequacy. *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996) (emphasis added) (cleaned up), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010). The opinions of a nonprofit organization and "journalist and activist" are even less persuasive.

Angola is an adequate alternative forum.

### B.

Next, the Court determines the amount of deference due to Aenergy's choice of forum. The Court then balances the private and public interest factors. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

### 1.

The Court's review of a *forum non conveniens* motion starts with "a strong presumption in favor of the plaintiff's choice of forum." *Id.* at 255. The degree of deference changes depending on the plaintiff's connection (or lack thereof) to that forum. As Aenergy concedes, courts give less deference "when the forum is not the plaintiff's home forum and most of the events occurred elsewhere." *Hueter*, 610 F. Supp. 3d at 68; *see* Opp'n at 30.

Aenergy is owed little deference here. To begin, this district is not its home forum. Aenergy is a corporation constituted under the laws of Angola. *See* Compl. ¶ 8. Its "principal commercial activities" took place in Angola. *See id.* And its former executives and directors all reside in Portugal. *See id.* So Aenergy, a "foreign plaintiff with minimal or no connections to the United States," is entitled to scant deference. *Air Crash*, 946 F.3d at 614.

Aenergy responds that because its home is now Portugal, the deference owed to its preference for a U.S. court "is a question of relative convenience as between Portugal and the United States." Opp'n at 32. Not so. "The doctrine of *forum non conveniens* is premised on the assumption that there are at least two forums in which the defendant is amenable to process, and furnishes criteria for choice between them." *Shi*, 918 F.3d at 950 (cleaned up). It is also curious that Aenergy offers Portugal as the relevant comparator when it has not sued there.

More, the sole case Aenergy relies on in support of this novel theory, *Simon v. Republic of Hungary*, explains that "[t]he presence of foreign plaintiffs certainly does not justify the preference for a forum . . . in which *no* plaintiff resides." 911 F.3d 1172, 1183 (D.C. Cir. 2018). So too here. Aenergy prefers a forum where no plaintiff *or* defendant resides. The case for deference here is thus even weaker than in Aenergy's prior litigation, when three Defendants were at home in the United States. *See* 2021 WL 1998725, at *9.

Nor does it appear that Aenergy's choice of forum was motivated by legitimate reasons. *Shi*, 918 F.3d at 950. The Court agrees with Judge Cronan that Aenergy's decision to sue in the United States—after initiating parallel proceedings in Angola's Supreme Court—"smacks of forum shopping." 2021 WL 1998725, at *10. Aenergy repeatedly laments its need to sue in the United States so that it can bring a damages action for breach of contract despite it simultaneously seeking reinstatement of those same contracts in Angola. And "dismissal may be warranted where a plaintiff chooses a particular forum, not because it is convenient, but solely in order to . . . take advantage of favorable law." *Piper Aircraft*, 454 U.S. at 249 n.14.

Aenergy's preference for a U.S. court is owed little deference.

A130

**2.**

Now consider the private interest factors.  To determine which forum the private interest supports, the Court evaluates "(1) the relative ease of access to sources of proof; (2) the availability of process for compelling unwilling witnesses; (3) the cost to obtain attendance of willing witnesses; (4) the need to inspect the premises, if appropriate; and (5) all other practical problems that make trial easy, expeditious, and inexpensive." *Hueter*, 610 F. Supp. 3d at 69 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

The first factor supports dismissal.  The events took place almost exclusively in Angola among Angolan parties.  The contracts at issue provided that Aenergy would construct and maintain power plants in Angola to benefit the Angolan people.  The alleged breaches of these contracts occurred in Angola by the Angolan government.  Much, if not all, of the evidence and many witnesses are in Angola or, perhaps, Europe.  Because the core facts occurred primarily in Angola, the "relative ease of access to sources of proof" supports dismissal.  *Id.*

The second factor supports dismissal as well.  Most of the potential witnesses and evidence is located abroad and "likely . . . beyond the reach of this Court's compulsory process." *BPA Intern., Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003).  And, as Defendants note, many of the Angolan state officials who will likely testify in defense of Aenergy's claim would be unwilling to travel here given their official roles.  *See* Reply at 18, ECF No. 42.

The third factor favors dismissal too.  Plaintiff says it "will agree to pay reasonable airfare and hotel costs for any witnesses it calls here from Angola."  Opp'n at 36.  Even so, those witnesses would still "have to make a lengthy trip" from Angola to give testimony, "whereas no similar burden is involved in conducting the litigation in" Angola.  *MBI Group, Inc. v. Credit*

20

A131

*Foncier du Cameroun*, 558 F. Supp. 2d 21, 34 (D.D.C. 2008), *aff'd*, 616 F.3d 568 (D.C. Cir. 2010).  And the witnesses "will all almost surely require translators in order to present live testimony before this Court."  *Id.* at 33.  On the other hand, Portuguese is the official language of Angola, so a language barrier would not exist in Angola for any witnesses residing in Portugal.

The fourth private interest factor is neutral or slightly favors dismissal.  If it is necessary to view the areas of land that were set aside for the proposed power plants or the plants themselves, that could only take place in Angola.

Finally, the "practical problems" with having trial in the District are largely captured by the Court's discussion above.  *Gulf Oil*, 330 U.S. at 508.  And Aenergy's "lawsuits in [Angola] acknowledge that forum as a convenient one."  *Hueter*, 610 F. Supp. 3d at 70.  At bottom, it seems Aenergy continues to sue in the United States to "take advantage of favorable law."  *Piper Aircraft*, 454 U.S. at 249 n.15.

The Court recognizes that Aenergy's founder, Ricardo Machado, and various other former employees have expressed safety concerns with traveling to Angola.  *See* Decl. of Ricardo Machado ¶¶ 3–4, 10, 13–15, ECF No. 36; Decl. of Pedro Bento, ECF No. 32; Decl. of Jose Leitao Amaro, ECF No. 33; Decl. of Jorge Morgado, ECF No. 34.  The Court assumes these "fears are legitimate, and thus [they] weigh slightly against dismissing this action."  *Aenergy I*, 2021 WL 1998725, at *19.  "But because all other private interest factors weigh in favor of dismissal," the Court finds that such fears fail meaningfully to tip the balance in favor of a U.S. court.  *Id.*

So the private interest factors favor litigation in Angola.

A132

**3.**

Now for the public interest factors.  The Court considers "(1) the administrative difficulties caused when litigation piles up in congested centers; (2) the burden of jury duty on a community that has no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the chance that the Court will confront choice-of-law problems or need to interpret foreign law."  *Hueter*, 610 F. Supp. 3d at 70 (citing *Shi*, 918 F.3d at 952).

First, "the administrative difficulties of trying this case in a forum thousands of miles away from the majority of witnesses and the evidence are obvious."  *MBI Grp.*, 558 F. Supp. 2d at 34 (cleaned up).  The Court will be burdened by the "need for extensive translation of documents and testimony," which is compounded by its inability "to compel the participation of unwilling" foreign government officials.  *Id.*  And this district had 6,001 cases pending as of March 2023—a 2.7% increase over 2022.[4]  Taking on this complicated case will burden a district with an increasingly heavy caseload and not guarantee Aenergy any speedier resolution than in Angolan courts.  Though Aenergy again complains that Angolan courts are slow, there is no evidence that Angolan courts are more or less congested than this district.  *See* Opp'n at 37.

The second factor is inapplicable since no jury trial is available under FSIA.  *See* 28 U.S.C. § 1330(a).

Third, the local interest in having localized disputes decided at home strongly suggests that an Angolan court should hear this case.  Aenergy concedes that the utility contracts "are indeed at the heart of" this dispute.  Opp'n at 37.  And these contracts are between an Angolan

---

[4] Admin. Office of the U.S. Courts, U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics (Mar. 31, 2023), https://perma.cc/SG34-M29R.

A133

company and the government of Angola to build power plants in Angola to provide energy to the Angolan people.  Neither the parties, witnesses, evidence, nor contracts have any real connection to the United States.  Any "ripple effect" on the credit facility underwritten by GE Capital caused by the termination of these contracts, *id.*, is outweighed by the interest of Angola is resolving this dispute.

The fourth factor favors dismissal because the utility contracts are governed by Angolan law.  *See* Abecasis Decl. Ex. 14.  So there is a high chance that in addressing the merits, the Court would need to solve difficult problems in conflict of laws and the application of foreign law.  For example, both parties have offered expert declarations on the question of whether Aenergy's claim for damages is time-barred in Angola under Angolan law.  Those experts come to opposite conclusions.  *Compare* Decl. of Lino Diamvutu ¶ 21, ECF No. 43 *with* Decl. of Sergio Raimundo ¶¶ 30–31, ECF No. 30.  Though the Court need not decide that question to resolve the case,[5] this scrap over foreign law highlights the types of questions this Court would face if this action remained here.  And the doctrine of *forum non conveniens* is partly designed to help courts avoid "be[ing] required to untangle problems . . . in law foreign to itself."  *Piper Aircraft*, 454 U.S. at 251 (cleaned up).

Thus, the applicable public interest factors all strongly favor an Angolan forum.  And given the wee deference owed to Aenergy's choice to sue here, the Court finds that a *forum non conveniens* dismissal is appropriate.

---

[5]  Aenergy moves to strike this declaration and three others, as well as portions of Defendants' reply.  *See* Mot. to Strike, ECF No. 46.  Aenergy argues that these materials and portions of the brief citing those materials improperly raise new arguments on reply.  Because the Court does not rely on matters or evidence raised for the first time on reply, the Court will deny this motion as moot.

A134

**IV.**

Defendants offer various other reasons why the Court should dismiss this case.  The

Court briefly explains why those defenses fail.[6]

**1.**

First, Defendants argue that this Court lacks jurisdiction under the FSIA to consider

Aenergy's claims.

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in [U.S.]

courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

Foreign states are presumptively immune from jurisdiction under the FSIA, subject to nine

enumerated exceptions.  *See* 28 U.S.C. §§ 1604, 1605–07.  Unless an exception applies, "the

foreign state has immunity and the court lacks subject matter jurisdiction."  *Wye Oak Tech., Inc.*

*v. Republic of Iraq*, 24 F.4th 686, 690 (D.C. Cir. 2022).

When, as here, the defendant challenges "only the legal sufficiency of plaintiff's

jurisdictional claims [under FSIA], the standard is similar to that of Rule 12(b)(6)."  S*chubarth v.*

*Federal Republic of Germany*, 891 F.3d 392, 398 (D.C. Cir. 2018) (cleaned up); *see* MTD at 14.

This means that "dismissal is warranted if no plausible inferences can be drawn from the facts

alleged that, if proven, would provide grounds for relief."  *Schubarth*, 891 F.3d at 398 (cleaned

up).  The defendant bears the burden of showing that plaintiff's allegations do not fit within an

exception to the FSIA's grant of immunity.  *See id.*

Aenergy invokes clause three of the FSIA's commercial activity exception.  *See* Opp'n at

12.  Under that clause, Defendants are not immune so long as Aenergy's suit is "based upon . . .

---

[6]  The Court need not decide whether this suit is subject to mandatory arbitration or whether to
stay the case pending resolution of the parallel proceeding before the Angolan Supreme Court.

A135

an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

For starters, it is undisputed that Aenergy's breach of contract claim is "based upon . . . an act outside the territory of the United States."  *Id.*  Defendants acknowledge that the "gravamen" of Aenergy's claim is "Angola's repudiation of the [utility contracts] (an act which occurred in Angola) and non-payment to Plaintiff."  MTD at 6–7.

Second, Defendants do not contest that Angola's repudiation and failure to pay were "in connection with" Angola's commercial activity.  28 U.S.C. § 1605(a)(2).  "A foreign state engages in commercial activity when it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns."  *Ivanenko v. Yanukovich*, 995 F.3d 232, 238 (D.C. Cir. 2021) (cleaned up).  Breaching or repudiating a contract, like a "failure to pay . . . invoices," is quintessential private commercial activity.  *Wye Oak*, 24 F.4th at 703; *see also Smith v. Overseas Korean Cultural Heritage Found.*, 279 F. Supp. 3d 293, 297 (D.D.C. 2018) ("if the activity can similarly be accomplished by a private party, the action is 'commercial' within the meaning of FSIA.").

The real action is whether Defendants' repudiation and failure to pay "caused a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  It has.

The FSIA contains no "requirement of substantiality or foreseeability"—"an effect is 'direct' if it follows as an immediate consequence of the defendant's activity."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (cleaned up).  Nor does the FSIA demand that the direct effect in the United States harm the plaintiff.  *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661, 666 (D.C. Cir. 2010).

25

The utility contracts required Aenergy to purchase turbines from GE Packaged Power, a Delaware corporation with its principal place of business in Texas.  *See* Compl. ¶ 36.  These turbines are manufactured in and shipped from the United States.  *See id.* ¶ 67.  Angola's termination and failure to pay Aenergy led GE to terminate its subcontracts with Aenergy.  *See id.* ¶ 55.  But for the termination, GE would have provided additional goods and services under those contracts to Aenergy.  *See id.*  So Angola stopped money from moving out of the credit facility and into the U.S. accounts of GE Packaged Power, as suppliers.  This "resulted in the direct loss of millions of dollars worth of business in the United States."  *Cruise Connections*, 600 F.3d at 666.

This case is much like *Cruise Connections*.  There, the court found a "direct effect" based on Canada's alleged breach of a contract that required the plaintiff "to subcontract with two U.S.-based cruise lines" to provide ships during the Vancouver Olympics.  *Id.* at 662.  Because "the contract itself required the ships to come from" U.S.-based companies, Canada's breach "led inexorably to the loss of revenues" in the United States.  *Id.* at 665.  So too here.  Defendants' repudiation of the utility contracts caused the GE entities with which Aenergy had subcontracted to lose revenue.  "This is sufficient."  *Id.*

Defendants fail to meaningfully distinguish *Cruise Connections*.  They respond that case has since been "clarified," such that the contract at issue must "provide for or contemplate U.S. performance" for an effect to be direct.  Reply at 5 (citing *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014); *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1141 (D.C. Cir. 2020)).  The Court disagrees that either *Odhiambo* or *Valambhia* abrogated the holding of *Cruise Connections*.  Those cases are consistent because the utility contracts did

26

A137

contemplate U.S. performance—the contracts required that Aenergy acquire supplies from U.S.-based companies.

So Aenergy's claim falls within the FSIA's commercial activity exception, giving this Court jurisdiction.

**2.**

Three Defendants argue that Aenergy has failed to state a claim against them.  Because only PRODEL and ENDE formally executed the contracts, the other Defendants (the Republic of Angola, the Ministry of Energy and Water, and the Ministry of Finance) claim that they cannot be liable for any alleged breach.  The Court disagrees.

To be sure, foreign states and their agencies and instrumentalities are entitled to a "presumption of independent status." *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba (Banec)*, 462 U.S. 611, 627 (1983).  And generally, a foreign sovereign cannot be sued based on the acts of such an instrumentality. *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000).  But that presumption can be overcome when the sovereign's control over its instrumentality renders the sovereign "amenable to suit under ordinary agency principles." *Id.* at 849.

In this context, a principal-agent relationship exists when "[1] the parent has manifested its desire for the subsidiary to act upon the parent's behalf, [2] the subsidiary has consented so to act, [3] the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and [4] the parent exercises its control in a manner more direct than by a voting majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *Id.* at 849.  No "mechanical" formula determines whether such a relationship exists—the question "is inherently fact specific." *Id.*

A138

At this preliminary stage, and taking Plaintiff's well-pleaded claims as true, Aenergy has plausibly alleged that PRODEL and ENDE acted as Angola's agents regarding the utility contracts.  The Angolan government regularly issues policies and directives to these instrumentalities, which "cause [them] to act on behalf of" the state.  *See* Compl. ¶¶ 12–13.  This dispute came about after a series of such directives.  Angola's representations to its Supreme Court leave no doubt that PRODEL and ENDE acted as its agents.

First, the former Angolan president "executed a delegation of powers to . . . the Presidents of the Boards of Directors of . . . PRODEL and ENDE, to represent the Angolan State in the [utility] contracts."  Translation of Defense to Sup. Ct. ¶ 78, ECF No. 31-24.  This was necessary because the public companies "lack[ed] competence to contract" absent a presidential decree authorizing the contracts' execution.  *Id.* ¶ 90.  So the contracts "were executed by . . . PRODEL and ENDE*, on behalf of* [the Ministry of Energy and Water]."  *Id.* ¶ 85 (emphasis added).

Thus, the Ministry of Energy and Water "was the real counterparty in the Contracts"— "despite it having opted out of mentioning this capacity in the contracts."  *Id.* ¶ 90.  And the Ministry "acted . . . on behalf of the State, the true contracting party in the Contracts."  *Id.* ¶ 92.  Indeed, payment under the contracts could be made only after the Minister of Energy and Water approved Aenergy's invoices, and only after the Minister of Finance approved payment.  *See* Compl. ¶ 13.  More, when things soured between the Angolan government and Aenergy, the president authorized the Ministry of Energy and Water to terminate the utility contracts directly and unilaterally.  *See* Compl. ¶ 52; Termination Letter, ECF No. 25-16.  So at least with respect to the utility contracts, the Republic of Angola "had plenary control" over PRODEL and ENDE.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005).

PRODEL and ENDE thus acted as Angola's agents.  Angola's statements to its high court demonstrate that it "actually exercised the requisite degree and manner of control" over PRODEL and ENDE as required by *Transamerica*.  *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 216 (D.D.C. 2014).  The Angolan government directed those entities to contract with Aenergy on its behalf, approved and doled out payments under the contacts, and eventually terminated those contracts itself.  At every step, Angola decided what would happen and ordered PRODEL and ENDE to carry out what the government wanted.

Thus, Aenergy has stated a claim against all Defendants.[7]  For this reason, PRODEL and ENDE's personal jurisdiction arguments fail.  *See* Opp'n at 38.  "Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." *GSS Grp. Ltd v. Nat. Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012).

## V.

Aenergy has had several chances to seek relief for Angola's alleged breach of contract.  It continues to do so in Angola, where its similar case is pending.  And multiple U.S. courts have rejected Aenergy's attempts to bring a parallel proceeding in this country.  Aenergy cannot avoid those well-reasoned decisions by repleading the heart of its case here.  Aenergy has hopped from forum to forum in search of success.  And it has chosen to do its forum-shopping in jurisdictions that have, at best, a tenuous connection to the parties involved and claims asserted.

---

[7]  The Court also rejects Defendants' contention that this case should be dismissed for insufficient service of process.  *See* MTD at 12–13.  Though Aenergy concedes that it addressed the summons and complaint to Angola's "Ministry of Foreign Affairs" rather than "Head of the Ministry of Foreign Affairs," *see* Opp'n at 9, "dismissal is not appropriate when there exists a reasonable prospect that service can be obtained."  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 29 (D.C. Cir. 2015).

A140

The Court will thus largely grant Defendants' motion to dismiss.  But the Court will deny Defendants' motion insofar as they request dismissal with prejudice.  Dismissals with prejudice are disfavored in this circuit, and the trial court must find that the allegation of other facts consistent with the challenged pleadings could not possibly cure the deficiency.  *See In re Danaher Corp. S'holder Derivative Litig.,* 549 F. Supp. 3d 59, 75 n.12 (D.D.C. 2021).  That high standard is not met here.

A separate Order will issue today.


Dated:  June 20, 2023

_____

TREVOR N. McFADDEN, U.S.D.J.

30

A141

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.**, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-02514 (TNM) |
| **REPUBLIC OF ANGOLA**, *et al.*, | |
| Defendants. | |

## ORDER

After considering the parties' motions, the briefs in support and opposition, the law, and the entire record in this case and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Defendants' [24] Motion to Dismiss Amended Complaint is **GRANTED** in part. The motion is **DENIED** insofar as it requests dismissal with prejudice; it is further

**ORDERED** that Plaintiff's [39] Motion for Hearing is **DENIED**; it is further

**ORDERED** that Plaintiff's [46] Motion to Strike is **DENIED** as moot.

**SO ORDERED.**

This is a final, appealable Order. The Clerk of Court is requested to close this case.

Dated: June 20, 2023

_____
TREVOR N. McFADDEN, U.S.D.J.

1

A142

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.** *Plaintiff,* <br><br> v. <br><br> **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** <br><br> *Defendants.* | CIVIL ACTION NO. <u>22-cv-2514-TNM</u> <br><br> **DECLARATION OF HENRIQUE ABECASIS IN SUPPORT OF THE ANGOLAN DEFENDANTS' OPPOSITION TO PLAINTIFF'S FRCP 59(E) MOTION FOR RECONSIDERATION OF DKTS. 49 AND 50** |

Henrique Abecasis declares under penalty of perjury, under the laws of the United States, pursuant to 28 U.S.C. 1746, that the following is true and correct:

1.     I am a licensed attorney and am co-counsel to The Republic of Angola, The Ministry of Energy and Water of the Republic of Angola ("MINEA"), The Ministry of Finance of the Republic of Angola ("MINFIN"), Empresa Pública de Produção de Electricidade, EP ("PRODEL"), and Empresa Nacional de Distribuição de Electricidade ("ENDE") (collectively, the "Angolan Defendants"). I have personal knowledge of the facts stated in this declaration.

2.     I earned my law degree from the University of Lisbon in 1973 and have been practicing law since then. I am a partner of the law firm Henrique Abecasis, Andersen Guimaraes & Associados ("HAAG"), which I founded in 1992. HAAG is headquartered in Lisbon, Portugal. HAAG specializes in, among other things, the representation of Angolan entities in international transactions, arbitration and litigation, including specifically in the areas of administrative and public procurements and energy.

1

3.   I am an advisor to The Republic of Angola and MINEA, in Angola, concerning the matters raised in parallel proceedings filed in Angola, including the "seizure" action pending in the Provincial Court in Luanda, Angola, as well as the challenge of the administrative decision to terminate the power plant contracts pending in the Supreme Court in Luanda, Angola.

4.   I submit this declaration in support of the Angolan Defendants' opposition to Plaintiff Aenergy S.A.'s ("Plaintiff") FRCP 59(e) motion for reconsideration of Dkt. Nos 49 and 50 (the "Motion") in this case.

5.   In particular, according to Plaintiff, the Court should reconsider its finding that the subject matter of this dispute can be litigated in Angola based on new evidence obtained "just last month." Motion, p. 5, Dkt. No. 51. Indeed, Plaintiff appears to contend that in June 2023 Plaintiff learned, for the first time, that the Angolan Defendants' position in the Angolan Supreme Court is that the equitable relief sought in Angola to reinstate the contracts is incompatible with the claim for damages sought in New York arising from the termination of the contracts and unpaid supplies and services.

6.   However, this is false.  Plaintiff had knowledge of and access to the Angolan Defendants' position on equitable relief since, at the very latest, *March 2021*.

   a.   In the Angolan Supreme Court proceedings, the Angolan Defendants' *Contestação* (Memorandum in Opposition), which was filed with the Angolan Supreme Court on September 16, 2020, advanced this same argument in sections 169 to 178 of that submission.  A true and correct copy of the *Contestação* filing, with a certified translation of the relevant sections, is enclosed as **Exhibit A**.

   b.   Plaintiff responded to this argument in its *Réplica* (Reply), which was filed with the Angolan Supreme Court on March 20, 2021.  In sections 125 to 129 of that

2



A144

submission, Plaintiff responded specifically to the Angolan Defendants' position on equitable relief (as argued in the September 2020 *Contestação*).  A true and correct copy of the *Réplica* filing, with a certified translation of the relevant sections, is enclosed as **Exhibit B**.

c.  Accordingly, at the very latest, as of *March 20, 2021*, Plaintiff had full knowledge of the Angolan Defendants' argument with respect to equitable relief.  It is false for Plaintiff to contend in its Motion that it learned such information *for the first time* "just last month" in June 2023.

Executed on this 1st day of August 2023.

Henrique Abecasis

3

A145

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.** | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. <u>22-cv-2514-TNM</u> |
| **REPUBLIC OF ANGOLA, MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA, MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,** | |
| *Defendants.* | |

<u>**NOTICE OF DISPOSITION OF RELATED CASES**</u>

On December 20, 2022, Defendants, The Republic of Angola, Ministry of Energy and Water of the Republic of Angola, Ministry of Finance of the Republic of Angola, Empresa Publica de Producao de Electricidade, EP, and Empresa Nacional de Destribuicao de Electricidade (together "The Angolan Defendants"), by and through undersigned counsel and pursuant to LCvR 40.5, provided this Court with Notice of Related Cases (Dkt. No. 16).

That Notice referred to <u>Aenergy et al v. Republic of Angola et al</u>, Case No. 20-cv-3569 (JPC) (S.D.N.Y), which involved the same parties and relates to the same subject matter. That case also involved claims by Plaintiff Aenergy ("Plaintiff") against General Electric Company and its affiliates, General Electric International, Inc., and GE Capital EFS Financing, Inc.

By order dated May 19, 2021, the United States District Court for the Southern District of New York dismissed that case based on *forum non-conveniens*. <u>See</u> <u>Aenergy SA v. Republic of Angola</u>, 2021 WL 1998725 (S.D.N.Y. May 19, 2021). Plaintiff appealed, and the Second Circuit Court of Appeals affirmed the district court's dismissal on April 13, 2022. <u>See</u> <u>Aenergy et al. v.</u>

1

A146

Republic of Angola et al, 31 F.4th 119 (2d Cir. 2022).  On November 14, 2022, Plaintiff filed a petition for writ of *certiorari* seeking review of the Second Circuit Court of Appeals' decision. By order dated January 9, 2023, the Supreme Court denied Plaintiff's petition for writ of *certiorari*.  Aenergy et al. v. Republic of Angola et al, 2023 WL124091.

In their Motion to Dismiss, the Angolan Defendants further informed this Court that, simultaneous with its initiation of this action, Plaintiff filed companion cases against General Electric before the United States District Court for the District of Connecticut for claims arising from the same transactions Plaintiff previously raised against General Electric and Angola before the New York district court.  See Aenergy v. General Electric International, Case No. 3:22-cv-1055, District of Connecticut; Aenergy v. GE Capital EFS Financing, Inc., Case No. 3:22-cv-1054, District of Connecticut.  General Electric moved to dismiss these cases based on *inter alia* collateral estoppel and *forum non conveniens*.  See generally Angolan Defendants' Motion to Dismiss (Dkt. No. 24) at p. 10.

**PLEASE TAKE NOTICE** that on August 1, 2023, the Connecticut district court entered judgment in favor of General Electric International and GE Capital EFS Financing, Inc. and dismissed Plaintiff's claims.  Plaintiff did not file any Notice of Appeal and the deadline to do so has now expired.

A147

**PLEASE TAKE FURTHER NOTICE** that the relevant docket sheets, orders, decisions, and judgments are enclosed for this Court's reference as **Exhibit 1** (for Case No. 3:22-cv-1055 concerning General Electric International) and **Exhibit 2** (for Case No. 3:22-cv-1054 concerning GE Capital EFS Financing, Inc.).

Dated: October 2, 2023

Respectfully submitted,

**EHRENSTEIN | SAGER**
2800 Ponce de Leon Boulevard, Suite 1400
Coral Gables, Florida 33134
Telephone: (305) 503-5930

By: */s/ Michael D. Ehrenstein*
Michael D. Ehrenstein
Florida Bar No.: 857378
(*Pro Hac Vice* Admission)
mike@ehrensteinsager.com

**LAW OFFICES OF KIRAN N. GORE, PLLC**
1050 30th Street NW
Washington, DC 20007
Telephone: (917) 589-8714

By: */s/ Kiran Nasir Gore*
Kiran Nasir Gore
DC Bar No. 1031846
kng@gorelaw.com

*Counsel for the Angolan Defendants*

3

A148

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AENERGY, S.A.,** | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-02514 (TNM) |
| **REPUBLIC OF ANGOLA**, *et al.,* | |
| Defendants. | |

## <u>ORDER</u>

Recently, the Court dismissed without prejudice Aenergy's breach of contract claim against the Republic of Angola and associated state entities (Angolan Defendants) on issue preclusion and *forum non conveniens* (FNC) grounds. Aenergy now moves for reconsideration of that decision, asserting that (1) the Court overlooked certain evidence, (2) new material evidence has surfaced since the Court ruled, and (3) the Court did not hold the Angolan Defendants to their burden on FNC. The Court concludes that it did not overlook any evidence and that the newly presented evidence does not alter its issue preclusion analysis. Because issue preclusion is an independent basis for dismissal, the Court does not reach Aenergy's argument that the Angolan Defendants failed to meet its burden on FNC.

### I.

The Court has already recounted the facts here. *See* Mem. Op. at 1–5. Put briefly, Aenergy inked several contracts with Angola to construct, operate, and maintain power plants. *See* Amended Compl. ¶¶ 36–38, ECF No. 22. Angola allegedly terminated these contracts. *Id.*

¶¶ 52–54.  Aenergy now seeks damages resulting from the Angolan government's alleged failure to pay for work performed and materials provided under these contracts.  *Id*. ¶ 76.

The central issue here has now been litigated repeatedly.  First, Aenergy challenged the termination of these contracts in Angola, where an appeal remains pending before the Angolan Supreme Court.  Amended Compl. ¶ 57.  Aenergy then sued in the Southern District of New York, which dismissed the case on FNC grounds.  *Aenergy, S.A. v. Rep. of Angola* (*Aenergy I*), 20-cv-3569, 2021 WL 1998725 (S.D.N.Y. May 7, 2020).  The Second Circuit affirmed. *Aenergy, S.A. v. Rep. of Angola* (*Aenergy II*), 31 F.4th 119, 124 (2d Cir. 2022).  Finally, Aenergy sued the same Angolan Defendants here, and this Court dismissed the complaint without prejudice on issue preclusion and FNC grounds.  *Aenergy, S.A. v. Rep. of Angola*, 22-cv-02514, 2023 WL 4075627 (D.D.C. June 20, 2023) (*Aenergy III*).[1]

## II.

Federal Rule of Civil Procedure 59(e) permits a party to file "[a] motion to alter or amend a judgment" within 28 days after a court enters judgment.  *See* Fed. R. Civ. P. 59(e).  Granting such motions "lie[s] within the discretion of the Court."  *Mercy Gen. Hosp. v. Azar*, 410 F. Supp. 3d 63, 70 (D.D.C. 2019).  But such motions are "disfavored," and the movant "bears the burden of establishing extraordinary circumstances warranting relief from a final judgment."  *Id.*  This Court need not grant such a motion unless there is an intervening change in controlling law, new evidence, clear error, or a need to prevent manifest injustice.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  And a Rule 59(e) motion neither provides a chance "to reargue

---

[1]  Aenergy has also unsuccessfully sued GE and its subsidiary, GE Capital EFS Financing, in the District of Connecticut over the same underlying contract dispute.  *See Aenergy, S.A. v. GE Cap. EFS Fin., Inc.*, No. 3:22-CV-1054 (JAM), 2023 WL 4677068 (D. Conn. July 21, 2023) (dismissing on FNC grounds).

A150

facts and theories" previously litigated, nor "is it a vehicle for presenting theories or arguments that could have been advanced earlier." *Rann v. Chao*, 209 F. Supp. 2d 75, 78 (D.D.C. 2002).

In its Rule 59(e) Motion, Aenergy makes three arguments for reconsideration. First, it contends that the Court overlooked evidence postdating the SDNY decision that shows the Angolan judiciary has deprived it of due process. Second, it presents recently obtained evidence supposedly demonstrating that the subject matter of this dispute cannot be litigated in Angola. Last, it argues that the Court failed to hold the Angolan Defendants to their burden of proving that Angola is an adequate alternative forum, and that the location of witnesses favors hearing of the dispute in Angola. *See* Pl.'s Mot. for Recon. (MFR) at 1–2, ECF No. 51. The Court addresses each argument in turn.

## A.

Consider Aenergy's argument that the Court overlooked evidence showing that Angola's courts violate due process and thus are not an adequate alternate forum. MFR at 2–4.

In SDNY, Aenergy presented evidence that an Angolan court oversaw an *ex parte* procedure transferring Aenergy property to a trustee. *Aenergy I*, 2021 WL 1998725, at *13. The district court concluded, however, that this seizure did not render Angola's judicial system inadequate. *Id*. The Second Circuit affirmed. *Aenergy II*, 31 F.4th at 128. Addressing Aenergy's argument that the seized turbines are now being used by state-owned power companies, the Second Circuit concluded that this "suggests at most that the Angolan court's trustee has failed to fulfill its obligations" and that there is "no evidence that Angola's courts cannot . . . address this asserted failure." *Id*. at 132.

3

A151

Aenergy now contends that, after the SDNY dismissal, more turbines were seized *ex parte* from Aenergy and transferred to MINEA, the state utility, which installed them in one of its power plants.  Amended Compl. ¶ 60.  In support of this claim, Aenergy cites its own Amended Complaint and a declaration in which the Angolan Defendants' counsel admits that the trustee permitted the state utility to use the turbines to "avoid dissipation and waste" but denies that the state utility took "permanent possession or title."  Decl. of Henrique Abecasis (Abecasis Decl.) ¶¶ 3–6, ECF No. 54.  While this transfer may have postdated the SDNY case, Aenergy has not shown how this *ex parte* transfer is different from the one that SDNY concluded (and the Second Circuit affirmed) did not violate due process.  *Aenergy I*, 2021 WL 1998725, at *13; *Aenergy II*, 31 F.4th at 132.  Even assuming the trustee's transfer of the turbine was unlawful, Aenergy has not explained why "Angola's courts cannot in appropriate circumstances address this asserted failure."  *Aenergy II*, 31 F.4th at 132.  Because Aenergy merely repeats a previously litigated theory, the Court continues to find Aenergy's due process argument barred by issue preclusion.  *See Aenergy III*, 2023 WL 4075627, at *5.

**B.**

Consider now Aenergy's argument that newly discovered evidence warrants reconsideration.  MFR at 4–6.

Before both SDNY and the Second Circuit, Aenergy argued that Angolan courts did not provide an adequate alternative forum because they would not permit it to seek breach of contract damages.  *See Aenergy I*, 2021 WL 1998725, at *12–13; *Aenergy II*, 31 F.4th at 131.  But the Second Circuit concluded that, even if Aenergy "cannot recover damages on its breach of contract claim against Angola, it has sought equitable contract remedies in Angola, allowing the Angolan court to address the essential subject matter of the dispute."  *Aenergy II*, 31 F.4th at

A152

131.  Considering the same argument, this Court explained that "Aenergy cannot avoid the holding of *Aenergy II*," which "relied on Aenergy's pursuit of equitable remedies in finding that Angolan courts could address the essential subject matter of the dispute." *Aenergy III*, 2023 WL 4075627, at *7.  Because *Aenergy II* necessarily determined that Angolan courts provided an adequate forum for its breach of contract claims, Aenergy was precluded from relitigating that issue before this Court.  *Id.*

Despite all this, Aenergy now doubles down on its argument that Angolan courts do not provide an adequate forum.  As new proof of inadequacy, Aergy points to court documents in which the Angolan government argued that Aenergy could not seek the equitable remedy of reinstatement in Angolan courts when it had conceded the termination of the disputed contracts by seeking damages in SDNY.  *See* Decl. of Kevin D. Benish (Benish Decl.), Ex. A, at ¶64, ECF No. 51-1 (asserting that Aenergy's damages claims were "distinct from th[e] appeal" before the Angolan Supreme Court and "completely incompatible with it.").[2]  Yet this new evidence proves little.  Whether Aenergy may have forfeited certain arguments in Angolan courts by making contradictory arguments in SDNY does not bear on the ultimate adequacy of the alternate forum.  Since this new evidence does not undermine the conclusion that Angolan courts "permit[] litigation of the subject matter of the dispute," *Aenergy II*, 31 F.4th at 130, the Court will not reconsider its issue preclusion holding.

## C.

Lastly, Aenergy argues that the Court did not hold the Angolan Defendants to their burden of showing that Angola is an adequate alternative forum, and that the location of

---

[2]  Though this court filing is dated April 14, 2021, it was not served on Aenergy in June 2023. Benish Decl., Ex. A at 1–2.

witnesses favors hearing of the dispute in Angola.  Because issue preclusion provides an independent basis for dismissal, the Court will not address arguments for reconsidering its alternative dismissal on FNC grounds.  *See Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) (explaining that courts have discretion to determine "whether reconsideration is necessary under the relevant circumstances").

### III.

For these reasons, it is hereby

**ORDERED** that Plaintiff's Motion for Reconsideration is DENIED.

Dated: October 27, 2023

_____

TREVOR N. McFADDEN, U.S.D.J.

6

A154

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AENERGY, S.A.,<br><br>    *Plaintiff*,<br><br>    v.<br><br>REPUBLIC OF ANGOLA; MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA; MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA; EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP; and EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,<br><br>    *Defendants*. | Civil Action No. 1:22-cv-02514-TNM<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that Aenergy, S.A., plaintiff in the above-captioned action, appeals to the United States Court of Appeals for the District of Columbia Circuit from the order of the Hon. Trevor N. McFadden, dated and entered on October 27, 2023 (Dkt. 58), the order and memorandum opinion of the Hon. Trevor N. McFadden, dated and entered on June 20, 2023 (Dkts. 49 and 50), and from any and all adverse rulings incorporated in, antecedent to, or ancillary to either of these two orders and accompanying opinions and orders.  *See* Fed. R. App. P. 4(a)(4)(A).

Dated:  November 27, 2023

Respectfully submitted,

HOLWELL SHUSTER & GOLDBERG LLP

By: ____*/s/ Vincent Levy*____
    Vincent Levy
    Kevin D. Benish
    425 Lexington Avenue, 14th Floor
    New York, NY 10017
    Tel:  (646) 837-5151

1

A155

vlevy@hsgllp.com
kbenish@hsllp.com

*Attorneys for Plaintiffs*

2

A156

**CERTIFICATION**

I hereby certify that on November 27, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*/s/ Vincent Levy*
Vincent Levy

3

A157